KARREN KENNEY, CA. SBN 174872
KENNEY LEGAL DEFENSE
2900 BRISTOL STREET, SUITE C204
COSTA MESA, CA 92626
TELEPHONE: (855) 505-5588
E-MAIL: KARREN.KENNEY@GMAIL.COM

Attorney for Defendant *Jason Fong*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No.: SACR 20-00146-DOC |
| Plaintiff, | ) |
| | ) MOTION TO RECUSE THE |
| | ) HONORABLE DAVID O. CARTER; |
| vs. | ) DECLARATION OF COUNSEL |
| | ) |
| JASON FONG, | ) |
| | ) DATE: August 23, 2021 |
| Defendants. | ) TIME: 1:30pm |
| | ) |
| | ) |

Defendant Jason Fong, by and through his attorney of record Karren Kenney, hereby submits this Motion to Recuse the Honorable David O. Carter. This motion is based upon the attached Points and Authorities, Exhibits, Declarations, and any other evidence that may be presented at the hearing on this motion.

DATED: July 25, 2021                    Respectfully submitted,


                                        /s/ *Karren Kenney*
                                        Karren Kenney
                                        Attorney for Jason Fong

# POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO RECUSE

## I.   INTRODUCTION

Defendant Jason Fong, respectfully moves to disqualify the Honorable David O. Carter from presiding over this case ("*U.S. v. Fong*"). On October 6, 2020, a single count Complaint was filed in the United States District Court for the Central District of California, Southern Division against Fong for violation of 18 U.S.C. § 2339C (c): Concealing the Provision of Material Support and Resources and Funds. The charged conduct concerned a fundraising link related to the Foreign Terrorist Organization (FTO), Hamas, sent by the defendant in a group chat at the request of a government operative.

By way of background, Fong previously served for the United States Marine Corps. (USMC), which he joined in July of 2014. His Marine Corps. Records noted that he was extremely intelligent, determined, and had an enormous potential for growth as a Marine. (See Government Under Seal Filing in Document No. 58 incorporated herein by reference).  Fong was working as an Avionics Maintenance Technician for the Marines up until July of 2020, when he declined to re-enlist for active duty and instead became a Reserve Marine. Fong left the Marine Corps. because he became frustrated with the people and structure of the military. He often made derogatory comments about the intelligence of the people in the Marines and the organization as a whole. December of 2020, Fong was administratively discharged (Other than Honorable) for misconduct from the USMC, due to the pending charges against him.

The Honorable Judge Carter is a former U.S. Marine who served from 1967-1969. *United States. Congress. Senate. Committee on the Judiciary. Confirmation Hearings*

*on Federal Appointments: Hearings before the Committee on the Judiciary, United States Senate, One Hundred Fifth Congress, Second Session, on Confirmation of Appointments to the Federal Judiciary. U.S. G.P.O., 1998.* Judge Carter is a Vietnam war veteran who fought in the infamous battle of Khe Sanh. Baroni, Michael L., *Judge Carter: Fighter on a Hill*, OC Bar President's Page (2017). He was medically discharged as a First Lieutenant after being wounded by a grenade blast, shot in the arm, and struck by flying shrapnel during battle. *Id.* He received a Bronze Star medal and two Purple Hearts for his service. Judge Carter is a proud veteran and patriot. *Id.* In a showcase piece of Judge Carter, Michael Baroni of the Orange County Bar Association described Judge Carter's chamber's as "a showcase of patriotism, no-nonsense bravery, and daring adventures. Military memorabilia abounds...." *Id.*

Movant applauds and thanks Judge Carter for his honorable service. However, under these circumstances, 28 U.S.C. § 455(a) requires Judge Carter's recusal from *this case*. This motion is based on statements by Judge Carter made during the April 2, 2021 hearing for review of the magistrate court's order setting bond conditions, and the apparent bias towards Mr. Fong given the defendant's alleged conduct. This coupled with Judge Carter's military history, an observer could reasonably question Judge Carter's impartiality in presiding over this case. *See U.S. v. Nelson,* 718 F.2d 315, 321 (9th Cir.1983). Due process entitles Jason Fong to a "proceeding in which he may present his case with assurance" that no member of the court is "predisposed to find against him." *See Williams v. Pennslyvania*, 136 S.Ct. 1899, 1910 (2016); *Citing Marshall v. Jerrico*, Inc., 446 U.S. 238, 242 (1980).

/ / /

## II. DISQUALIFICATION UNDER SECTION 455:

### A. 28 U.S.C. §455(a):

Section 455(a) states that "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality may be reasonably questioned." 28 U.S.C. §455(a). The legal standard is an objective one which involves determining "whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Nelson*, 718 F.2d at 321. Judicial rulings alone do not meet the threshold for recusal **unless they are accompanied by surrounding opinions and comments or "they evidence such deep-seated favoritism or antagonism as would make a fair judgement impossible**." *Liteky v. U.S.*, 510 U.S. 540, 541 (1994) [emphasis added].

### B. 28 U.S.C. 455(b):

Section 28 U.S.C. 455(b) lists five specific circumstances in which recusal is required. One of these circumstances requires a judge to disqualify himself when he has "a personal bias or prejudice concerning a party." 28 U.S.C. 455(b)(1). A personal bias is distinguishable from a judicial bias, personal bias must "arise out of the judge's background and association and not from the judge's view of the law." *U.S. v. Story*, 716 F.2d 1088, 1090 (6th Cir. 1983). It has been defined as a bias that is "more particularized" than the normal, general opinions held by society. *See Mims v. Shapp*, 541 F.2d 415, 417 (3d Cir. 1976). Under Section 455(b**) the appearance of partiality is sufficient to establish grounds for recusal under 455(a) absent actual bias.** *See U.S. v. Sibla*, 624 F.2d 864, 867 (9th Cir. 1980) [emphasis added].

### III. DISCUSSION

A.  Biased Statements Made by Judge Carter Toward Fong

On April 2, 2021 a hearing for the review of the magistrate's order was held to discuss Jason Fong's eligibility for bail. Throughout the hearing, Judge Carter made hostile comments that revealed his personal bias against the defendant and his lack of impartiality due to his military background.  [See attached **Exhibit A** – April 2, 2021 Reporter's Transcript (RT)].

During the April 2, 2021 hearing, Judge Carter stated the following:

"First of all, you should be extremely proud of your service in the United States Marine Corps. But, as such, you represent that unique American who may've entered under patriotic desire on behalf of our country. But any Marine is extraordinarily well-trained in combat. If you recall your heritage, it's that you're an infantry person first, no matter what MOS is designated for you. You can be a cook and, unlike any other branch of the service, you're still called upon to defend that perimeter as a rifleman, so there's no specialization. And therefore, you're an excellent marksman. You're trained in bomb techniques. You're trained in putting together an IED or a bomb. You represent that unique ability, quite frankly, to turn that corner, and rightfully so, on behalf of the country when it's called upon, from that of an ordinary system [sic], into a person of extreme violence. You're to be commended for your service. By the same token, you represent an extraordinary combination of combat skills that the average American exercising their First Amendment rights don't have." (April 2, 2021 RT 62:4-23.)

/ / /

Judge Carter continued by stating:

> And you planned on leaving the military, which you're entitled to do --- because the U.S. Army are terrorists, and so are the Marines." (RT 66:13-15.)

This commentary by Judge Carter directed at Fong was in reference to a comment Fong previously made in a group chat (which was produced in discovery and provided to Judge Carter in the Government's filings) that equated the Marines to terrorists. These comments by Judge Carter were not due to reading from an exhibit presented before the court, but rather from the Judge looking at the defendant during the hearing, and mocking the defendant's opinion as stated in chats contained in the Government's discovery. Judge Carter's attitude towards the defendant belies a hostility that a "fair-minded person could not entirely set aside". *U.S. v. Conforte*, 624 F.2d 869, 881 (9th Cir. 1980).  Even if Judge Carter's comments do not rise to the level of actual bias, appearance of partiality "is as dangerous as the fact of it." *Herrington v. Sonoma Cnty.*, 834 F.2d 1488, 1502 (9th Cir. 1987).

Throughout the remainder of the hearing Judge Carter made statements while looking directly at Mr. Fong, that clearly establish his military-based bias.  As an example, Judge Carter stated at one point during the hearing:

> "On April 1st, 2020, you posted to mujahideen in America, once again, regarding the making of chemical weapons and improvised explosive devises, and this included instructions on "how to make mortar scrap mines, nail grenades" -- Unfortunately, the Court understands that very, very well. "-- sodium chlorate and sugar or aluminum explosives" -- Now, this isn't some farfetched recipe. This is right down the line with military training. This isn't fiction." (RT 71:13-23.)

This was followed by:

> "Not in the military, might think this is fiction. But for anybody in the military, you've got the rare combination of knowledge and capability. (RT 72:6-9.)

Judge Carter  further commented:

> "I was curious because I didn't have a clear picture from the warrant. I had a picture and I had a description, but I wanted to verify that not only did you have that AR-15, you had it, what I call, "banana clipped." And in the Marine Corps we know what that is: : Two magazines taped back-to-back so, in combat, you can shove the first "20 round" in, flip that magazine, flip it upside down, and we're ready to go with 20 more rounds. Civilian world, they don't have an idea what I'm saying, but in the Marine Corps, understand it very well." (RT 73:25-74:10.)

Judge Carter views Fong through a lens of his personal military experience, not an impartial trial judge. This is a biased viewpoint, seeing as the defendant (who is charged with terrorism) and Judge Carter served in the Marine Corps. at very different times in history. Instead of confirming with Fong whether he knew these statements to be true based on his Marines experience, he instead stated, "I don't want you to speak to me." (RT 66:11-12.).  Judge Carter reached conclusions about the dangerousness of the defendant based on his personal disposition. Personal bias has been defined as arising out of a "judge's background and association." *Story*, 716 F.2d at 1090. It is clear that Judge Carter's Marines background and military ties predispose him to view Fong and his alleged conduct in a partisan manner.

Finally Judge Carter concluded the hearing by stating directly to Fong:

"I find you an extraordinary risk beyond clear and convincing, in fact, beyond a reasonable doubt, and that there are no combinations at this time or conditions that would reasonably address the danger you present" (RT 75:1-4).

Judge Carter's comments towards Fong would sway a reasonable average person to question on the basis of appearances, whether the final result in the present action is foreordained. He went beyond the culpability level necessary for the hearing before him. Judge Carter claimed that Fong was a dangerous risk with the highest legal standard in the American judicial system, clearly convicting Fong before he even has a jury trial. It is hard to see how Fong could obtain an impartial trial in which the trial judge is empowered to render evidentiary rulings, after the judge has already convicted him "beyond a reasonable doubt" as to his alleged dangerousness. Judge Carter asserted there were no conditions that would address the danger Fong presents. However, the Ninth Circuit recently reversed Judge Carter's detention order explaining that Judge Carter failed to make clear why specific pretrial conditions were inadequate. (See **Exhibit B** – Ninth Circuit Order). His lack of an explanation to the Ninth Circuit further demonstrates the personal military-based bias Judge Carter possesses towards Fong.

In light of Judge Carter's background, extrajudicial military knowledge, and remarks made specifically to Fong during the hearing for the review of the magistrate's order setting bond conditions, a reasonable observer would conclude that Judge Carter is biased towards Fong. He has shown a high degree of antagonism against the defendant and his alleged crimes that would make a fair judgement clearly impossible. *See Liteky*, 510 U.S. at 541. As in *In re Marshall*, "if the appearance of bias or prejudice is a close call, recusal is appropriate." *In re Marshall*, 403 B.R. 668, 679 (C.D. Cal

2009). This is not a close call. Fong is entitled to present his defense with the assurance that the judicial officer presiding over the matter is not predisposed to find against him. *See Williams*, 136 S.Ct. at 1910.

## **CONCLUSION**

Based upon the foregoing, Mr. Fong's due process rights, including the right to a fair and impartial judge, would be violated if Judge Carter remains on this case. Therefore, Fong respectfully requests Judge Carter be recused from further proceedings on this case.

DATED:  July 25, 2021                          Respectfully submitted,

*Karren Kenney*
Karren Kenney
Attorney for Jason Fong

# DECLARATION OF COUNSEL

I, Karren Kenney, declare the following:

1.  I am the attorney of record for Jason Fong in this matter.

2.  Attached hereto as Exhibit A is a true and correct copy of the Reporter's
    Transcript for the April 2, 2021 proceedings referenced in the motion.

3.  Attached hereto as Exhibit B is a true and correct copy of the Ninth Circuit Court
    of Appeal's July 21, 2021 Order reversing and remanding Judge Carter and his
    detention order.

I declare under penalty of perjury, under the laws of the United States that the foregoing
is true and correct.

DATED: July 25, 2021


*Karren Kenney*
Karren Kenney

EXHIBIT A

1        **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    - - - - - - -

5    UNITED STATES OF AMERICA,        )
                                      )    <u>**CERTIFIED**</u>
6            Plaintiff,               )
                                      )
7        vs.                          )  No. 8:20-cr-00146-DOC-1
                                      )     Item Number 1
8    JASON FONG, also known as        )
     asian_ghazi,                     )
9                                     )
             Defendant.               )
10   _____ )

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16    Government's Request [41] for Review of Magistrate Order

17                 Santa Ana, California

18                 Friday, April 2, 2021

19

20

21

22   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-8141

25

**Certified for Law Office of Edward M. Robinson**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**

1     **APPEARANCES OF COUNSEL:**

2

3    FOR THE UNITED STATES OF AMERICA:

4        DEPARTMENT OF JUSTICE
       OFFICE OF THE UNITED STATES ATTORNEY
       Terrorism and Export Crimes Section

5        BY:  Mark P. Takla
          Assistant United States Attorney

6        411 West 4th Street
       8th Floor

7        Santa Ana, California 92701
       714-338-3591

8        mark.takla@usdoj.gov

9

10    FOR DEFENDANT JASON FONG, also known as asian_ghazi:

11        Karren Kenney (retained)
       KENNEY LEGAL DEFENSE CORPORATION

12        5000 Birch Street - West Tower Suite 3000
       Newport Beach, California 92660

13        855-505-5588
       karren.kenney@gmail.com

14    ALSO PRESENT:

15        Terry Ginsburg, Supervising Probation Officer

16        Nicholas Walker, Probation Officer

17

18

19

20

21

22

23

24

25

1                            **I N D E X**

2    **PROCEEDINGS**                              **PAGE**

3    REVIEW OF MAGISTRATE ORDER
     PURSUANT TO GOVERNMENT REQUEST [41]

4

5    Appearances                                  4

6    Initial Remarks by the Court                 5

7    Government's Position                        5

8    Defense position                           19

9    Court's findings                           60

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, FRIDAY, APRIL 2, 2021**             |
|       | 2  | **Item Number 1**                                            |
|       | 3  | (11:28 a.m.)                                                  |
| 11:34 | 4  | THE COURT:  Call the matter of 20-00146,                     |
|       | 5  | United States v. Jason Fong.                                 |
| 11:34 | 6  | **APPEARANCES**                                              |
| 11:34 | 7  | THE COURT:  And we'll begin with the government's            |
|       | 8  | appearance.                                                  |
| 11:34 | 9  | Mr. Takla.                                                   |
| 11:34 | 10 | MR. TAKLA:  Good morning, Your Honor.  Mark Takla            |
|       | 11 | on behalf of the United States.                              |
| 11:34 | 12 | THE COURT:  Ms. Kenney.                                       |
| 11:34 | 13 | MS. KENNEY:  Good morning, Your Honor.  Karren               |
|       | 14 | Kenney on behalf of Mr. Fong.  He's present in court in      |
|       | 15 | custody.                                                     |
| 11:35 | 16 | Also present is my client's --                               |
| 11:35 | 17 | THE COURT:  Have a seat for just a moment.  That's           |
|       | 18 | an order.  Sit down.  And then move the microphones closer   |
|       | 19 | to you.  And we'll just use it as a state court process      |
|       | 20 | because when you stand -- I appreciate the courtesy, but I'm |
|       | 21 | going to change my whole courtroom around concerning COVID.  |
|       | 22 | So by staying seated, Debbie can hear you.  You don't have   |
|       | 23 | to go to the lectern, and we can clean the microphone each   |
|       | 24 | time for the next party.                                     |
| 11:35 | 25 | So pretend we're back in state court.  Okay?                 |

| | | |
|---|---|---|
| 11:35 | 1 | MS. KENNEY:  Thank you, Your Honor. |
| 11:35 | 2 | Karren Kenney on behalf of Jason Fong.  He's |
| | 3 | present in court in custody.  Also present is my client's |
| | 4 | family:  His father, his mother and his sister. |
| 11:35 | 5 | And I do wanna make, uh -- for the record, there |
| | 6 | apparently seems to be several agents that are also present |
| | 7 | that were involved in this case, that are sitting on -- to |
| | 8 | my right. |
| 11:35 | 9 | THE COURT:  All right. |
| 11:35 | 10 | And I've read it before, but we're gathering the |
| | 11 | search warrant, once again, as we speak. |

11:36     12                    **INITIAL REMARKS BY THE COURT**

| | | |
|---|---|---|
| 11:36 | 13 | THE COURT:  I've already made a determination that |
| | 14 | Mr. Fong does not present a flight risk.  But now we're on |
| | 15 | the dangerousness aspect.  So I don't care which counsel |
| | 16 | addresses the Court.  We're going to have a number of |
| | 17 | rounds, and you can call witnesses, if you'd like to. |
| 11:36 | 18 | MR. TAKLA:  Your Honor, I'll start since it's my |
| | 19 | motion. |
| 11:36 | 20 | THE COURT:  Please. |

11:36     21                    **GOVERNMENT'S POSITION**

| | | |
|---|---|---|
| 11:36 | 22 | MR. TAKLA:  Your Honor, the government strongly |
| | 23 | believes that the defendant is a danger to the community. |
| | 24 | He's exhibited all the warning signs of violence. |
| 11:36 | 25 | On February 13, before COVID even -- |

| | | |
|---|---|---|
| 11:36 | 1 | THE COURT:  Now, I'm going to slow you way down |
| | 2 | Okay? |
| 11:36 | 3 | All right.  Thank you.  February 13th. |
| 11:36 | 4 | MR. TAKLA:  Before -- before COVID started, he |
| | 5 | stated: |
| 11:36 | 6 | "I have the money saved for equipment |
| | 7 | because I planned on dying here |
| | 8 | violently." |
| 11:36 | 9 | THE COURT:  Now, I want you to get that document |
| | 10 | that you -- because we've got a myriad of documents now. |
| 11:36 | 11 | Show that to me. |
| 11:36 | 12 | MR. TAKLA:  Your Honor, that's in the search |
| | 13 | warrant affidavit, which is Exhibit A. |
| 11:36 | 14 | THE COURT:  Okay.  Now, just a moment. |
| 11:36 | 15 | We're going to pull that up, Kelly.  And while |
| | 16 | we're doing that, I've looked at it before, and read it off |
| | 17 | the record.  Now I'm going to get a paper copy and you're |
| | 18 | going to show me the page in just a moment. |
| 11:37 | 19 | THE CLERK:  It's 65 pages. |
| 11:37 | 20 | THE COURT:  It can be 5,000 pages. |
| 11:37 | 21 | THE CLERK:  Just give me a minute. |
| 11:37 | 22 | THE COURT:  Kelly, give me the first portion as it |
| | 23 | comes off the press. |
| 11:38 | 24 | *(Documents provided to the Court.)* |
| 11:39 | 25 | THE COURT:  Thank you, Kelly. |

| | | |
|---|---|---|
| 11:39 | 1 | I want to ask, Mr. Walker, if he's submitted any |
| | 2 | additional paperwork. |
| 11:39 | 3 | P.O. WALKER:  Good morning, Your Honor.  Pretrial |
| | 4 | Services has not submitted any additional paperwork. |
| 11:41 | 5 | THE COURT:  Thank you.  All right. |
| 11:53 | 6 | All right.  Counsel, thank you. |
| 11:53 | 7 | I have read this a number of times off of the |
| | 8 | site, but I wanted to get a paper copy.  And in particular, |
| | 9 | amongst other pages, I finally found what I was looking for. |
| 11:53 | 10 | It's going to be on page 28, and one of the many |
| | 11 | statements I'm going to focus on is the February 13, 2020, |
| | 12 | Instagram group chat where Fong posted, quote: |
| 11:53 | 13 | "I have money saved up for equipment I |
| | 14 | need because I plan on dying here |
| | 15 | violently, initially." |
| 11:54 | 16 | Still not opposed to it.  I still hold to my |
| | 17 | finding that he's not a flight risk.  Everything that I've |
| | 18 | read in these documents, Counsel, indicated he was staying |
| | 19 | in the United States, and whatever activity he was going to |
| | 20 | be involved in was in the United States, although there's |
| | 21 | indication of training in Syria or going overseas.  I don't |
| | 22 | see the further act of completion, like Badawi or Elhuzayel, |
| | 23 | going to the airport or purchasing tickets. |
| 11:54 | 24 | I am extraordinarily concerned about the |
| | 25 | dangerousness aspect.  So on the defense side, I'm going to |

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | have quite a few questions especially in light of the last           |
|       | 2  | question I asked; and that is, at the time of apprehension,           |
|       | 3  | he was found, I believe, with an AR-15 or assault rifle that          |
|       | 4  | was loaded.                                                           |
| 11:54 | 5  | All right.  Counsel, please continue on behalf of                    |
|       | 6  | the government.                                                       |
| 11:54 | 7  | MR. TAKLA:  Thank you, Your Honor.                                    |
| 11:54 | 8  | Additionally, in addition to that statement, he                      |
|       | 9  | stated, with respect to the LGBTQ community:  They must be            |
|       | 10 | eradicated.                                                           |
| 11:55 | 11 | He also stated he wanted to hunt down a teacher                      |
|       | 12 | that he thought was a pedophile.  He stated --                        |
| 11:55 | 13 | THE COURT:  I want a better record of this.  I                       |
|       | 14 | want the page that you're referring to and the warrant or            |
|       | 15 | where I would find that information.                                  |
| 11:55 | 16 | I've read it now three times.                                        |
| 11:55 | 17 | MR. TAKLA:  Yes, Your Honor.                                          |
| 11:55 | 18 | THE COURT:  Doesn't mean I can rapidly find it in                    |
|       | 19 | a 60-page warrant.                                                    |
| 11:55 | 20 | Slow down.  Go back and give me the page numbers.                    |
| 11:55 | 21 | MR. TAKLA:  Yes, Your Honor.  And I'munna be re --                    |
|       | 22 | relying on, uh, the right-hand, bottom page numbers since             |
|       | 23 | there're --                                                           |
| 11:55 | 24 | THE COURT:  Thank you.                                                |
| 11:55 | 25 | MR. TAKLA:  -- multiple page numbers.                                 |

| | | |
|---|---|---|
| 11:55 | 1 | So for those three statements that I just made, |
| | 2 | that is on page 28. |
| 11:55 | 3 | THE COURT:  All right. |
| 11:55 | 4 | So would that be subsection (b), that: |
| 11:55 | 5 | "DT stated that Fong was prepared |
| | 6 | document defend him if people started |
| | 7 | rioting or the government failed.  And |
| | 8 | DT stated that Fong had loaded weapons |
| | 9 | next to his bed and had told or |
| | 10 | explained to DT that he had them in case |
| | 11 | he needed to respond quickly." (As |
| | 12 | read.) |
| 11:56 | 13 | MR. TAKLA:  Actually, no, Your Honor. |
| 11:56 | 14 | THE COURT:  Just a moment, Counsel. |
| 11:56 | 15 | "DT observed several weapons in Fong's |
| | 16 | bedroom at his home in Irvine, |
| | 17 | California.  DT knew Fong stored his |
| | 18 | AR-looking rifle in -- on a mount next |
| | 19 | to his bed with a magazine loaded into |
| | 20 | the weapon.  Fong stated he had 30-round |
| | 21 | magazines for his AR-15 that were |
| | 22 | non-California compliant." |
| 11:56 | 23 | So let me go back to my questions now. |
| 11:56 | 24 | I want to hear again a description of what was |
| | 25 | found in the bedroom and in what condition and where this |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | was located.                                                 |
| 11:56 | 2  | MR. TAKLA:  Yes, Your Honor.                                 |
| 11:56 | 3  | That is on page 35 of the search warrant --                  |
| 11:56 | 4  | THE COURT:  Okay.  Just --                                    |
| 11:56 | 5  | MR. TAKLA:  -- the search warrant affidavit, using           |
|       | 6  | the bottom --                                                |
| 11:56 | 7  | THE COURT:  Thank you.                                        |
| 12:00 | 8  | MR. TAKLA:  -- right-hand numbers.                            |
| 11:56 | 9  | THE COURT:  Thank you.                                        |
| 11:56 | 10 | MR. TAKLA:  So in --                                          |
| 11:56 | 11 | THE COURT:  Thank you, Counsel.  That means stop.            |
|       | 12 | I'll tell you when to speak again.                           |
| 12:00 | 13 | All right.  On page 33 -- I didn't have the                 |
|       | 14 | warrant in front me on the last occasion, which is why I    |
|       | 15 | struggled with the exact condition of the bedroom.  And this |
|       | 16 | was shown to me -- thank you -- on the last occasion.        |
| 12:00 | 17 | It states, in Paragraph 29, subsection (a):                 |
| 12:00 | 18 | "In Fong's bedroom, law enforcement                          |
|       | 19 | found an un-serialized AR-15 assault                         |
|       | 20 | rifle, a bolt action rifle with a scope,                     |
|       | 21 | two handguns, nine high-capacity handgun                     |
|       | 22 | and rifle magazines and several thousand                     |
|       | 23 | rounds of ammunition.  The AR-15 type                        |
|       | 24 | assault rifle was found on an improvised                     |
|       | 25 | rifle rack on the side of [the] bed."                        |

|       |    |                                                        |
|-------|----|--------------------------------------------------------|
|       | 1  | (As read.)                                             |
| 12:01 | 2  | Now, just one moment.  There it is.  And it goes       |
|       | 3  | on to state that it was,                               |
| 12:01 | 4  | "-- loaded with a round in the chamber                 |
|       | 5  | and a high-capacity magazine with a                    |
|       | 6  | second high-capacity magazine taped to                 |
|       | 7  | it."                                                   |
| 12:01 | 8  | Which must've caused extreme concern because of        |
|       | 9  | his willingness or statements to kill a police officer on |
|       | 10 | the spot, and also the capability of violence because these |
|       | 11 | weapons are locked and loaded and ready to go.         |
| 12:01 | 12 | Now, just a moment.                                    |
| 12:01 | 13 | So what I'm going to assume is this:  In those two     |
|       | 14 | magazines -- were they taped back to back?             |
| 12:02 | 15 | On an AR-15 or an old M16.  You can take those         |
|       | 16 | magazines and tape them so it gives 20 plus 20, if you spin |
|       | 17 | it quickly.                                            |
| 12:02 | 18 | Is that what was occurring here?                       |
| 12:02 | 19 | MR. TAKLA:  Your Honor --                              |
| 12:02 | 20 | THE COURT:  What was the capability?  Did he have      |
|       | 21 | 40 rounds ready to go, two magazines of approximately 20 |
|       | 22 | each?                                                   |
| 12:02 | 23 | MR. TAKLA:  Correct.  And I need to check with --      |
| 12:02 | 24 | THE COURT:  Thank you.  The answer's yes.              |
| 12:02 | 25 | All right.  Counsel, please continue.  I'll turn       |

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | it back to you now.                                                |
| 12:02 | 2  | MR. TAKLA:  Thank you, Your Honor.                                 |
| 12:02 | 3  | Again, going back to the defendant's statements --                |
|       | 4  | and this is on page 15 of the search warrant affidavit -- he      |
|       | 5  | stated that dying like a martyr sounded better than an            |
|       | 6  | earthly marriage.                                                  |
| 12:02 | 7  | Also, on page 15, he said:                                         |
| 12:02 | 8  | "I pray to Allah every night that I                               |
|       | 9  | can become *shaheed* instead of die                               |
|       | 10 | peacefully."                                                       |
| 12:03 | 11 | On page 29, he stated:                                            |
| 12:03 | 12 | "I am done [sic].  I am only here in                              |
|       | 13 | America for the violence right now."                             |
| 12:03 | 14 | On page 29, he stated:                                            |
| 12:03 | 15 | "Time to remove our government.  I                               |
|       | 16 | would actually wage *jihad* against the                          |
|       | 17 | United States [sic]."  (As read.)                                |
| 12:03 | 18 | Also on page 29, referring to the company that he                 |
|       | 19 | worked for, because he missed prayer:                             |
| 12:03 | 20 | "F this place.  I am going to kill                               |
|       | 21 | these Fs."  (As read.)                                           |
| 12:03 | 22 | And on page 31, he told a Marine Corps associate                  |
|       | 23 | he would not hesitate to shoot a police officer who was just      |
|       | 24 | doing his job.                                                    |
| 12:03 | 25 | Now, as the Court is concerned, Your Honor, the                   |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | government is also concerned that this rhetoric is very,     |
|       | 2  | very scary.  It's particularly scary when it comes from a   |
|       | 3  | U.S. service member who's been trained in combat.           |
| 12:03 | 4  | The fact that the defendant had a ghost gun, which          |
|       | 5  | was untraceable, that he built himself, and illegal under   |
|       | 6  | state law is also very concerning.  He had nine            |
|       | 7  | high-capacity magazines, which were also illegal under state |
|       | 8  | law.                                                         |
| 12:04 | 9  | And the removal of the guns from his house and             |
|       | 10 | firearm restrictions are just not enough for this case,      |
|       | 11 | because defendant has demonstrated an ability to be able to  |
|       | 12 | purchase an untraceable ghost gun and make it into a         |
|       | 13 | California illegal assault rifle.                            |
| 12:04 | 14 | Firearm restrictions only work if there's trust in         |
|       | 15 | the defendant that he's not gonna violate those              |
|       | 16 | restrictions.  And searches all day long are not gonna      |
|       | 17 | protect the public if the defendant chooses to build another |
|       | 18 | ghost gun that's untraceable and keep it.                    |
| 12:04 | 19 | Defendant also had a gas mask and body armor in            |
|       | 20 | his bedroom.  The argument that those are souvenirs is      |
|       | 21 | absurd 'cause the Marine Corps doesn't allow service members |
|       | 22 | to keep body armor and gas masks.                           |
| 12:05 | 23 | What the government submits is that is in keeping           |
|       | 24 | with his very first statement on February 13th, when he      |
|       | 25 | said:                                                        |

| | | |
|---|---|---|
| 12:05 | 1 | "I have money saved for equipment |
| | 2 | because I planned on dying here |
| | 3 | violently." |
| 12:05 | 4 | That's the type of equipment somebody might want |
| | 5 | to get. |
| 12:05 | 6 | Your Honor, there's also some evidence that the |
| | 7 | defendant has an inability to cope with negativity.  When he |
| | 8 | was restricted from being able to pray, his response was, |
| | 9 | "I'm going to kill these Fs."  That's not a normal response. |
| 12:05 | 10 | His Marine Corps associate also said he had anger |
| | 11 | issues.  And, Your Honor, there's additional evidence that's |
| | 12 | not in the search warrant affidavit that I do wanna proffer |
| | 13 | that I think is important on this issue because, in 2017, |
| | 14 | defendant's family called the Irvine Police Department |
| | 15 | because they were concerned with defendant's activities. |
| 12:06 | 16 | MS. KENNEY:  Your Honor, I'm sorry.  At this |
| | 17 | point, I'munna have to at least lodge an objection for |
| | 18 | purposes of making a clean record. |
| 12:06 | 19 | This information that's now being proffered by the |
| | 20 | government was not provided.  I don't have anything from the |
| | 21 | Irvine Police Department in regards to a 2017 call. |
| 12:06 | 22 | THE COURT:  Thank you. |
| 12:06 | 23 | Please continue. |
| 12:06 | 24 | MR. TAKLA:  Thank you, Your Honor. |
| 12:06 | 25 | And that, uh, was disclosed in the discovery. |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

15

12:06    1              But in 2017, defendant's sister called the Irvine

         2     Police Department because he had punched two holes in two

         3     doors at their residence.  Defendant's sister was so

         4     concerned about it that she waited to call the police at a

         5     time when the defendant was not in the residence.

12:06    6              The sister reported that, "When defendant gets

         7     angry, he goes to his room and loads and unloads firearms to

         8     calm down."  His family reported he's got anger management

         9     issues.  And his mother reported that she did not approve of

        10     weapons in the house in 2017.

12:07   11              Now, they declined to press charges and the Irvine

        12     Police Department just reported it and took some pictures.

        13     But what this shows, Your Honor, is that defendant's house

        14     is probably not the best place for him.  His parents don't

        15     have an ability to control him.

12:07   16              There is a real danger here, Your Honor.  From the

        17     defendant's rhetoric, these are all the warning signs.  I

        18     hesitate to say his family's in danger, but there is a

        19     history.  And this household seems to intensify his anger.

12:07   20              I also note, Your Honor, that defendant's fellow

        21     service members could be in danger here too.  He stated that

        22     he believes that the Marines and the Army were terrorists.

        23     And despite the fact that he's no longer in the Marine

        24     Corps, it's not difficult to get on a military base without

        25     a military ID.

|       |    |                                                               |
|-------|----|---------------------------------------------------------------|
| 12:08 | 1  | Now, Your Honor, I want to clarify one question               |
|       | 2  | I -- that you had last time for me about his contact with     |
|       | 3  | individuals overseas.  Uh, he did report to other people in   |
|       | 4  | the group chat that he'd been offered a position as a         |
|       | 5  | trainer.                                                      |
| 12:08 | 6  | THE COURT:  Trainer.  Right.                                  |
| 12:08 | 7  | MR. TAKLA:  That's on page 20 of the search                   |
|       | 8  | warrant affidavit.                                            |
| 12:08 | 9  | Now, ultimately, the FBI did not find any                     |
|       | 10 | corroboration of that.  But they did find that the defendant  |
|       | 11 | had deleted some chats and deleted some messaging apps, and   |
|       | 12 | so we think that was correct.  Uh, we just didn't find any    |
|       | 13 | independent evidence of it.                                   |
| 12:08 | 14 | And I haven't even got to the most important                  |
|       | 15 | chargeable conduct yet, Your Honor, and that's defendant's    |
|       | 16 | distribution of IED-making instructions to people who he      |
|       | 17 | thought were gonna engage in bad actions.  And this is on     |
|       | 18 | page 25 and 26 of the search warrant affidavit.  I'm gonna    |
|       | 19 | walk through the timeline.                                    |
| 12:09 | 20 | On March 4th, the minor stated he was gonna go                |
|       | 21 | fight for a foreign terrorist organization.  That             |
|       | 22 | organization is HTS.                                          |
| 12:09 | 23 | On March 17th, two weeks later, the defendant                 |
|       | 24 | provided to the individuals in the group chat, including      |
|       | 25 | that minor, information to make IED's and chemical weapons.   |

12:09  1           One week later, the minor stated he was planning

2     on blowing up Kessler Air Force Base in Alabama.  And

3     immediately the defendant provided to the minor and

4     individuals in the group chat tactical information on

5     entering buildings.  So when you walk up to a building, how

6     to use the door and the building to shield yourself when you

7     enter.

12:09  8           Now, defendant later stated he thought the minor

9     was joking.  But he also stated that, if the minor wanted to

10    commit an attack in the United States, he would not do

11    anything; he would stand back.

12:10  12          Now, I want to stop right here, Your Honor.

12:10  13          Defendant's the adult.  He was 24 years old.  He's

14    a U.S. service member.  And a minor says, "I'm going to blow

15    up an Air Force Base."  And he's not sure whether the

16    minor's joking.  Defendant does nothing to dissuade the

17    minor; and instead, five days later, again provides

18    IED-making information to the minor and other people on that

19    group chat.  And he said, "We're gonna keep this information

20    on this chat as a library."

12:10  21          Now, ultimately when interviewed by law

22    enforcement, defendant stated that he thought the

23    information -- the IED-making information and chemical

24    weapons information -- would be used by the minor in Syria

25    in favor of a foreign terrorist organization, HTS, to commit

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

18

```
 1   ambushes.  So when he sent that information, he thought that
 2   information was gonna be used on behalf of a foreign
 3   terrorist organization.
12:11  4          And then we get to the charged conduct here,
 5   Your Honor, which is arguably the most minor of the stuff
 6   that I've spoken about already, particularly on the issue of
 7   danger, where he sent out a solicitation link to several
 8   individuals on a group chat, a link where they can donate to
 9   Hamas, which is another foreign terrorist organization.  He
10   said the money would be used to fight Israel.
12:11 11          And when he was interviewed by law enforcement, he
12   admitted to saying -- to researching Hamas, knowing Hamas
13   was a foreign terrorist organization, and wanted to solicit
14   money for Hamas so that they could fight Israel.
12:11 15          Your Honor, these aren't normal statements people
16   make, even in the time of COVID, and it's certainly not
17   normal for a U.S. service member who's been trained in
18   combat, to do.
12:12 19          Defendant is absolutely dangerous.  He's a trained
20   marine who believes that the Marines are the terrorists.
21   And he's expressed hatred and violence against various parts
22   of the community, including the U.S. Government, the LGBTQ
23   community, a high school teacher, and law enforcement.
12:12 24          Defendant's danger is not possible to mitigate
25   with conditions.  The ability to get an untraceable firearm
```

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | is not something that a condition can prevent.  And                  |
|       | 2  | defendant expressed an interest in dying violently.                  |
| 12:12 | 3  | Unlike the Badawi and Elhuzayel case, Your Honor,                    |
|       | 4  | those defendants were planning on committing acts abroad.            |
|       | 5  | And in that scenario, the FBI has a little bit more liberty          |
|       | 6  | to be able to catch them at the airport, wait till they buy          |
|       | 7  | plane tickets, um, wait till they go ahead and do the steps          |
|       | 8  | that they need in order to commit their activities, because          |
|       | 9  | the conduct that they're worried about is going to be                |
|       | 10 | abroad.                                                              |
| 12:13 | 11 | Defendant's conduct is here.  And those aren't                       |
|       | 12 | steps that the FBI and Pretrial Services can mitigate.               |
|       | 13 | Because if defendant wants to commit an act, he can do it.           |
|       | 14 | He's got the training, the background.  And, unfortunately,          |
|       | 15 | even in the last few weeks, we've seen a lot of gun                  |
|       | 16 | violence.  These are the warning signs, Your Honor.                  |
| 12:13 | 17 | And for those reasons, the government believes                       |
|       | 18 | he's a danger.                                                       |
| 12:13 | 19 | THE COURT:  All right.  Thank you.                                   |
| 12:13 | 20 | Let me turn to the defense, please.                                  |
| 12:13 | 21 | Ms. Kenney.                                                          |
| 12:13 | 22 | MS. KENNEY:  Yes, Your Honor.                                        |
| 12:13 | 23 | **DEFENSE POSITION**                                                 |
| 12:13 | 24 | MS. KENNEY:  I would just like to start with                         |
|       | 25 | stating that I believe Judge Scott properly granted bond for         |

1   Mr. Fong.  And the information that I provided to her in the

2   February 26th, '21 hearing, I'm assuming the Court has also

3   reviewed.

12:14   4           Your Honor, in regards to the burden of

5   establishing dangerousness that the government has, at this

6   point I think the government is overreaching and taking

7   things out of context.  They're relying on a search warrant

8   that contains multiple levels of hearsay, without actually

9   referencing any of the specific chats and any of the actual

10   transcripts of these interviews that they're claiming

11   support what they're saying.

12:14   12          I keep saying this:  Things are being taken out of

13   context.

12:14   14          I've objected to just the information in the

15   search warrant because it contains multiple layers of

16   hearsay.  They're relying on an interview that an officer

17   did of someone who was an associate of Mr. Fong's, and

18   they're relying on chats, some of which were in Russian --

19   and somebody apparently tried to transcribe them and put

20   their transcriptions in the pictures of the chats.

12:15   21          Again, I object.  I don't -- I don't know how

22   valid those transcriptions are.  I do know, 'cause I have

23   come from Russian descent, Russian does not translate

24   word-for-word into the English language.  There's some sort

25   of -- the person translating it has to, uh, decide exactly

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | what's being said in terms of putting it from Russian to     |
|        | 2  | English.  So I don't agree with all of these translations.   |
| 12:15  | 3  | I don't have somebody that I can, um, bring in               |
|        | 4  | to -- bring into this Court, at least for purposes of this   |
|        | 5  | hearing, to tell the Court if they're valid or not.  So I at |
|        | 6  | least want that on the record.  I'm not agreeing that the    |
|        | 7  | translations that they're relying upon that were in Russian  |
|        | 8  | are actually what was said.                                  |
| 12:16  | 9  | Your Honor, the Court requested my client's                  |
|        | 10 | military record.  I'm assuming that the Court had the        |
|        | 11 | ability to review that.  And he had great marks when he did  |
|        | 12 | serve our country.  One of his supervisors, as of            |
|        | 13 | November 2019, had stated that he had a -- Mr. Fong has      |
|        | 14 | enormous potential for growth as a Marine, and during his    |
|        | 15 | training period he oversaw the completion of multiple --     |
| 12:16  | 16 | *(Court reporter requests clarification for the*             |
|        | 17 | *record.)*                                                   |
| 12:16  | 18 | MS. KENNEY:  Judge, can I take my mask off?                   |
| 12:16  | 19 | THE COURT:  You can, if you'd like to.  And if               |
|        | 20 | you'd like to have Mr. Fong separated from you, you --       |
| 12:16  | 21 | MS. KENNEY:  That's fine.  I've been vaccinated.             |
| 12:16  | 22 | THE COURT:  We have also.  But I always want a               |
|        | 23 | record of that.  But to be heard better, if you would like   |
|        | 24 | your mask off, I will consent to that.                       |
| 12:17  | 25 | MS. KENNEY:  Okay.  Thank you.                               |

12:17   1            His supervisor also stated that he was pursuing

2    higher education at Irvine Valley College.  He had a

3    3.62 GPA, and he, um, was recommended for professional

4    military education, retention, and promotion.

12:17   5            A second supervising officer also concurred with

6    the assessment and said that:  (Reading:)

12:17   7             "Mr. Fong is an ambitious, efficient,

8             and highly intelligent avionics

9             technician, whose performance,

10             singularly and collectively, has been

11             outstanding.  He's dedicated NCO who

12             constantly mentors and trains his

13             subordinates to ensure they keep up with

14             current requirements and reach their

15             full potential.  These traits have

16             earned him the respect of his seniors,

17             his peers, and junior marines alike.  He

18             was also recommending him for

19             promotion." (As read.)

12:18   20            Your Honor, I looked through his entire military

21    record, there was not one negative thing.

12:18   22            As the Court knows, Mr. Fong grew up here locally

23    in Irvine.  His family is present.  I think that his Marine

24    record speaks volumes of his character, Your Honor.

12:18   25            In addition, I want to make a comment about the

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | interview that was -- was being relied upon, from the person             |
|       | 2  | called "DT," somebody who was in the Marines with my client.             |
| 12:18 | 3  | I don't know if the Court had opportunity to                             |
|       | 4  | actually see the transcript of DT's interview that was                   |
|       | 5  | provided, I believe, in Exhibit B.  There was voluminous                 |
|       | 6  | materials that the Court was provided.  I'm not sure exactly             |
|       | 7  | what the Court was able to get through.                                   |
| 12:18 | 8  | But in regards to DT's interview -- and I'm not                          |
|       | 9  | taking this from a search warrant.  I'm taking this from the             |
|       | 10 | actual transcript, or text, when I'm referring to things.                |
| 12:19 | 11 | DT told the supervise -- or the interviewing                             |
|       | 12 | officer that my client was a firearms instructor, um, in the            |
|       | 13 | past, and he worked at a range in Orange.  So he had a                   |
|       | 14 | liking for guns before this incident happened.  He was in               |
|       | 15 | the Marines.  He's just -- there's people that just enjoy                |
|       | 16 | guns, that are huge proponents of the Second Amendment.  And            |
|       | 17 | that is one of the Constitutional rights, at least for now,             |
|       | 18 | that we still have as Americans -- although it is currently             |
|       | 19 | under attack.                                                            |
| 12:19 | 20 | He was asked -- DT was asked, um, about the                             |
|       | 21 | instructor status of Mr. Fong, and said that he was a                   |
|       | 22 | civilian instructor in the City of Orange.  And my client               |
|       | 23 | actually would take trips out to Arizona to shoot his gun               |
|       | 24 | because there was more open area.  And, as we all know,                 |
|       | 25 | Arizona's really relaxed when it comes to respecting the                |

|  |  |  |
|--|--|--|
| | 1 | Second Amendment. |
| 12:20 | 2 | Um, he didn't do any competitions.  DT told them |
| | 3 | that he thought my client was an expert, was not sure about |
| | 4 | that.  And, um, at the end of the interview, the |
| | 5 | interviewing officers -- and let's -- let's place the |
| | 6 | scenario of how DT was being interviewed. |
| 12:20 | 7 | I believe it was an NCIS person that showed up to |
| | 8 | interview him, which puts on an extra added layer of |
| | 9 | pressure, when you're in the Marines, to speak.  So he was |
| | 10 | being questioned by the authorities, in addition to the NCIS |
| | 11 | people.  And one of the interviewing officers said: |
| 12:20 | 12 | "That's our whole concern, David, is |
| | 13 | like -- is this kid someone potentially |
| | 14 | planning something methodically?  Is he |
| | 15 | gonna -- is he kind of like hiding |
| | 16 | behind a computer screen?  You know what |
| | 17 | I mean?  Put yourself in our shoes. |
| | 18 | People's safety.  Community safety." |
| 12:21 | 19 | And then in response to that, DT said: |
| 12:21 | 20 | "Personally, I can't really see him |
| | 21 | doing any of that -- whether or not, |
| | 22 | like, he were to go to the edge, there's |
| | 23 | been plenty of times where he could |
| | 24 | have, but hasn't." |
| 12:21 | 25 | And that's DT's interview, page 55.  The Bates |

Case 8:20-cr-00146-DOC   Document 77   Filed 07/25/21   Page 36 of 99   Page ID #:603
8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

25

|        |    |                                                             |
|--------|----|-------------------------------------------------------------|
|        | 1  | stamp number is ending '2809.                               |
| 12:21  | 2  | DT went on to also tell the interviewing officers:          |
| 12:21  | 3  | "As far as him actually going out and                       |
|        | 4  | doing anything, I really don't think he                     |
|        | 5  | would.  His primary goal is to have his                     |
|        | 6  | own property and be away from people."                      |
| 12:21  | 7  | So with that mindset, I don't really see him going          |
|        | 8  | to kill a bunch of people because of hate.  I think he's    |
|        | 9  | leaning more towards like "I'm gonna get away from people   |
|        | 10 | because I hate them."                                        |
| 12:22  | 11 | And there are people that -- you know, society              |
|        | 12 | today -- and I'm sure the Court would agree, it's complete  |
|        | 13 | chaos, and there's a lot of hate in the world.  And         |
|        | 14 | especially for now, which is relevant to my client and his  |
|        | 15 | family, Your Honor, with the Asian -- rise in Asian hate,   |
|        | 16 | it's -- it's really bad.  My client has seen his family,    |
|        | 17 | um -- the product of bullying in the City of Irvine, and    |
|        | 18 | certain things -- certain statements being made to his      |
|        | 19 | mom -- to "Go back to China" and things like that -- I mean,|
|        | 20 | it's real and this whole family has experienced it.         |
| 12:22  | 21 | So I can understand why Mr. Fong would wanna be             |
|        | 22 | away from people, especially in today's world.              |
| 12:23  | 23 | In addition, Your Honor, the dangerousness that             |
|        | 24 | we're talking about would be -- be "now" -- his -- dangerous|
|        | 25 | now.  Is he dangerous if we let him out today?              |

12:23    1            Remember, Your Honor, he was arrested back in May

2    of 2020.  And it was at -- the timing was a little weird,

3    'cause he'd already stopped the group chats, and he kicked

4    out one of the -- I believe the operatives.  There was three

5    government operatives in this very small group.  And I'll

6    get to the prodding that they were doing so you can put this

7    into context.

12:23    8            But, remember, his conduct happened between

9    February and April.  That is at the height of when the world

10    shut down.  We're in the middle of this international

11    pandemic.  People were scared.  I was scared.  People were

12    afraid of civil war.  Everyone's just existing.  And we lost

13    the last year of our lives.  And I look back and, just, it

14    feels like a nightmare that just wouldn't end.

12:24    15          People were afraid.  People became "preppers."

16    And I'm sure Your Honor knows what that is:  When you're

17    afraid that groups are gonna take over the government.

18    We've seen that stuff nationwide with the crazy protesting

19    going on, the people that went to the Capitol.  There's just

20    a lot of crazy -- is as if it's the end times.  It's crazy.

12:24    21          So I think we have to keep that in mind when we're

22    looking at this.  'Cause had this happened five years ago,

23    it would be more concerning.  But because of the time frame

24    that this is occurring in, and the context that it's in,

25    some of this is understandable.

12:25   1        Mr. Fong was more of a prepper.  And with the

2   Asian hate, you know, he just wanted to be ready to defend

3   his family.  And that is in the actual text in these groups.

12:25   4        In regards to -- you know, people were paranoid,

5   obviously, because of hate and during the pandemic.  But

6   even as the Court pointed out at the last hearing, there's

7   no evidence that he had plans to travel anywhere.  He didn't

8   make any specific threats to anyone.  I know Mr. Takla's

9   claiming "from the search warrant," but I'll get to that.

10   There was no bomb-making materials found at his house.

11   There was no direct communications with any terrorist

12   groups.

12:25  13        He's been in custody since May, Your Honor.

14   There's no jail letters like claiming allegiance to Allah or

15   talking about terrorist activities -- which I think is huge

16   because they did have a mail cover on him.  He was writing

17   his sister.  He was writing his mom.  His parents have been

18   a part of the church that I belong to:  Saddleback Church,

19   which is in South County.  Mom would continuously send him

20   things from, you know, *Daily Hope* and Pastor Rick and things

21   Christian-based because Jason grew up as a Christian, and at

22   some point was looking for more.  And I won't get into a

23   sidetrack of the -- Saddleback is a seeker church and some

24   people seek deeper connection.

12:26  25        THE COURT:  Well, they have an excellent

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
|         | 1  | counseling program out there also.                           |
| 12:26   | 2  | MS. KENNEY:  Yes.  Celebrate Recovery.                       |
| 12:26   | 3  | And he was looking for more substance.  And                  |
|         | 4  | unfortunately -- the devil works in the ways he works -- he   |
|         | 5  | got taken to a different route and he started getting         |
|         | 6  | involved in Islam.  And for him, personally, that's what he   |
|         | 7  | believed was filling his void.  He was able to go to the      |
|         | 8  | church and actually volunteer his time for security.  He      |
|         | 9  | didn't formally convert until January of 2020, Your Honor.    |
| 12:27   | 10 | But before that time, after seeing the Christ                |
|         | 11 | Church massacre, which I'm sure Your Honor's well-aware of,   |
|         | 12 | he was extremely disturbed and volunteered his time at the    |
|         | 13 | mosque in Irvine as security.                                 |
| 12:27   | 14 | THE COURT:  I see.                                           |
| 12:27   | 15 | MS. KENNEY:  I tried to get a letter from the                |
|         | 16 | person in charge of that mosque through his mother's help,    |
|         | 17 | but they were uneasy about getting involved in anything       |
|         | 18 | because of, you know, the way people view Muslims,            |
|         | 19 | unfortunately.  They didn't want to get involved.  But my     |
|         | 20 | client did disclose that to me, and his parents did confirm   |
|         | 21 | it.                                                           |
| 12:28   | 22 | In addition, Your Honor, there's no jail calls of            |
|         | 23 | him claiming allegiance to any terrorist organization.  I     |
|         | 24 | just think this whole thing, which happened in a matter of    |
|         | 25 | like three months, has been completely blown out of          |

|      |    | proportion.  And the things that have been presented to the |
|------|----|
| | 1 | proportion.  And the things that have been presented to the |
| | 2 | Court have been cherrypicked to make it look like something |
| | 3 | that it's really not when you look at the big picture and |
| | 4 | the actual evidence, not just a search warrant. |
| 12:28 | 5 | Your Honor, I do wanna make a comment that, during |
| | 6 | the time they were executing the warrant, one of the |
| | 7 | officers -- who's not here -- was from Irvine Police |
| | 8 | Department.  His name is Michael Moore.  And I don't know if |
| | 9 | he realized his mic was still on, but there is a transcript |
| | 10 | of my client's statement and all the officers who were there |
| | 11 | that had their microphones on -- so even if they got out of |
| | 12 | the presence of my client, they were still being recorded. |
| 12:29 | 13 | There's one point in the interview where Michael |
| | 14 | Moore steps away and he's talking to, I believe -- let me -- |
| | 15 | I don't wanna get this wrong.  It just says an "Unidentified |
| | 16 | Male Number 3" in the transcript.  But Michael Moore is in, |
| | 17 | I guess, a side room -- I can only guess -- and he says: |
| 12:29 | 18 | "On charges so, um, but we were not -- |
| | 19 | based on pictures we saw, we couldn't |
| | 20 | tell if he had more than that or not, |
| | 21 | um --" |
| 12:29 | 22 | And then the unidentified male says: |
| 12:29 | 23 | "The upstairs, I know they're looking |
| | 24 | now.  They only had -- there was only an |
| | 25 | AR that I saw." |

12:30    1              "MICHAEL MOORE:" -- the investigator -- "Right.

          2    Now he's saying he just has the one."

12:30    3              "UNIDENTIFIED MALE.  Okay."

12:30    4              "MICHAEL MOORE:  So which sucks."

12:30    5          So we've got a main investigator that's sitting

          6    here thinking he's going to find some huge arsenal.  And

          7    they didn't.  And it was based on all of, you know, pictures

          8    or YouTube videos that are being shared.  And it just

          9    completely like grew.  And it just got so big -- and it's

         10    like they get there and they're disappointed in what they

         11    found.

12:30   12              But Michael Moore didn't stop there, Your Honor.

         13    And I know Your Honor's gonna understand where I'm going

         14    'cause I'm gonna bring in the relevance of the state court

         15    action.  And Your Honor was a state court judge I appeared

         16    in front of when I was a baby lawyer -- and you probably

         17    wouldn't remember that -- in C5.

12:31   18              So in state court, he's charged with a total of

         19    10 counts.  Your Honor, they are all wobblers.  Penal Code

         20    section -- the only weapon's charges, Penal Code

         21    Section 30605, possession of an assault weapon.  That

         22    carries a three-year max, as the Court knows.

12:31   23              The additional charges, all which are wobblers,

         24    are for large-capacity magazines, Penal Code Section 32310.

         25    You, uh -- you have to, um -- figuring out the max

|  |  |  |
|---|---|---|
|  | 1 | sentencing, eight months for each, his max on a state case |
|  | 2 | is 9 years.  They're all wobblers. |
| 12:31 | 3 | Michael Moore -- and I'm assuming it was through |
|  | 4 | the assistance of the government and their whole team -- |
|  | 5 | submitted a declaration under seal, which I was able to |
|  | 6 | obtain from state court, claiming, from some of the |
|  | 7 | information that Mr. Takla's presented this Court -- |
|  | 8 | claiming that my client threatened his teacher, was wanting |
|  | 9 | to, um, eradicate "LGBT," admitting to fund-raising for |
|  | 10 | Hamas.  And a state court judge sees this, and |
|  | 11 | Investigator Moore had the nerve to ask the Court to set the |
|  | 12 | bail at a million dollars. |
| 12:32 | 13 | My client could've murdered someone and got the |
|  | 14 | same bail, as the Court knows.  The Orange County bail |
|  | 15 | schedule for what he's being charged with is $20,000.  So |
|  | 16 | this overreaching by this entire team of the government is |
|  | 17 | just beyond me, especially now that I know Michael Moore |
|  | 18 | was, on his hot mic, upset that he only found one gun. |
| 12:33 | 19 | You know, moving -- moving on to the specifics |
|  | 20 | that Mr. Takla had stated.  The first one -- and it was also |
|  | 21 | in Moore's declaration -- the former teacher threat. |
| 12:33 | 22 | Looking at the actual transcript of my client's |
|  | 23 | interview, not the search warrant, at page 105, my client |
|  | 24 | told Investigator Moore that he had no intentions of hurting |
|  | 25 | anyone.  Referring to his former teacher, when they asked |

1    him about it, Mr. Fong said, in high school, he observed the

2    teacher look down the shirts of underage girls in his

3    classes.  And this is something that all the students would

4    talk about.  And that was the main reason he didn't like

5    'em:  Pedophile activity or pedophile -- pedophilia conduct,

6    which most people would agree.

12:34    7    But he told them during his interview that he

8    didn't have any plans to track him down.  There was nothing

9    on his computer trying to figure out where the teacher lived

10   or any type of commentary anywhere that he was gonna track

11   this -- this teacher down and kill 'em.  Again, it's -- it's

12   taken out of context.

12:34   13    In addition, Your Honor, in regards to

14   eradicating -- the statement about eradicating the "LGBT"

15   community.  And I'm looking again at the transcript of my

16   client's interview.  And this is at page 137 of the

17   transcript:

12:35   18         "I just think that LGBTQ and stuff

19              like that is wrong.  I just think it

20              largely -- from my viewpoint, it is not

21              normal, per se.  They're contributing to

22              the death of the family structure, and

23              that's what I said."  (As read.)

12:36   24    So again, there's no plans for him to do anything

25   to target any specific LGBTQ groups.

12:35    1        There's a lot of people that follow the Christian

         2   faith, Islam, the Catholic faith, the Jewish faith that

         3   would agree with that statement, Your Honor.  They wouldn't

         4   necessarily say it pubic -- publically for being -- fear of

         5   being canceled, especially in today's "cancel culture."  But

         6   I would surmise to say the majority of Americans probably

         7   feel the same way.

12:36    8        I don't think that's something that should be used

         9   against him, to keep him in jail, without bond, for a case

        10   that -- he needs to help me on the outside and figure this

        11   out and prepare for trial, given the access to counsel

        12   issues.

12:36   13        In regard to admitting to fundraising for Hamas,

        14   in this link that we've heard about, Your Honor -- again,

        15   I'm looking at the transcript, not a search warrant,

        16   page 74.  My client told Investigator Moore that his

        17   whole -- his whole intent was like humanitarian purposes of

        18   giving to the Palestinian people.  He was never intending to

        19   support terrorism.  He never says that.

12:36   20        In fact, in his texts that are in the chats, as

        21   well as in his interview, he makes it clear he does not

        22   support terrorism.  He even says,

12:37   23            "I'm not really versed in Hamas, as a

        24        whole.  I just figured I found this

        25        organization and figured they were for

| | 1 | Palestinian people.  That's kind of why |
|---|---|---|
| | 2 | I just -- I wasn't aware of that |
| | 3 | designation of a terrorist group in |
| | 4 | terms of like ISIS or al-Qaeda.  I just |
| | 5 | thought it was like a militia for -- |
| | 6 | standing for the Palestinians.  I |
| | 7 | thought it would be more of like |
| | 8 | humanitarian." |
| 12:37 | 9 | And then we -- he was asked where he found the |
| | 10 | link, and he said, "Largely, it was just kind've like an |
| | 11 | Internet search." |
| 12:37 | 12 | It wasn't like he was, "Hey, I'm part of this |
| | 13 | group and I'm gonna fund-raise, and we've got this link. |
| | 14 | We're gonna -- you know, we're gonna have meetings with the |
| | 15 | people that we're sending the money to, and we're really |
| | 16 | gonna fund-raise." |
| 12:38 | 17 | It was more of just in haste, which obviously was |
| | 18 | a bad decision.  But it wasn't as calculated as the |
| | 19 | government's tryin'a lead the Court to believe. |
| 12:38 | 20 | Again, later on in his interview, the |
| | 21 | investigator's literally trying to put words in his mouth. |
| | 22 | And at some point, my client says, "Everyone has a right to |
| | 23 | their opinion." |
| 12:38 | 24 | And, Your Honor, my client was completely |
| | 25 | respectful during any entire interview, probably because of |

|        |    |                                                    |
|--------|----|----------------------------------------------------|
|        | 1  | his training as a Marine.  I was very impressed with how he |
|        | 2  | held his composure and how respectful he was to the |
|        | 3  | investigating officers.  But he said, |
| 12:38  | 4  | "Everyone has a right to their |
|        | 5  | opinion.  You know, that's kind of just |
|        | 6  | the way I like to look at it.  But as -- |
|        | 7  | per support -- telling them to support, |
|        | 8  | I mainly -- my intention was mainly |
|        | 9  | humanitarian."  (As read.) |
| 12:38  | 10 | He even told them: |
| 12:38  | 11 | "I didn't really know too much |
|        | 12 | about -- um, Hamas.  I support |
|        | 13 | Palestine, especially in a time like |
|        | 14 | Ramadan to kind of give aid to people we |
|        | 15 | care about on the other side of the |
|        | 16 | world."  (As read.) |
| 12:39  | 17 | "Regarding what I thought about |
|        | 18 | Hamas -- and, of course, now I know" -- |
| 12:39  | 19 | He says, now he knows, after he's -- after he sent |
|        | 20 | that link, they found stuff on his phone.  Then he starts |
|        | 21 | researching:  Oh, Hamas. |
| 12:39  | 22 | He didn't do the research before he sent that |
|        | 23 | link, Your Honor.  It was done after the fact, after he |
|        | 24 | pressed "send" and a link goes on out.  But he wasn't |
|        | 25 | actively fund-raising for them. |

12:39   1          Your Honor, just, in -- in addition, to the

        2   fund-raising issue, was the sharing of that link negligent?

        3   I think we would agree on that.  But there was no criminal

        4   intent behind that because he was unaware of the risks

        5   associated with sharing this link that -- and look where

        6   he's at now because of it.  Um, it was done in haste.  He

        7   was looking for a way to give charity and humanitarian

        8   support during Ramadan.  And it was two of the government

        9   operatives, Your Honor, that were prodding my client and

       10   wanting to know how they could donate.

12:40  11          And that leads us to the government prodding.  One

       12   of the operatives asked my client to teach him to shoot.

       13   There's a text message, and this is in Russian -- and this

       14   is just taking their interpretation of the Russian, which I

       15   don't know if it's accurate, but one of the operatives says,

       16   "I wanted you to teach me how to shoot."

12:40  17          On another one, the operative asks my client to

       18   teach him how to organize and assemble a weapon.  "Will you

       19   train me how to organize and assemble a weapon?"  This is at

       20   Bates stamp number ending '1021.  Again, it's the government

       21   operatives in this group that are trying to lead my client

       22   down some rabbit hole and -- excuse my language -- screw 'em

       23   over.  And here he is.

12:41  24          They were the ones prodding him, Your Honor.  This

       25   wasn't him doing this on his own and pressuring people to do

Case 8:20-cr-00146-DOC   Document 77   Filed 07/25/21   Page 48 of 99   Page ID #:615
8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

37

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | this.  This is in response to them asking for this.          |
| 12:41 | 2  | One of the -- the same operative says, "And I want           |
|       | 3  | you to teach me to shoot."  And if -- my client says, "Of    |
|       | 4  | course," 'cause he started this group.                       |
| 12:41 | 5  | THE OPERATIVE:  "I wanna learn.  AR-1 I liked                 |
|       | 6  | more."                                                        |
| 12:41 | 7  | He wants to learn how to assemble guns.  In                  |
|       | 8  | another one, he asks, "I wanna learn how to make an IED."    |
| 12:42 | 9  | That's coming from the government operative,                 |
|       | 10 | Your Honor.  The government operative's asking my client,    |
|       | 11 | "Hey, teach me how to make an IED."                          |
| 12:42 | 12 | It's not my client saying, "Hey, today's lesson is           |
|       | 13 | going to be how to make an IED."  My client didn't -- didn't |
|       | 14 | bring that up.  This was always in response to government    |
|       | 15 | prodding.                                                    |
| 12:42 | 16 | After the operative asks my client -- like he                |
|       | 17 | want -- or tells him that he wants to learn how to make an   |
|       | 18 | IED, then he says, "and car bombs."                          |
| 12:42 | 19 | So my client says, "Well, these are only against            |
|       | 20 | aggressors."  Like, my client's making sure that this isn't  |
|       | 21 | for any type of terrorist-related activity.  And he made it  |
|       | 22 | clear in his chats that he was not supporting terrorism in   |
|       | 23 | any way.                                                     |
| 12:43 | 24 | Going to some of the specific chats, Your Honor.             |
|       | 25 | The chat groups my client created were a result of a         |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

38

|       |    |                                                        |
|-------|----|--------------------------------------------------------|
|       | 1  | culmination of different things.  One, the Christ Church |
|       | 2  | massacre that he actually saw the video of, which was very |
|       | 3  | disturbing.  I personally have not watched it.  He's a huge |
|       | 4  | supporter of his constitutional rights:  Obviously, free |
|       | 5  | speech, bearing arms, and his freedom of religion.     |
| 12:43 | 6  | His group was focused on learning defense --           |
|       | 7  | defensive tack-ics -- tactics, basic firearm safety, um, |
|       | 8  | religious small talk for a group, politics, inventing.  It |
|       | 9  | was -- whenever they talked about *jihad* in this group, it |
|       | 10 | was for offensive *jihad*, Your Honor.                 |
| 12:43 | 11 | And I don't know if the Court's familiar,              |
|       | 12 | there's -- in the Islam region -- I had to look this up -- |
|       | 13 | what?  I'm sorry.  Defensive *jihad*, not offensive.   |
| 12:44 | 14 | There's three types of *jihad*.  There's offensive,    |
|       | 15 | defensive, and spiritual.  My client's group was focused on |
|       | 16 | the defensive perspective in terms of protecting family and |
|       | 17 | community.  That's why he taught, um, firearms safety. |
| 12:44 | 18 | There was a truth movement he was interested in.       |
|       | 19 | He was never trying to get any of the members to take on any |
|       | 20 | type of terroristic ideals.                            |
| 12:44 | 21 | He wanted people to stay in America, protect their     |
|       | 22 | families, live a normal life, but practice the         |
|       | 23 | Second Amendment coupled with, you know, their religious |
|       | 24 | beliefs and practicing those as well.  He wanted a group to |
|       | 25 | be able to preserve their families in times like this: |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | Again, the pandemic and how crazy it's been over the past  |
|       | 2  | year.                                                       |
| 12:44 | 3  | When the government, um, operative -- one of the           |
|       | 4  | government operatives asked about my client's military unit, |
|       | 5  | he just said that they were on standby, and he would       |
|       | 6  | probably, uh -- he was concerned with reinforcing auth --  |
|       | 7  | the issue of authera -- authoritarianism -- sorry.  That's a |
|       | 8  | mouthful.  He gave directions on basics survival skills.   |
| 12:45 | 9  | Um, the group chats.  He never intended to wade --         |
|       | 10 | wage any *jihad* on the American government.  Again, it was |
|       | 11 | for defensive purposes only.                               |
| 12:45 | 12 | And I know, at least in terms of the general               |
|       | 13 | public, you hear the term *"jihad,"* you just automatically |
|       | 14 | think terrorism, which that's not true.  Like I said,      |
|       | 15 | there's three different types of *jihad* within the Islam  |
|       | 16 | religion.                                                   |
| 12:45 | 17 | THE COURT:  The Christ Church massacre, was that           |
|       | 18 | submitted to the Court?  'Cause I just tried to pull that up |
|       | 19 | on the Internet.  In other words, you referred to that.  I |
|       | 20 | didn't see that in any exhibit.  And I tried to read       |
|       | 21 | hundreds of pages on this.                                 |
| 12:46 | 22 | Was that submitted to the Court.                           |
| 12:46 | 23 | MR. TAKLA:  Not by the government, Your Honor.             |
| 12:46 | 24 | THE COURT:  And here's why I'm asking:  I don't            |
|       | 25 | recall -- 'cause I follow attacks across the world -- I    |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       |  1 | don't recall explicit video of the Christ Church massacre.   |
|       |  2 | It was the response to the massacre.  And it was a response  |
|       |  3 | by the police.  But inside the, um, massacre itself, I don't |
|       |  4 | recall seeing person's executed.                             |
| 12:46 |  5 | MS. KENNEY:  Your Honor, my client stated that               |
|       |  6 | there was a video posted right after it happened that he saw |
|       |  7 | that was taken down.                                          |
| 12:46 |  8 | THE COURT:  I -- I don't have that.                          |
| 12:46 |  9 | I have -- what we know so far:  Christ Church               |
|       | 10 | shooting from the *Guardian*, and "New footing emerges moments |
|       | 11 | after the Christ Church" -- so you can see me up here on    |
|       | 12 | YouTube, because I didn't see any of that.  And I want to   |
|       | 13 | disclose that I just looked.  But I don't have some of those |
|       | 14 | massacre films that, unfortunately, I'm used to dealing with |
|       | 15 | in another unrelated effort.                                 |
| 12:47 | 16 | MS. KENNEY:  Your Honor, I don't --                          |
| 12:47 | 17 | THE COURT:  -- unrelated to this Court action.             |
| 12:47 | 18 | MS. KENNEY:  I don't think it's available.                  |
| 12:47 | 19 | THE COURT:  Well, I'll disclose to you:  You               |
|       | 20 | know -- you both know I go across the world in terms of some |
|       | 21 | of these incidences in Afghanistan, Pakistan and Indonesia,  |
|       | 22 | Sri Lanka.  In fact, they bombed the church I was at in      |
|       | 23 | Sri Lanka short time after I was there -- not connected to   |
|       | 24 | me, Counsel -- but when you read "across" that massacre,     |
|       | 25 | that was the hotel -- not church -- that was the hotel I     |

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
|         | 1  | would normally stay in, so I missed it by a week.        |
| 12:47   | 2  | MS. KENNEY:  That's scary.                                |
| 12:47   | 3  | THE COURT:  That was the Easter attack on that           |
|         | 4  | same hotel.                                               |
| 12:47   | 5  | Um, but I -- unfortunately, have to follow that          |
|         | 6  | because of some things I do on behalf of our government. |
| 12:48   | 7  | And I don't recall in the Christ Church massacre,        |
|         | 8  | as I did on the London attack, for instance, or on the tower |
|         | 9  | bridge attack -- I don't recall that specific footage.   |
|         | 10 | Everything I watched, in terms of some of the French, Paris |
|         | 11 | attacks, *et cetera* -- uh, and the Christ Church massacre, it |
|         | 12 | was a response to that.                                   |
| 12:48   | 13 | So that's why -- I'm not questioning the integrity       |
|         | 14 | of that.  I'm not questioning --                          |
| 12:48   | 15 | MS. KENNEY:  Right.                                       |
| 12:48   | 16 | THE COURT:  -- if something was taken down.  I           |
|         | 17 | just --                                                   |
| 12:48   | 18 | MS. KENNEY:  I believe it was taken down.                 |
| 12:48   | 19 | THE COURT:  I've just followed, unfortunately, and       |
|         | 20 | have to, because of some counterterrorism efforts across the |
|         | 21 | world.  And I didn't recall that.  So I'm not questioning |
|         | 22 | credibility.  It could be taken down.  I'm not aware of it |
|         | 23 | nor, in going through the record, did I see any, um --    |
|         | 24 | anything in the record that, uh -- of what he would've    |
|         | 25 | viewed.  Not that I know that that's germane.  I just want |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | to disclose to you why I was up here typing on the Internet  |
|       | 2  | for a moment.                                                |
| 12:49 | 3  | MS. KENNEY:  And, Your Honor, going back to the              |
|       | 4  | actual chats, and not search warrant, my client stated in    |
|       | 5  | one of his chats that, um:                                   |
| 12:49 | 6  | "I'm just ready to defend my family,                         |
|       | 7  | my community, secure my future."                             |
| 12:50 | 8  | He also stated --                                            |
| 12:49 | 9  | THE COURT:  Just one moment.                                 |
| 12:49 | 10 | Off the record.                                              |
| 12:49 | 11 | *(Court and clerk confer.)*                                  |
| 12:49 | 12 | THE COURT:  All right.                                       |
| 12:49 | 13 | Now, please continue, Counsel.                               |
| 12:49 | 14 | MS. KENNEY:  He also stated, um, that he was                 |
|       | 15 | talking to one of, I believe, the operatives.  There was --  |
|       | 16 | saying that, uh -- my client was saying that, "Muslim men    |
|       | 17 | are to defend" --                                            |
| 12:49 | 18 | THE COURT:  Slower.  Slower.  We need a record.              |
|       | 19 | Start again.                                                 |
| 12:49 | 20 | MS. KENNEY:  Uh-huh.                                         |
| 12:49 | 21 | "Muslim men are to defend their homes                        |
|       | 22 | from encroachment like Native American's                     |
|       | 23 | initially did.  I told 'em a handgun                         |
|       | 24 | arguably isn't a priority.  Rifle and                        |
|       | 25 | chest rigs or armor --"                                      |

| 12:50 | 1 | *(Court reporter requests clarification for the* |
| | 2 | *record.)* |
| 12:50 | 3 | MS. KENNEY:  (Reading continued:) |
| 12:50 | 4 | "I like chest rigs because you can |
| | 5 | throw them on easily, and they're good |
| | 6 | for reduce [sic]." |
| 12:50 | 7 | "I told them the white nationalists |
| | 8 | and other pro-Trump ignorance are ready |
| | 9 | to harm -- to bring harm to you and your |
| | 10 | families." |
| 12:50 | 11 | So again, Your Honor, when you put it in context, |
| | 12 | it's in terms of like the civil -- civil unrest that people |
| | 13 | were expecting during the pandemic. |
| 12:50 | 14 | There's also a chat that was cut off in the next |
| | 15 | page in discovery -- didn't actually have what he said -- |
| | 16 | but he did make a statement that he was vetting, you know, |
| | 17 | people in the group because he wasn't supporting any type of |
| | 18 | terrorism activity. |
| 12:51 | 19 | My client said, um: |
| 12:51 | 20 | "I would like to know if you view or |
| | 21 | believe ISIS to be a true *caliphate*." |
| 12:51 | 22 | And *"caliphate"* meaning in the historical sense -- |
| | 23 | not in the sense of the terrorist group -- |
| 12:51 | 24 | "I believe them to be terrorists. |
| | 25 | This is true.  And I do not support |

**Certified for Law Office of Edward M. Robinson**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | them."                                                       |
| 12:51 | 2  | So he's saying this in his group chats:  That he            |
|       | 3  | does not support terrorism.  We cannot kill innocents.       |
| 12:51 | 4  | And in regards to, um, a comment that is blocked             |
|       | 5  | out in this chat -- I don't know why it's blocked out; it's  |
|       | 6  | redacted -- my client said,                                  |
| 12:51 | 7  | "If they wanna blow themselves up in                        |
|       | 8  | Syria, I don't even know why I'm                            |
|       | 9  | training them.  I'm not training                            |
|       | 10 | terrorists or suicide bombers.  I'm                         |
|       | 11 | training soldiers:  Soldiers who love                       |
|       | 12 | life and wanna win and nothing more."                       |
| 12:52 | 13 | And then, when asked if somebody was planning               |
|       | 14 | anything in the U.S., by an operative, um, my client said.  |
| 12:52 | 15 | "Planning an attack is not needed and                       |
|       | 16 | not thoughtful."                                            |
| 12:52 | 17 | Again, my client's making it clear he does not              |
|       | 18 | support terrorism.                                          |
| 12:52 | 19 | There was even one part, Your Honor -- or one               |
|       | 20 | point in the time frame where my client kicked people out   |
|       | 21 | that he thought were radicals.  And he posted an explanation |
|       | 22 | to his new group explaining, um, why he had kicked them out. |
|       | 23 | And again, it -- it goes in line with:  He was not gonna     |
|       | 24 | tolerate people who were just interested in terroristic      |
|       | 25 | activities.                                                 |

**Certified for Law Office of Edward M. Robinson**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**

| | | |
|---|---|---|
| 12:52 | 1 | At one point my client says, in one of the chats, |
| | 2 | that he's not even sure about HTS, "to be honest, because |
| | 3 | they fight against ISIS.  But I'm not sure if they fully |
| | 4 | follow the Quran." |
| 12:53 | 5 | So my client was always interested in following |
| | 6 | the actual Islam religion and the Quran -- not the extremism |
| | 7 | that some people engage in, but true Islam. |
| 12:53 | 8 | He stated in another text: |
| 12:53 | 9 | "My goal is to get married and have |
| | 10 | kids and own my business and make |
| | 11 | *halal*." |
| 12:53 | 12 | And I don't know if the Court knows what *halal* is, |
| | 13 | but it's -- |
| 12:53 | 14 | THE COURT:  I do. |
| 12:53 | 15 | MS. KENNEY:  -- it's making money from good |
| | 16 | intentions not poor intentions. |
| 12:53 | 17 | When he was questioned, he told one of the |
| | 18 | investigating officers -- |
| 12:53 | 19 | THE COURT:  Just a moment. |
| 12:53 | 20 | He also lied.  He initially denied -- so let's |
| | 21 | make this complete for both sides, 'cause I was about to |
| | 22 | discuss that with you -- he had to eventually be confronted |
| | 23 | before he stated what his actions were. |
| 12:54 | 24 | Go to the page, Counsel -- I'll read to you. |
| 12:54 | 25 | MS. KENNEY:  Wait.  I'm not following. |

12:54   1          THE COURT:  So you're not caught shortsighted --

        2    let me find that on page --

12:54   3          MR. TAKLA:  32, Your Honor.

12:54   4          MS. KENNEY:  32 of the search warrant or actual

        5    transcript?

12:54   6          THE COURT:  Search warrant.  No.  Strike that.

12:56   7          It would actually be on page 30 of the search

        8    warrant, not 32.  And it would be in Paragraph 28.

12:56   9          After the reading of Miranda rights in

       10    subsection (a), it reads that:

12:56  11              "Fong claimed he stopped using

       12               Instagram or social media sometime in

       13               January or February of 2020.  Fong used

       14               WhatsApp for work and the Signal

       15               application for communicating with

       16               friends he met online.  Fong said he

       17               used the Signal application because it

       18               offered end-to-end encryption and

       19               privacy.  Fong was initially hesitant to

       20               provide the names, even user names, of

       21               those he communicated with online,

       22               stating that he was having trouble

       23               recalling their names.

12:57  24              "Fong stated that he formed his online

       25               group on the Signal app, the

|        |    |                                          |
|--------|----|------------------------------------------|
|        | 1  | Signal Group, that he was the leader of  |
|        | 2  | the group.  Fong stated two members of   |
|        | 3  | the Signal Group were Person 1 and       |
|        | 4  | Person 2."  (As read.)                   |
| 12:57  | 5  | "Fong stated Person 1 was a kid from     |
|        | 6  | Florida who was 15 or 16 of age.  Fong   |
|        | 7  | referred to groups like AK [sic] and     |
|        | 8  | ISIS as terrorists and stated he did not |
|        | 9  | condone extremism.  Fong stated these    |
|        | 10 | groups have damaged Islam rather than    |
|        | 11 | unifying it.  And Fong denied supporting |
|        | 12 | or believing in terrorist groups.        |
| 12:57  | 13 | "Fong explained than an 'FTO' was any    |
|        | 14 | group that the United States government  |
|        | 15 | or State Department designated as a      |
|        | 16 | terrorist organization."                 |
| 12:57  | 17 | In subsection (d) it states:             |
| 12:57  | 18 | "Fong initially denied that anyone,      |
|        | 19 | including Person 1 and Person 2,         |
|        | 20 | mentioned any terrorist groups.  Fong    |
|        | 21 | initially denied providing Person 1 or   |
|        | 22 | Person 2 with training other than        |
|        | 23 | religious guidance and firearm safety.   |
| 12:58  | 24 | "Fong initially denied discussing        |
|        | 25 | weapons or bombs with any members of any |

|   |   |   |
|---|---|---|
|       | 1  | online group.  Fong initially denied |
|       | 2  | supporting any FTO, including Hamas. |
|       | 3  | Fong initially stated he did not know |
|       | 4  | Hamas was a designated FTO" -- |
| 12:58 | 5  | And that, of course, is a Foreign Terrorist |
|       | 6  | Organization.  Has to be certified or designated. |
| 12:58 | 7  | "Fong initially denied soliciting |
|       | 8  | anyone to donate to a terrorist |
|       | 9  | organization. |
| 12:58 | 10 | "Fong initially denied ever meeting |
|       | 11 | any -- in person any members from his |
|       | 12 | online groups." |
| 12:58 | 13 | Subsection (e): |
| 12:58 | 14 | "After being confronted with messages |
|       | 15 | found in his phone, Fong admitted |
|       | 16 | Person 1 and Person 2 told him that -- |
|       | 17 | that they wanted to join HTS in Syria. |
| 12:58 | 18 | "Fong admitted to providing |
|       | 19 | photographs from a munitions manual |
|       | 20 | regarding explosives and improvised |
|       | 21 | explosive devices." |
| 12:59 | 22 | -- which we all know are IEDs -- |
| 12:59 | 23 | "-- to the Signal Group, which |
|       | 24 | included Person Number 1 and Person |
|       | 25 | Number 2, even after he knew they both |

|       |    |                                           |
|-------|----|-------------------------------------------|
|       | 1  | wanted to join HTS.                       |
| 12:59 | 2  |   "Fong stated that he did not have -- |
|       | 3  | he should not've sent the information,    |
|       | 4  | but his intentions were not to hurt       |
|       | 5  | people."                                  |
| 12:59 | 6  | Going on:                                 |
| 12:59 | 7  |   "He admitted to Person and 1 and 2 he |
|       | 8  | would likely use the information for war  |
|       | 9  | against the Russians and Syrian army in   |
|       | 10 | support of HTS.  He admitted, then, to    |
|       | 11 | knowing that Hamas was a designated FTO   |
|       | 12 | by the United States State Department.    |
| 12:59 | 13 |   "He also stated he believed the LGBTQ |
|       | 14 | community was contributing to the death   |
|       | 15 | of family structure in the west.  And     |
|       | 16 | stated his online statement that the      |
|       | 17 | LGBTQ community should be eradicated was   |
|       | 18 | only an angry outburst."  (As read.)      |
| 01:00 | 19 | And then it goes on.                      |
| 01:00 | 20 | So this was after a confrontation or at least a |
|       | 21 | submission.                               |
| 01:00 | 22 | MS. KENNEY:  Again, Your Honor, just 'cause I have |
|       | 23 | the actual transcript of my client's interview pulled up and |
|       | 24 | bookmarked, do we have any references?  'Cause, again, this |
|       | 25 | goes back to my problem with the search warrant and the |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

50

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | characterization of the conversation.  Do we have any        |
|       | 2  | references to the actual transcript pages so I can at least   |
|       | 3  | look at where they think that he said all of this or did all |
|       | 4  | of that?                                                     |
| 01:00 | 5  | THE COURT:  You know, I would appreciate that                |
|       | 6  | coming from all both of you.  In other words, I've got       |
|       | 7  | hundreds and hundreds of pages I've read now.                |
| 01:00 | 8  | It appears to me that you gave a lot of                      |
|       | 9  | information to the magistrate judge.  You've tried to give a |
|       | 10 | lot to Court.  We've tried to read that.                     |
| 01:00 | 11 | So I leave that, each, as your responsibility.               |
| 01:00 | 12 | MS. KENNEY:  Well, Your Honor, I would just                  |
|       | 13 | request that the Court can actually read my client's         |
|       | 14 | interview that is part of Exhibit B.                         |
| 01:00 | 15 | THE COURT:  I think I've already read that,                  |
|       | 16 | Counsel.                                                     |
| 01:00 | 17 | MS. KENNEY:  His actual interview with the police?           |
| 01:01 | 18 | THE COURT:  Wasn't that submitted to the Court?              |
| 01:01 | 19 | MR. TAKLA:  Your Honor, uh, with respect to the              |
|       | 20 | Exhibit B, that was declined by the magistrate judge.  She   |
|       | 21 | said it wasn't helpful, and then, uh, didn't file it.        |
| 01:01 | 22 | THE COURT:  I don't know what Exhibit B is,                  |
|       | 23 | apparently.  I haven't read that.                            |
| 01:01 | 24 | MS. KENNEY:  I thought it was filed.  At least               |
|       | 25 | that's what I saw in the court record.                       |

| | | |
|---|---|---|
| 01:01 | 1 | THE COURT:  Well, Exhibit B to something that I |
| | 2 | apparently don't have. |
| 01:01 | 3 | MS. KENNEY:  Anyways, Your Honor, should I |
| | 4 | continue? |
| 01:01 | 5 | THE COURT:  Please. |
| 01:01 | 6 | MS. KENNEY:  Okay. |
| 01:01 | 7 | THE COURT:  We need to take a break, though, and |
| | 8 | come back at some point.  We have another matter at 1:30. |
| | 9 | So if that meets with your permission.  I have no other |
| | 10 | options except to be courteous to you, and I'll have you |
| | 11 | back at 3:00 or 3:30. |
| 01:01 | 12 | MS. KENNEY:  Um, when he was asked -- well, this |
| | 13 | was actually, I believe, listed, from what the Court just |
| | 14 | read -- that he did say that, um, terrorist damage Islam |
| | 15 | more than unify it.  And that's one of the reasons why he |
| | 16 | doesn't condone it. |
| 01:02 | 17 | And he stated in his interview -- interview, "I |
| | 18 | don't condone extremism at all." |
| 01:02 | 19 | Um, and when he was asked about why he was sharing |
| | 20 | certain things in his group, my client explained that he |
| | 21 | liked to -- he liked to talk about the historical aspects |
| | 22 | of, um, things his group -- in his Muslim group -- the |
| | 23 | history of the *mujahideen* -- I don't wanna pronounce -- |
| | 24 | *mujahideen* -- uh, mainly just out of historical interest. |
| 01:02 | 25 | And he shared, uh, weapons information because |

|       |    |                                                       |
|-------|----|-------------------------------------------------------|
|       | 1  | it's a hobby and it's a self-defense thing.  He stated: |
| 01:03 | 2  | "I just -- I was just kind of like --                 |
|       | 3  | I mean, obviously for shooting, that's                |
|       | 4  | just -- that's kind of just a hobby-est               |
|       | 5  | sort of self-defense thing, you know,                 |
|       | 6  | eventually, when you're like -- I                     |
|       | 7  | basically gave viewpoint, like,                       |
|       | 8  | eventually somebody would have to" --                 |
| 01:03 | 9  | THE COURT:  Slower.  Slower.  We're going to lose     |
|       | 10 | the transcript, if you read quickly.                  |
| 01:03 | 11 | MS. KENNEY:  (Reading continued:)                     |
| 01:03 | 12 | "Somebody -- have to defend your                      |
|       | 13 | family, you know, or eventually some                  |
|       | 14 | day.  I think it be good for Muslims to               |
|       | 15 | bear arms especially after Christ                     |
|       | 16 | Church, you know, that shooting."  (As                |
|       | 17 | read.)                                                |
| 01:03 | 18 | That was on page 57 of his interview.                 |
| 01:03 | 19 | THE COURT:  I'm not arguing about Christ Church.      |
|       | 20 | You all know what the deep web is and quite frankly the web |
|       | 21 | has 90 percent below the surface.  We see about       |
|       | 22 | 10 percent -- not in terms of volume -- but about 10 percent |
|       | 23 | of the web is above, which the public commonly looks at, and |
|       | 24 | Googled, or whatever.  About 90 percent of it's below. |
| 01:04 | 25 | So, Counsel, this could've come -- I don't know if    |

**Certified for Law Office of Edward M. Robinson**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**

|       | 1  | your client's adept at the deep web or not, but this |
|-------|----|------|
|       | 2  | could've come -- so I'm not -- I'm not saying that.  But |
|       | 3  | everything I've seen about the Christ Church is much |
|       | 4  | different than the Paris attacks, much different than Pearl |
|       | 5  | getting beheaded, et cetera. |
| 01:04 | 6  | MS. KENNEY:  Okay.  He -- |
| 01:04 | 7  | THE COURT:  I watch that stuff.  I have to. |
| 01:04 | 8  | MS. KENNEY:  I don't. |
| 01:04 | 9  | THE COURT:  You don't wanna see the behead -- |
| 01:04 | 10 | MS. KENNEY:  I don't want that in my head.  Thank |
|       | 11 | you. |
| 01:04 | 12 | Um, he says: |
| 01:04 | 13 | "I mean, just like in the event I do |
|       | 14 | buy a gun and actually go out and learn |
|       | 15 | to use it and stuff like that, mainly |
|       | 16 | for defense only." (As read.) |
| 01:04 | 17 | And then when he's asked later on in the interview |
|       | 18 | about training -- you know, they were accusing him of |
|       | 19 | wanting to, like, train terrorists, which he denied 'cause |
|       | 20 | he's against all terrorism -- he says: |
| 01:05 | 21 | "I didn't feel obligated to help them, |
|       | 22 | you know, them wanting to go over.  For |
|       | 23 | the most part, all they mention was just |
|       | 24 | *hijera*, and that's kind of why.  But I |
|       | 25 | always wanted" -- |

| | | |
|---|---|---|
| 01:05 | 1 | THE COURT:  Slower.  Slower, Counsel. |
| 01:05 | 2 | *(Court reporter requests clarification for the* |
| | 3 | *record.)* |
| 01:05 | 4 | MS. KENNEY:  H-I-J-E-R-A. |
| 01:05 | 5 | (Reading continued:) |
| 01:05 | 6 | "The reason why I ever talked to them |
| | 7 | about, you know, guns or self-defense or |
| | 8 | anything of that sort was with the |
| | 9 | attention [sic] -- intention that they |
| | 10 | stay here to use those skills as -- you |
| | 11 | know, as an American, you know, just a |
| | 12 | regular civilian." |
| 01:05 | 13 | And then, at some point, when Investigator Moore |
| | 14 | from Irvine was talking to him, my client said, |
| 01:06 | 15 | "A lot of things in text can be taken |
| | 16 | out of context.  We were joking." |
| 01:06 | 17 | And then he mentions that, in reference to the |
| | 18 | *caliphate* -- again, it's the historical *caliphate*.  I'm not |
| | 19 | talking about ISIS.  They're not a *caliphate*. |
| 01:06 | 20 | And then, um, when one of -- and I believe this |
| | 21 | officer's present in the courtroom -- asked him about the |
| | 22 | statement, "You're here for the violence?"  Mr. Fong said, |
| 01:06 | 23 | "In the event of war, um, I would take |
| | 24 | part in it to try and restore order. |
| 01:06 | 25 | Again -- and that would be in terms of, you know, |

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | the civil unrest issue.                                          |
| 01:06 | 2  | Later on, in his interview, he's talking about,                 |
|       | 3  | again, wanting to support the Palestinian people.  And when     |
|       | 4  | one of the officers that's in court asked him, you know,        |
|       | 5  | we're concerned that there's a plan out there, my client        |
|       | 6  | said, "I did not have a plan."  And he didn't -- wasn't         |
|       | 7  | trying to motivate them to do anything in -- with a plan.       |
|       | 8  | And there's -- as the Court knows, there's no evidence of       |
|       | 9  | that in this -- in this case.                                    |
| 01:07 | 10 | My client also said that, "I think terrorism is                 |
|       | 11 | not the answer."                                                 |
| 01:07 | 12 | I also wanna make a comment, Your Honor, in                     |
|       | 13 | regards to the "dying as a martyr" comment.  That was           |
|       | 14 | completely taken out of context.  There's -- the text          |
|       | 15 | messages of where that's discussed, my client's talking with   |
|       | 16 | a government operative, and he talks about some girl that       |
|       | 17 | was trying to message him, and saying that he'd stopped         |
|       | 18 | talking to her because she thought they were incompatible.     |
|       | 19 | And she just messaged him again because her previous            |
|       | 20 | endeavors must not've worked out 'cause they stopped            |
|       | 21 | communicating.                                                  |
| 01:08 | 22 | And then my client said:                                        |
| 01:08 | 23 | "I'm currently in the process of                                |
|       | 24 | trying to scare her back off, to let her                        |
|       | 25 | know if it didn't work then, it sure is                         |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

56

| | | |
|---|---|---|
| | 1 | not going to work now.  I told her that |
| | 2 | dying as a martyr sounds way better than |
| | 3 | marrying in the West, in general, and |
| | 4 | that my afterlife is worth way more than |
| | 5 | any earthly marriage." |
| 01:08 | 6 | So, Your Honor, he's saying this in the context |
| | 7 | of -- this girl reaches back out to him, after she's already |
| | 8 | stopped communicating, and he's trying to scare her off, and |
| | 9 | that that's what he told the girl.  So I hope the Court can |
| | 10 | see that that was completely taken out of context in regards |
| | 11 | to what's in the actual text messages, not a search warrant. |
| 01:08 | 12 | I may be done, Your Honor.  I just need to... |
| 01:08 | 13 | THE COURT:  Take your time.  There's no problem. |
| 01:08 | 14 | But, please, for both of you, be available at |
| | 15 | 3:30, if we don't conclude. |
| 01:09 | 16 | MS. KENNEY:  In regards to the statement that the |
| | 17 | government's trying to use -- that my client was here only |
| | 18 | to, uh, die, only for the violence -- that was made in the |
| | 19 | context of paranoia and government outreach, obviously |
| | 20 | during the pandemic, and protecting the Islam community, as |
| | 21 | a "prepper" -- um, civil unrest, sort of doomsday-type |
| | 22 | things. |
| 01:09 | 23 | Again, my client wasn't -- was never interested in |
| | 24 | being a terrorist, training terrorists, anything of that |
| | 25 | nature.  And I think the actual evidence, not the search |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | warrant, supports that.                                      |
| 01:09 | 2  | My client was frustrated at one point with his               |
|       | 3  | work, not being able to pray.  And at one point he was just  |
|       | 4  | venting because he was over -- you know, he was overwhelmed  |
|       | 5  | with frustration.  So when the government's trying to say,   |
|       | 6  | like, "Oh, he wanted to kill his employers," he was saying   |
|       | 7  | that in the context of being so frustrated because they had  |
|       | 8  | him working such long days -- I believe, it was              |
|       | 9  | ten-hour days -- and he wasn't able to pray like he is       |
|       | 10 | supposed to be doing, um, I believe, three times during --   |
|       | 11 | or five times during the day.                                |
| 01:10 | 12 | Yeah, he just corrected me, Your Honor.  Thank               |
|       | 13 | you.                                                         |
| 01:10 | 14 | It was -- it was frustrating to him.  In this                |
|       | 15 | conversation of when he said this, he was driving home from  |
|       | 16 | work completely frustrated.                                  |
| 01:10 | 17 | Everybody in this room can probably admit to                 |
|       | 18 | saying something in gest or out of frustration that they     |
|       | 19 | didn't necessarily intend to act upon.  You're just saying   |
|       | 20 | things in frustration.                                       |
| 01:11 | 21 | In regards to the "hurting the police officers,"             |
|       | 22 | Your Honor, that was -- that was said in the context of,     |
|       | 23 | like, a defensive context in case marshal law was imposed.   |
|       | 24 | There were people within the last year who sincerely thought |
|       | 25 | marshal law was going to be declared because of what was     |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

58

| | |
|---|---|
| | 1 | going on with the Presidential election, the, um, pandemic, |
| | 2 | this -- this isn't -- this wasn't uncommon. |
| 01:11 | 3 | He never wanted -- and said -- he never was gonna |
| | 4 | hunt down a cop and hurt the cop for the sake of hurting a |
| | 5 | cop.  That's not in the evidence, Your Honor. |
| 01:11 | 6 | And then some term in regards to blowing up an Air |
| | 7 | Force Base.  That was a statement that somebody else in the |
| | 8 | group -- who I believe was a government operative -- making |
| | 9 | that statement.  My client didn't take it seriously, and |
| | 10 | then ended -- ended up making a joke about it, saying, "No |
| | 11 | need to blow them up.  Just yank the nerds off their |
| | 12 | computers and they'll die of anxiety." |
| 01:12 | 13 | It was clearly not taken seriously by my client. |
| | 14 | And it's just hard because you can't see the tone or the |
| | 15 | intent in any text message.  And I'm sure the Court would |
| | 16 | agree -- or everybody would agree with that.  And, in this |
| | 17 | case, things are being taken out of context, Your Honor. |
| 01:12 | 18 | I believe that the conditions that Judge Scott set |
| | 19 | are completely restrictive.  They're probably the most |
| | 20 | restrictive I've ever personally seen on a case.  And |
| | 21 | especially in light of -- there was another individual who's |
| | 22 | charged with the riots at the capital.  We all saw the |
| | 23 | footage of that.  And he came through this Court.  His name |
| | 24 | was Christian Secor.  And he was in front of Judge Early for |
| | 25 | a detention hearing. |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

59

01:13   1            Judge Early detained him.  He got sent to

        2    Washington, DC.  And the defense attorney there successfully

        3    got him out on bond, on a $200,000 appearance bond, but he's

        4    on 24-hour lockdown at his home.

01:13   5            Your Honor, this is a person that was actually

        6    seen in the Capitol building.  He's charged with civil

        7    disorder, all of those difference charges that the people

        8    that are involved in this case in DC are being charged with.

        9    And this person resides in Costa Mesa.

01:13   10           Um, the restrictions that Judge Scott put on my

        11   client were an ankle monitor.  He -- you know, house arrest.

        12   He can't leave his house, except for certain reasons --

        13   obviously, to come to my office because there's a protective

        14   order.  And I have yet to be able to show him any discovery.

        15   And now the discovery in this case is climbing to 7,000

        16   pages, with numerous recordings and translations that are

        17   gonna need to be reviewed.

01:14   18           Your Honor, I don't think the government is -- has

        19   established that, if my client gets out, he's just gonna go

        20   off and start killing people.  I don't think it's there for

        21   the reasons and the specifics and the evidence I actually

        22   pointed out -- not referencing the search warrant.  The

        23   conditions would guarantee that he comes to court, behaves

        24   while he's out on bond, in his parents home -- that they are

        25   willing to put up for -- a $3,000 secured bond.

| | | |
|---|---|---|
| 01:14 | 1 | THE CLERK:  Not 3,000. |
| 01:14 | 2 | MS. KENNEY:  300,000. |
| 01:14 | 3 | -- 300,000 secured bond, and be on ankle |
| | 4 | monitoring, not have access to the Internet. |
| 01:15 | 5 | It's the most restrictive, Your Honor.  He needs |
| | 6 | to be able to help me prepare his defense.  And with the |
| | 7 | current state of things, with the Santa Ana Jail and not |
| | 8 | being actually able to go through things -- I can't sit at a |
| | 9 | table with him -- um, I just don't think that he's a danger |
| | 10 | to the community, especially in light of him being in |
| | 11 | custody since May of last year. |
| 01:15 | 12 | He's completely distanced himself from the Islam |
| | 13 | religion, and his family's been completely supportive, |
| | 14 | Your Honor. |
| 01:15 | 15 | And in terms of the, you know, Bail Reform Act, I |
| | 16 | think that's what -- what is just and fair in this case. |
| 01:15 | 17 | THE COURT:  I want to thank both of you.  It's |
| | 18 | been quite a journey.  And I especially want to thank each |
| | 19 | of you for your courtesy concerning some of the questions |
| | 20 | that the Court asked on the last occasion. |
| 01:16 | 21 | Some of the delay's been caused -- so, the |
| | 22 | transcripts were obtained at Ms. Kenney's request -- some of |
| | 23 | the delays have been caused because the Court asked |
| | 24 | questions concerning his military background. |
| | 25 | |

|          |     |                                                               |
|----------|-----|---------------------------------------------------------------|
| 01:16    | 1   | **COURT'S FINDINGS**                                          |
| 01:16    | 2   | THE COURT:  Let me begin with this for this record            |
|          | 3   | by stating that HTS is *Tahrir al-Sham*.  "Hamas," of course, |
|          | 4   | you may be much more familiar with.  But like the *al-Nusra*  |
|          | 5   | front and others that operate in Syria and along the Iraqi    |
|          | 6   | border.  The designations can sometimes morph from "ISIS" to  |
|          | 7   | "ISIL."  And the designations, on many occasions by the       |
|          | 8   | United States is kept track of, of different groups involved  |
|          | 9   | in the Syria-Iraq area.                                        |
| 01:16    | 10  | The beginning of this Court's journey is what                 |
|          | 11  | appears to be the willingness to travel to Syria, without     |
|          | 12  | this Court seeing the implementation of that.  There is        |
|          | 13  | discussion about going in the future, two or three years in   |
|          | 14  | the future; and, therefore, Counsel on behalf of the          |
|          | 15  | government, I'd previously ruled against you in terms of the   |
|          | 16  | defendant being a flight danger.                              |
| 01:17    | 17  | The activity in terms of flight, although he                  |
|          | 18  | possessed a passport, didn't lead to a situation where he     |
|          | 19  | purchased a ticket, was taking a war bride, had those         |
|          | 20  | connections with specificity overseas, such that he would     |
|          | 21  | fly into Istanbul, work himself south to Izmir, cross the     |
|          | 22  | 60-mile border that was so open for so many years along the   |
|          | 23  | Iraq-Turkish border that the UN couldn't control.  I didn't   |
|          | 24  | see any of that kind of that past indicia.                    |
| 01:18    | 25  | I have quite a different finding, though, because             |

|   |    |                                                              |
|---|----|--------------------------------------------------------------|
|        | 1  | I believe that, not only do you represent a danger,          |
|        | 2  | Mr. Fong, but an extraordinary danger.  I'm going to set my  |
|        | 3  | record very carefully in this matter.                        |
| 01:18  | 4  | First of all, you should be extremely proud of               |
|        | 5  | your service in the United States Marine Corps.  But, as     |
|        | 6  | such, you represent that unique American who may've entered  |
|        | 7  | under patriotic desire on behalf of our country.  But any    |
|        | 8  | Marine is extraordinarily well-trained in combat.  If you    |
|        | 9  | recall your heritage, it's that you're an infantry person    |
|        | 10 | first, no matter what MOS is designated for you.             |
| 01:19  | 11 | You can be a cook and, unlike any other branch of            |
|        | 12 | the service, you're still called upon to defend that         |
|        | 13 | perimeter as a rifleman, so there's no specialization.  And  |
|        | 14 | therefore, you're an excellent marksman.  You're trained in  |
|        | 15 | bomb techniques.  You're trained in putting together an IED  |
|        | 16 | or a bomb.  You represent that unique ability, quite         |
|        | 17 | frankly, to turn that corner, and rightfully so, on behalf   |
|        | 18 | of the country when it's called upon, from that of an        |
|        | 19 | ordinary system [sic], into a person of extreme violence.    |
|        | 20 | You're to be commended for your service.  By the same token, |
|        | 21 | you represent an extraordinary combination of combat skills  |
|        | 22 | that the average American exercising their First Amendment   |
|        | 23 | rights don't have.                                           |
| 01:20  | 24 | The second thing is this redundancy and whether              |
|        | 25 | there is an anomaly or not.  I don't believe it is.          |

8:20-CR-00146-DOC-1 - 4/2/2021 - Item Number 1

63

01:20    1            On February 6th, you enter into an Instagram
         2    social media group, chat room, *Baqiyah*, a number of members.
         3    I'm not too concerned about your language skills and commend
         4    you on being able to speak Russian.  But pursuant to this,
         5    there've been a number of meetings that have taken place.

01:20    6            I'm extraordinarily concerned when I hear what I
         7    call martyrdom*, jihad.*  I'm extraordinarily concerned when I
         8    have statements that you're willing to die as a martyr in
         9    Syria, regardless of what the group, whether it's al-Nusra,
        10    ISIL, ISIS, HTS.  And while these statements are being made,
        11    and although you say you're against killing innocent
        12    individuals, you well-understood both "AK," [sic] which is
        13    al-Qaeda, and ISIS are terrorist organizations dedicated to
        14    killing.

01:21   15            On February 17th, 2020, during the ^Signal
        16    application and messaging, you agreed with UCI Number 1 that
        17    there was much *haram* and *fitna* in America and Arab
        18    countries.

01:21   19            Disloyal statements can be made, and you can
        20    represent your First Amendment rights.  But on April 15th,
        21    during the conversation, you stated, quote:

01:21   22                "Dying as a martyr sounds way better
        23                than marrying in the West in general and
        24                that My afterlife is worth way more than
        25                any earthly marriage."

01:22    1        -- the beginning of a journey that this Court

           2  believes makes you extraordinarily dangerous.  And,

01:22    3         "I pray to Allah every night that I

           4         become a *shaheed* instead of die

           5         peacefully."

01:22    6        And we both know what *"shaheed"* is.  And we both

           7  understand it very well, don't we?

01:22    8        You go on, on March 6th of 2020, to state and

          9  understand that al-Awlaki was a terrorist.  And we both know

     10  who al-Awlaki is, and we know he operates at the highest

     11  echelons, along with al-Baghdadi and the rest, at the very

     12  top of this pyramid structure.  And we understand his

     13  teachings.  And it's violent extremism, and death.  And

     14  there's no other explanation for it.

01:22   15        You go on to state that you must make *jihad*.  And

     16  we know that that's war.  You go on to state, on March 3rd,

     17  that with *mujahideen Amerikeoon*, the group chat, that you're

     18  going to send financial donations to Malhama Tactical.  And

     19  we both understand, but for my record, instead of belaboring

     20  this, page 15, Footnote 13, holy warriors.

01:23   21        MS. KENNEY:  Your Honor, is the transcript --

01:23   22        THE COURT:  Thank you, Counsel.  I did not

     23  interrupt you.  You will not interrupt me during my

     24  presentation.  Then you can come back and ask questions.  I

     25  want that same politeness.

01:23   1            Thank you.  I will make my record now, Counsel.
        2   And,

01:23   3                "I'd be down to put it all on the line
        4                to go help them train, but we shall
        5                see."

01:24   6            Now, you talk about joining the Soldiers of the
        7   Caucasus.  And depending upon which part, the Soldiers of
        8   the Caucasus we know are primarily Muslim, Tajik.

01:24   9            THE DEFENDANT:  Yes, Your Honor.

01:24  10            THE COURT:  You don't have to answer my question.
       11   I'm just telling you now.  And they operate up in The
       12   Northern Alliance, along the border.  So this isn't some
       13   Christian group.  This is connected again to *jaheed* [sic].

01:24  14            And on March 8, 2020, you sent the *mujahideen*
       15   *Amerikeoon*, via the Signal application, the image and book
       16   *of mujahideen* fighters, describing it as a compendium and
       17   examples of attacks that take place and each commander's
       18   reasoning and philosophy.

01:24  19            Now, that might seem a very innocent signal to
       20   most people who aren't versed in this area.  But those
       21   tactics are *jihad*.  That is how to wage war on both the
       22   Russians and Americans, who are the outside enemy to
       23   al-Qaeda and ISIS, not the inner force, the outside force
       24   that al-Awlaki and al-Bagdadi swung from the initial
       25   al-Qaeda, to looking to outside, the foreign enemy, the

|        |    |                                                          |
|--------|----|----------------------------------------------------------|
|        | 1  | United States -- and the Russians before that.           |
| 01:25  | 2  | And on March 24th, during the chat, you stated:          |
| 01:25  | 3  | "To be honest, if I were to join any                     |
|        | 4  | group in Syria, my choice would be the                   |
|        | 5  | Soldiers of the Caucuses.  They are pure                 |
|        | 6  | and lawfully fighting for Islam."                        |
| 01:25  | 7  | And you are further stated:                              |
| 01:25  | 8  | "Only HTS, Malhama, and the Soldiers                     |
|        | 9  | of the Caucasus are on the right path                    |
|        | 10 | because they fight against *kafir*."                     |
| 01:26  | 11 | I don't want you to speak to me.  But you and I          |
|        | 12 | know what *"kafir"* is.                                  |
| 01:26  | 13 | And you planned to leave the military, which             |
|        | 14 | you're entitled to do -- because the U.S. Army are       |
|        | 15 | terrorists, and so are the Marines.                      |
| 01:26  | 16 | On April 17th, you go on to send a voice                 |
|        | 17 | message -- once again, through the Signal application -- |
|        | 18 | stating you tried to find the Kavas [sic] group, but were|
|        | 19 | unable to look because you believed it had been designated|
|        | 20 | by the United States as a terrorist group.               |
| 01:26  | 21 | So now I know that you're searching.  You aren't         |
|        | 22 | confined to just ATS [sic].  You're looking across the   |
|        | 23 | spectrum of terrorist groups for affiliation.            |
| 01:26  | 24 | You have every right, if you believe, on page 18,        |
|        | 25 | as an American, to distrust the U.S. government.  But you go|

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | on, on April 19th, to state:                                 |
| 01:26 | 2  | "The *mujahideen* in America if I get to                     |
|       | 3  | *Dar ul-Harb* first, we will be your guys.                   |
|       | 4  | We'll probably try getting in with                           |
|       | 5  | *Khorasan* and working more with *Ajnad*,                    |
|       | 6  | though they're both small and really                         |
|       | 7  | determined groups."                                          |
| 01:27 | 8  | Take a look at those groups.  They're                        |
|       | 9  | extraordinarily violent.  Offshoots sometimes of ISIS and    |
|       | 10 | al-Qaeda are the most violent.                               |
| 01:27 | 11 | So, once again, searching.                                   |
| 01:27 | 12 | On April 21st, you go on to say that you thought             |
|       | 13 | the LK [sic] "conducted the 9/11 attacks against the         |
|       | 14 | United States were loyal to" AK [sic].  And you state that,  |
|       | 15 | "It's a stupid idea to die for HTS."                         |
| 01:27 | 16 | It doesn't appear that you're down for martyrdom;            |
|       | 17 | but your certainly down for training, which I'll get to in   |
|       | 18 | just a moment.                                               |
| 01:28 | 19 | You go on to say that when you were a *kafir*, you           |
|       | 20 | wanted to travel to kill ISIS and other extremist groups.    |
|       | 21 | And then you go on to state you're not opposed to killing    |
|       | 22 | them, "They are the dogs of the west," and stated that       |
|       | 23 | "ISIS," Syr- -- "Iranians, Syrians, Russians are all there   |
|       | 24 | for control," in reference to Syria.                         |
| 01:28 | 25 | But on April 25th, during this meeting that, uh,             |

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | Malhama Tactical was recruiting for you to be an instructor. |
|       | 2  | You state that you wanted to make and test a thermite bomb |
|       | 3  | in the desert. |
| 01:28 | 4  | Now, I'm moving from speech, which could be |
|       | 5  | construed or misconstrued as a First Amendment right, to |
|       | 6  | action. |
| 01:28 | 7  | And on May 3rd there's a conversation.  But |
|       | 8  | May 5th caught the Court's eye, on page 20, |
|       | 9  | subparagraph (q).  You tell a UCI that Muslim brothers told |
|       | 10 | you that it was a bad idea to travel to Syria. |
| 01:29 | 11 | Now, for a while, I thought that I would possibly |
|       | 12 | find that you were, in fact, a travel risk.  But one of the |
|       | 13 | things I went back through in the record, with these |
|       | 14 | hundreds and hundreds of pages -- I was looking for |
|       | 15 | something to validate that.  I didn't find that.  If I |
|       | 16 | would've found that, I would've made a different ruling on |
|       | 17 | flight. |
| 01:29 | 18 | But you go on to say that you and the |
|       | 19 | UCI-E-1 [sic] needed to move to a state where they can |
|       | 20 | practice with weapons every weekend, and that you were bored |
|       | 21 | and wanted to kill people, like Person Number 1. |
| 01:29 | 22 | You go on to state that "HTS fighter" had asked |
|       | 23 | you to teach them to make bombs because the Turks already |
|       | 24 | killed their bomb-maker. |
| 01:30 | 25 | Now, why is that relevant to the Court? |

**Certified for Law Office of Edward M. Robinson**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**

01:30   1          First of all, now I've moved from speech, to your

2    capability from your combat training in the Marine Corps --

3    whether you saw combat or not -- to now discuss bomb-making

4    on more than one occasion and your desire to use those, not

5    only as an instructor but to make them.

01:30   6          In and of itself, that would lead to the Court's

7    decision and finding that you're extraordinarily dangerous.

01:30   8          Your May 18th Signal application then goes on by

9    posting to Hamas, the *al-Qassam* brigade -- let me repeat

10   that:  The *al-Qassam* brigade -- which is a military wing of

11   Hamas; this isn't even the fund-raising group -- that you're

12   going to, uh, "find out more about crypto currency because

13   it's the safest way to send money to help our brothers

14   overseas."

01:31   15         And whether it's this country or another country,

16   it's hard to find the peacefulness in your actions, when you

17   state:

01:31   18             "It's very difficult to fight there

19             because Israeli scum are in power and

20             Israeli's weaponry are -- structured are

21             very difficult."  (As read.)

01:31   22         So, from this Court's perspective, I don't just

23   have a domestic view, whether you're killing Russians or

24   innocent Syrians or soldiers of any country, you represent

25   an extraordinary threat.

01:31    1              On March 17th you then start sending information

    2    about chemical weapons and improvised explosives to

    3    *mujahideen Amerikeoon*.

01:31    4              And this goes on in statements, that:

01:32    5                  "Various chemicals, when combined,

    6                  could cause breathing issues and

    7                  chest" --

01:32    8              And you know, in the Marine Corps, you've gone

    9    through that training.  They actually put you in a trailer

    10   and expose you to chemical weapons.

01:32    11             By the way, you also know how to use them, if

    12   you've got basic Marine Corps training.

01:32    13             And you go on to state that -- the materials

    14   stated that:

01:32    15                 "Various chemicals, when combined,

    16                 could cause breathing issues and chest

    17                 pain."

01:32    18             You certainly know that from the Marine Corps.

01:32    19             And, "contained recipes for making improvised

    20   explosive devises."

01:32    21             Quote:

01:32    22                 "Please don't send yourself to Allah

    23                 so soon from a dumb mistake,"

01:32    24             -- meaning:  Don't blow yourself up.  From my

    25   impression:  Go kill others.

01:32    1            Goes on.  You "posted military tactical

         2    instructions for entering a building to minimize losses

         3    and," quote:

01:33    4                 "Take it.  Save it.  Study it."

01:33    5            And you subsequently, in that group chat with

         6    members of *mujahideen*, you state, quote:

01:33    7                 "The ideal combat environment would be

         8                 forest and mountain, however, but we

         9                 don't always get to pick our battles."

01:33   10            There's a tactical environment.  To the average

        11    civilian, means nothing.  To anybody with a military

        12    background -- understand it very well.

01:33   13            On April 1st, 2020, you posted to *mujahideen* in

        14    America, once again, regarding the making of chemical

        15    weapons and improvised explosive devises, and this included

        16    instructions on "how to make mortar scrap mines, nail

        17    grenades" --

01:33   18            Unfortunately, the Court understands that very,

        19    very well.

01:34   20            "-- sodium chlorate and sugar or aluminum

        21    explosives" --

01:34   22            Now, this isn't some farfetched recipe.  This is

        23    right down the line with military training.  This isn't

        24    fiction.  This isn't a delusional person.

01:34   25                 "Fertilizer explosives, nitric acid,

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | improvised black power, potassium                        |
|       | 2  | nitrate, plastics explosive filler,                      |
|       | 3  | chemical fire bottles, sodium chlorate,                  |
|       | 4  | recoilless launcher, grenade launcher,                   |
|       | 5  | pipe hand grenades."                                     |
| 01:34 | 6  | Somebody in the military -- or not in the                |
|       | 7  | military, might think this is fiction.  But for anybody in |
|       | 8  | the military, you've got the rare combination of knowledge |
|       | 9  | and capability.                                          |
| 01:34 | 10 | "It stays in this chat with ours like                    |
|       | 11 | a library so that if you ever need it                    |
|       | 12 | [sic], you know where to look." (As                      |
|       | 13 | read.)                                                    |
| 01:35 | 14 | And then you go on with more training on page 25.        |
|       | 15 | And this is the ambush of the Russians that proceeded the |
|       | 16 | United States.  Lots of film out there -- that the U.S.  |
|       | 17 | uses, by the way -- both countries went through a        |
|       | 18 | significant and interesting journey.                     |
| 01:35 | 19 | And this is "offered" by a former Afghan officer.        |
|       | 20 | And that's the *mujahideen* tactics at the time in attacking |
|       | 21 | and killing Soviet soldiers before these same tactics were |
|       | 22 | used on Americans.                                       |
| 01:35 | 23 | You not only knew that, you express this interest        |
|       | 24 | in engaging in violence.  So it's not just your capability. |
|       | 25 | You send a private message that you had built a firearm and |

| | | |
|---|---|---|
| | 1 | advised to be careful purchasing certain firearms in |
| | 2 | California. |
| 01:35 | 3 | So internally, when I'm pouring through the |
| | 4 | weekend of documents, and took the time today to reread a |
| | 5 | number of other documents on the bench, I found out that |
| | 6 | that's not only true, that what we have, in a sense, is a |
| | 7 | non-serialized weapon in your possession.  So internally, |
| | 8 | what you're saying isn't fiction or delusional, it's |
| | 9 | matching what the police later find at your residence. |
| 01:36 | 10 | And you stated: |
| 01:36 | 11 | "We needed [sic] a civil war.  I think |
| | 12 | most Americans are scumbags or cunts, |
| | 13 | and this is exclusively [sic] to only |
| | 14 | men."  (As read.) |
| 01:36 | 15 | And on February 13th: |
| 01:36 | 16 | "I have money saved up for equipment I |
| | 17 | need because I planned on dying here |
| | 18 | violently, initially.  Still not opposed |
| | 19 | to it." |
| 01:36 | 20 | You either changed yourself in not willing to die |
| | 21 | and just be a trainer or now you're down for the cause. |
| | 22 | Now, you're seeking martyrdom. |
| 01:37 | 23 | In the interview, you initially lied to the FBI. |
| | 24 | You had to be confronted.  But I stopped the last proceeding |
| | 25 | to inquire about the capability that you possessed.  I was |

1    curious because I didn't have a clear picture from the

2    warrant.  I had a picture and I had a description, but I

3    wanted to verify that not only did you have that AR-15, but

4    you had it, what I call, "banana clipped."  And in the

5    Marine Corps we know what that is:  Two magazines taped

6    back-to-back so, in combat, you can shove the first

7    "20 round" in, flip that magazine, flip it upside down, and

8    we're ready to go with 20 more rounds.

01:37    9    Civilian world, they don't have an idea what I'm

10    saying, but in the Marine Corps, understand it very well.

01:38    11    And you stored this right next to your bed with

12    those -- and I said "20" -- I mean, 30-round magazines.  And

13    then you say and tell Fong [sic] that you "would not

14    hesitate to shoot a police officer or anyone that was coming

15    to get you."  And the capability is right beside your bed.

01:38    16    And you'd "kill a police officer on the spot" if

17    you see "the police officer just doing their job."

01:38    18    I understand that the government wants me to make

19    a double finding that you're a flight risk, but I also took

20    into account that any statements about leaving the country

21    were two and three years in advance; and that was, that you

22    might go to the Middle East -- it was equivocal -- in two to

23    three years.  You've got family ties here.  I believe that

24    all of your activities are either military bases here or

25    actions here within this country.

01:39   1          I find you an extraordinary risk beyond clear and

2    convincing, in fact, beyond a reasonable doubt, and that

3    there are no combinations at this time or conditions that

4    would reasonably address the danger you present.

01:39   5          That's a final determination.

01:39   6          Now, Counsel, let me talk to you about a trial

7    date.

01:39   8          A bail hearing is just that.  That holds a person

9    for a period of time, which means that your counsel is

10   concerned about access.  I have no problem with that.  That

11   access will provide -- be provided right next door for your

12   Counsel, Ms. Kenney.  So if she wants access, she can have

13   it.

01:40   14         I'm tired of this COVID, "We can't get to our" --

15   she has a constitutional right to consult with you, and the

16   Court will make certain that that occurs for both of you.

17   Did that with the Aryan Brotherhood, and we had lengthy

18   meetings next door.  And that would be a private

19   conversation at any time.

01:40   20         So, Ms. Kenney, that's open to you.

01:40   21         My question to both of you is, Are we going to

22   trial on the 25th?  If so, I'm calling for a jury.  If we're

23   not, then tell me now, and I will not call for a jury.  But

24   you two -- and this is an order -- get up and go talk to

25   each other quietly about what your needs are in light of my

|  | 1 | ruling.  Because the Court's ready on the 25th.  That's an |
|---|---|---|
|  | 2 | order.  Stand up and go have a conversation.  That's an |
|  | 3 | order. |
| 01:40 | 4 | Otherwise, I'm calling for a jury.  But if I do, |
|  | 5 | we're going to trial on the 25th. |
| 01:40 | 6 | *(Government and defense counsel confer.)* |
| 01:41 | 7 | THE COURT:  And defendant is ordered detained |
|  | 8 | pending trial.  No bail. |
| 01:41 | 9 | Once we set this date, Counsel, it's the "dead or |
|  | 10 | dying" rule.  That's the date we go on, so be careful. |
| 01:41 | 11 | MR. TAKLA:  Your Honor -- |
| 01:41 | 12 | THE COURT:  No.  Listen to me carefully:  I don't |
|  | 13 | care what date you both set to accommodate you.  I don't |
|  | 14 | care if it's the 25th of May or at a later time.  But once I |
|  | 15 | set that date, be very careful with that date because I |
|  | 16 | won't be moving it.  You won't be able to make a good-enough |
|  | 17 | record 'cause I'm going to provide all the access Counsel |
|  | 18 | needs. |
| 01:42 | 19 | Have that conversation. |
| 01:42 | 20 | MS. KENNEY:  That's what I'm confused -- |
| 01:42 | 21 | THE COURT:  Counsel, have that conversation now |
|  | 22 | and come up with a date, or I will hold it on the 25th. |
| 01:42 | 23 | *(Government and defense counsel further confer.)* |
| 01:44 | 24 | MR. TAKLA:  Your Honor, I think we've decided on |
|  | 25 | September 21. |

| | | |
|---|---|---|
| 01:44 | 1 | THE COURT: September 21st. Ms. Kenney, does that |
| | 2 | meet with your consent? |
| 01:44 | 3 | MS. KENNEY: It does. But I just wanna put on the |
| | 4 | record regarding the access to counsel -- |
| 01:44 | 5 | THE COURT: Just a moment. |
| 01:44 | 6 | MS. KENNEY: Can I at least -- |
| 01:44 | 7 | THE COURT: Watch out. You're in my court. Now, |
| | 8 | I'm going to interrupt you 'cause you interrupted me one |
| | 9 | time. So I'm just kidding ya. |
| 01:44 | 10 | I will provide you unlimited access. I will |
| | 11 | provide you that access next door so you don't have any |
| | 12 | problem with the jail, if you don't have access. |
| 01:44 | 13 | MS. KENNEY: When you say "next door," I don't |
| | 14 | know what you're -- |
| 01:44 | 15 | THE COURT: The courtroom right next door so you |
| | 16 | have privacy. |
| 01:44 | 17 | MS. KENNEY: Okay. So -- |
| 01:44 | 18 | THE COURT: I'll bring you to court. |
| 01:44 | 19 | MS. KENNEY: So the courtroom next door where I |
| | 20 | can like set up my computer and sit with my client? |
| 01:44 | 21 | THE COURT: Absolutely. |
| 01:44 | 22 | MS. KENNEY: And that -- that would be just like |
| | 23 | during the Court hours? |
| 01:44 | 24 | THE COURT: Yes. |
| 01:45 | 25 | MS. KENNEY: All right. And how would I schedule |

|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
|       | 1  | that?                                                       |
| 01:45 | 2  | THE COURT:  Just call Kelly and tell us that you            |
|       | 3  | need your client brought over.                              |
| 01:45 | 4  | MS. KENNEY:  And my --                                       |
| 01:45 | 5  | THE COURT:  And you -- remember when you said you           |
|       | 6  | were a young lawyer, way back when -- you know, just a      |
|       | 7  | few days ago.  I'm just kidding you.  We spent seven        |
|       | 8  | consecutive weekends on the Aryan Brotherhood case, catching|
|       | 9  | up with 50,000 documents that the FBI just discovered.      |
| 01:45 | 10 | MS. KENNEY:  So is there access on the weekends,            |
|       | 11 | if it's needed?                                             |
| 01:45 | 12 | THE COURT:  If I need to.  If I can open up the             |
|       | 13 | court.                                                      |
| 01:45 | 14 | Now -- now I'm hesitant right now on the weekends          |
|       | 15 | 'cause I don't want that additional time.  We should be able|
|       | 16 | to do this during court hours.                              |
| 01:45 | 17 | MS. KENNEY:  And would that include my paralegal           |
|       | 18 | being able to meet with my client too to review things?    |
| 01:45 | 19 | THE COURT:  I'm not certain about that.  Let me            |
|       | 20 | discuss that with you because I would want to talk with the |
|       | 21 | marshal's first about that.  But I think so.  I think you   |
|       | 22 | need that kind of effort and aid.  But this isn't for your  |
|       | 23 | convenience.                                                |
| 01:45 | 24 | *(Court and court clerk confer.)*                           |
| 01:45 | 25 | THE COURT:  Oh, I'm not here September 21st.               |

01:46   1              I'm overseas September 21.  Pick another day.

01:46   2              Thank you, Kelly.

01:46   3              MS. KENNEY:  When are you back, Your Honor?

01:46   4              THE COURT:  Not on the record, Counsel.  Just pick

        5   another day.

01:46   6              MS. KENNEY:  October 5th?

01:46   7              THE COURT:  Kelly?

01:46   8              THE CLERK:  That's fine.

01:46   9              THE COURT:  We can.  But be careful with that date

        10  only because, if I'm coming back from someplace in the

        11  world, you might be requesting a jury questionnaire -- I

        12  don't know -- at that time, which I might accede to because

        13  of the inflammatory nature of the charges with some jurors.

01:46   14             I'm going to accommodate that on a murder case we

        15  have coming up with Mr. Weichert and Mr. Wilke, for

        16  instance.  And if you want that, then I don't have that week

        17  before to sort that out with you.  And so if you're

        18  requesting that, I need a period of time where I can go

        19  through those questionnaires, along with you and counsel and

        20  take out those jurors for cause.  So October 5th's fine.

01:47   21             I'm just saying, if -- if you wanted a

        22  questionnaire, I might be amenable to that; and if I was,

        23  then we'd want time to work with the government -- just like

        24  we would on a death penalty case.  Like the AB or the

        25  Mexican Mafia cases, we went through those.  And, actually,

|       |    |                                                                |
|-------|----|----------------------------------------------------------------|
|       | 1  | we got a jury in one day.  But we spent a lot of time on       |
|       | 2  | those questionnaires.  You knew who they were.                |
| 01:47 | 3  | So to get a fair jury, you want to get rid of                 |
|       | 4  | people who, for instance, have hypothetically heard about     |
|       | 5  | the Aryan Brotherhood and the racist undertones or the        |
|       | 6  | Mexican Mafia.  So we got rid of those blatant, you know,     |
|       | 7  | "for cause" right away.  It took about 300 jurors that we     |
|       | 8  | summoned, down to about 140.  Okay?                            |
| 01:47 | 9  | So October 5th's fine.  But then I'm not going to             |
|       | 10 | work with you on a questionnaire.                              |
| 01:48 | 11 | You got time for a story?  See, I'm old now.  I               |
|       | 12 | get to tell stories.                                           |
| 01:48 | 13 | MR. TAKLA:  Of course, Your Honor.                            |
| 01:48 | 14 | THE COURT:  One of my trial judges over in                    |
|       | 15 | depart -- when I was over in Department 5, supervising those  |
|       | 16 | courts -- that you appeared in for all those years -- got up  |
|       | 17 | on a death penalty case and he or she, so I don't designate   |
|       | 18 | who, decided they were going to be Mr. or Ms. Efficient.      |
|       | 19 | They were going to show all the judges down in the judge's    |
|       | 20 | room how quickly they do things.                               |
| 01:48 | 21 | MS. KENNEY:  You won't give the name?                         |
| 01:48 | 22 | THE COURT:  How quickly they could select a jury.            |
| 01:48 | 23 | MS. KENNEY:  You won't give the name?                         |
| 01:48 | 24 | THE COURT:  I won't give the name.  No.                      |
| 01:48 | 25 | And, um, so all the judges gathered.  And normally           |

|       |    |                                                                 |
|-------|----|-----------------------------------------------------------------|
|       | 1  | we will go through a Witt-Witherspoon on a death penalty        |
|       | 2  | case, and minimally one at a time, but, even if you wanted      |
|       | 3  | to take a chance, five, because if somebody said something      |
|       | 4  | in the audience with four jurors waiting and there was bias,    |
|       | 5  | you could get rid of all of five.                               |
| 01:48 | 6  | Judge X decided to do about a hundred up in                     |
|       | 7  | Department 45 at the time -- or 44 or 40 -- I won't tell you     |
|       | 8  | which department, the big one up there.  And they asked a       |
|       | 9  | juror the following:                                            |
| 01:49 | 10 | "Could you be fair?"                                            |
| 01:49 | 11 | And the juror said, "I don't think so."                        |
| 01:49 | 12 | And the judge said, "Why?"                                     |
| 01:49 | 13 | And the response was:  "Because anybody who                    |
|       | 14 | committed this act should be executed 'cause my sister was      |
|       | 15 | raped and murdered."                                            |
| 01:49 | 16 | Now, you go down and try to perfect a record of                |
|       | 17 | fairness for the District Court -- I mean, the Circuit over     |
|       | 18 | here.  How do you clean that up?                                |
| 01:49 | 19 | A hundred jurors needed to be sent home.  You see               |
|       | 20 | what I mean?  That's why those questionnaires can be            |
|       | 21 | extraordinarily invaluable.  Because here you may have some     |
|       | 22 | things that both of you are very concerned about in terms of    |
|       | 23 | fairness.  And a jury questionnaire hopefully will start by     |
|       | 24 | sorting those out.                                              |
| 01:49 | 25 | I'm even open to an individual Hovey or                         |

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | Witherspoon type of questioning.  We can do about 20 to 30 a       |
|       | 2  | day, quite frankly.  Four or five days might be well-taken         |
|       | 3  | to get a fair jury in this period of time.  That's the only        |
|       | 4  | reason I was concerned about October 5th.                          |
| 01:50 | 5  | By the same token, I'm ready to go on May 25th, if                  |
|       | 6  | you want.  That's open to me.                                       |
| 01:50 | 7  | So October?                                                         |
| 01:50 | 8  | MS. KENNEY:  Yes, Your Honor.  'Cause I've not --                   |
|       | 9  | I do not have access right now.                                     |
| 01:50 | 10 | THE COURT:  Okay.                                                   |
| 01:50 | 11 | October and -- time out.  Yes, you do.  You want                   |
|       | 12 | to go on the 25th, I'm ready to go.                                 |
| 01:50 | 13 | Now, hold on.  I can order the marshals to bring                   |
|       | 14 | him over tomorrow.  And they are exuberant --                       |
| 01:50 | 15 | (To U.S. Marshals:) Aren't you?                                    |
| 01:50 | 16 | -- enthused to bring him over.                                     |
| 01:50 | 17 | Look at how enthused they are.                                     |
| 01:50 | 18 | MS. KENNEY:  I would be ineffective if I had to go                 |
|       | 19 | to trial on the date currently set.                                 |
| 01:50 | 20 | THE COURT:  Time out.  I'm not forcing you into                    |
|       | 21 | any trial date.  I'm just not letting you set a record that        |
|       | 22 | you can't get access.  Because you can in my court.                 |
| 01:50 | 23 | MS. KENNEY:  Okay.                                                 |
| 01:50 | 24 | THE COURT:  You can get access as early as                        |
|       | 25 | tomorrow.                                                           |

| | | |
|---|---|---|
| 01:51 | 1 | MS. KENNEY:  Okay. |
| 01:51 | 2 | THE COURT:  That's your choice going to the 5th. |
| | 3 | But I promise you -- just ask Cori Ferrentino ask Kate -- |
| | 4 | they sat here on weekends. |
| 01:51 | 5 | Now, I don't have to do that 'cause I think I can |
| | 6 | get you in on regular hours.  Access is never gonna be a |
| | 7 | problem in my court.  You have the right and I -- I think |
| | 8 | the paralegal will work out.  I just wanna talk to you folks |
| | 9 | about how to set that up with the marshal's office.  Okay? |
| 01:51 | 10 | MS. KENNEY:  Okay. |
| 01:51 | 11 | THE COURT:  Okay. |
| 01:51 | 12 | So what date do you want? |
| 01:51 | 13 | MR. TAKLA:  October 12th, Your Honor? |
| 01:51 | 14 | THE CLERK:  Hold on. |
| 01:51 | 15 | MS. KENNEY:  Oh, not the 5th? |
| 01:51 | 16 | THE COURT:  No.  October 5th? |
| 01:51 | 17 | MS. KENNEY:  I thought it was October 5th. |
| 01:51 | 18 | THE COURT:  I'm just not going to work with you on |
| | 19 | a jury questionnaire the week before.  I'm not here. |
| 01:51 | 20 | MR. TAKLA:  That's why I proposed the 12th, |
| | 21 | Your Honor.  But I'll go with what -- |
| 01:51 | 22 | THE COURT:  Okay. |
| 01:51 | 23 | Matter's set for October 5th. |
| 01:52 | 24 | THE CLERK:  Status conference? |
| 01:52 | 25 | THE COURT:  I'm not going to have a status |

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
|       | 1  | conference.                                               |
| 01:52 | 2  | THE CLERK:  No?                                           |
| 01:52 | 3  | THE COURT:  I don't need a status conference.  No.        |
|       | 4  | They're going to trial on that date.  Set this matter on  |
|       | 5  | October 5th for trial.  I don't need a status conference  |
|       | 6  | with you.  If there's a resolution, inform the Court.  But|
|       | 7  | we don't need to visit again.  That's the date.           |
| 01:52 | 8  | Now, I would order a written Waiver of Excludable         |
|       | 9  | Time to protect the record.                               |
| 01:52 | 10 | MR. TAKLA:  We can draft that, Your Honor.                |
| 01:52 | 11 | THE COURT:  And I wish you the best.                      |
| 01:52 | 12 | MR. TAKLA:  Thank you, Your Honor.                        |
| 01:52 | 13 | THE COURT:  We're in recess.                             |
| 01:52 | 14 | But I'm going to sit here for the next matter.            |
| 01:52 | 15 | *(Proceedings adjourned at 1:52 p.m.)*                    |
| 01:52 | 16 | -oOo-                                                     |
| 01:52 | 17 |                                                           |
|       | 18 |                                                           |
|       | 19 |                                                           |
|       | 20 |                                                           |
|       | 21 |                                                           |
|       | 22 |                                                           |
|       | 23 |                                                           |
|       | 24 |                                                           |
|       | 25 |                                                           |

| 01:52 | 1 | -oOo- |
| 01:52 | 2 | |
| 01:52 | 3 | CERTIFICATE |
| 01:52 | 4 | |
| 01:52 | 5 | I hereby certify that pursuant to Section 753, |

6   Title 28, United States Code, the foregoing is a true and

7   correct transcript of the stenographically reported

8   proceedings held telephone in the above-entitled matter and

9   that the transcript page format is in conformance with the

10  regulations of the Judicial Conference of the United States.

01:52   11

01:52   12  Date:  April 21, 2021

01:52   13

01:52   14

01:52            /s/ Debbie Gale
01:52   15
01:52            _____
01:52   16        DEBBIE GALE, U.S. COURT REPORTER
                 CSR NO. 9472, RPR, CCRR

01:52   17

01:52   18

01:52   19

20

21

22

23

24

25

**Certified for Law Office of Edward M. Robinson**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**

EXHIBIT B

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JUL 21 2021

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                 Plaintiff-Appellee,<br><br>  v.<br><br>JASON FONG, AKA asian_ghazi,<br><br>                 Defendant-Appellant. | No.    21-50089<br><br>D.C. No.<br>8:20-cr-00146-DOC-1<br>Central District of California,<br>Santa Ana<br><br>ORDER |

Before:  PAEZ, BERZON, and FORREST, Circuit Judges.

This is an appeal from the district court's pre-trial detention order.  We have jurisdiction pursuant to 18 U.S.C. § 3145(c) and 28 U.S.C. § 1291.  We have reviewed the district court's statement of reasons and the parties' supplemental briefing filed pursuant to our June 3, 2021 order.  We reverse and remand.

We previously remanded this case to allow the district court to explain why conditions of release – such as those imposed by the magistrate judge – would be inadequate to reasonably address the danger posed by appellant.  On remand, however, the district court simply reiterated its earlier findings regarding the danger appellant posed to the community and concluded that this danger "transcends the magistrate's restrictions."  This was inadequate.  *See United States v. Wheeler*, 795 F.2d 893, 841 (9th Cir. 1986) (order) ("[A] district court's reasons for its [detention] decision must be adequately explained; conclusory statements

KWH/MOATT

are insufficient.").  The district court did not discuss the specific conditions of release imposed by the magistrate judge let alone explain why they were inadequate.  Accordingly, we reverse the district court's April 2, 2021, detention order.  On remand, the district court shall place appellant on pre-trial release subject to the conditions imposed by the magistrate judge in her February 26, 2021 order.

Nothing in this order shall be construed as preventing the district court from addressing any violation of pre-trial release.

The mandate shall issue forthwith.  *See* Fed. R. App. P. 41(b).

**REVERSED and REMANDED.**