KARREN KENNEY, CA. SBN 174872
KENNEY LEGAL DEFENSE
5000 BIRCH STREET, SUITE 3000
COSTA MESA, CA 92626
TELEPHONE: (855) 505-5588
E-MAIL: karren.kenney@gmail.com

Attorney for Defendant

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATE OF AMERICA ) <br> ) <br> v. ) <br> ) <br> JASON FONG ) <br> ) <br> ) <br> ) <br> ) <br> ) | Case No.   SACR  20-00146 -DOC <br><br> DEFENDANT'S OBJECTION TO GOVERNMENT'S NOTICE OF INTENT TO INVOKE THE CLASSIFIED INFORMATION PROCEDURES ACT ("CIPA") AND MOTION TO DESIGNATE A CLASSIFIED INFORMATION SECURITY OFFICER ("CISO") |

Defendant Jason Fong, by and through his attorney of record Karren Kenney, hereby objects to the GOVERNMENT'S NOTICE OF INTENT TO INVOKE THE CLASSIFIED INFORMATION PROCEDURES ACT ("CIPA") AND MOTION TO DESIGNATE A CLASSIFIED INFORMATION SECURITY OFFICER ("CISO").

DATED: August 15, 2021                         /s/     *Karren Kenney*
                                                                        KARREN KENNEY
                                                                        Attorney for Defendant

## I. Introduction

In enacting CIPA, Congress clearly determined that it did not intend for a defendant to stand in a worse position merely because the case involved classified information. *United States v. Poindexter*, 698 F. Supp. at 320 (citing 1980 U.S. Code Cong. & Admin. News 4294, 4302). CIPA does not narrow—let alone eliminate—a defendant's longstanding right to notice and disclosure of surveillance or other issues that are relevant for potential suppression motions. Nothing in CIPA permits the government to make such *ex parte* submissions as a matter of right. Rather, Congress intentionally chose the permissive "may" in the plain text of CIPA Section 4, rather than the mandatory "shall," which makes it clear that courts retain discretion to reject *ex parte* submissions on a case-by-case basis. Thus, if classified information is discoverable—or even arguably discoverable—CIPA provides that the prosecutors may apply to the court for a protective order. 18 U.S.C. app. §3, 4.

Moreover, when applying CIPA's procedures, various courts have recognized that they must give defendants "the benefit of the doubt" when determining whether information may be relevant or helpful. *United States v. Mejia*, 448 F.3d at 458 (citing *Yunis*, 867 F.2d at 624); *see also United States v. Price*, 566 F.3d 900, 913 n.14 (9th Cir. 2009) ("[I]f doubt exists, it should be resolved in favor of the defendant and full disclosure made.") (quoting *United States v. Acosta*, 357 F .Supp. 2d 1228, 1239-40 (D. Nev. 2005)); *Rezaq*, 134 F.3d at 1142 ("A court applying this rule [under Section 4 of CIPA] should, of course, err on the side of protecting the interests of the defendant."). *See also United States v. Brown*, No. 5:14-CR-58-FL, 2014 U.S. Dist. LEXIS 54143, at *12 (E.D.N.C. Apr. 18, 2014) ("Even though CIPA allows § 4 proceedings to be held *ex parte*, and courts have upheld the *ex parte* nature of these proceedings, the court's decision-making regarding the 'relevant and helpful' nature of certain classified materials may be enhanced if cleared

2

defense counsel are involved in some adversary proceeding with the government.").

Thus, because CIPA "does not expand or restrict established principles of discovery," (*United States v. Sedaghaty*, 728 F.3d 885, 904 (9th Cir. 2013)), it preserves Defendant's rights to notice and disclosure of surreptitious surveillance of him, and to obtain relevant and helpful material. Even if such information is in fact privileged, the DOJ's privilege must "give way . . . to a criminal defendant's right to present a meaningful defense." *United States v. Stewart*, 590 F.3d 93, 131 (2d Cir. 2009).

## II. CIPA Section 4 Does Not Permit *Ex Parte* Obfuscation and Litigation of Potential Fourth Amendment Suppression Issues.

CIPA does not permit the prosecutors to litigate Fourth Amendment suppression issues entirely in secret, under the guise of "relevance." If surveillance of Defendant contributed to the intelligence agencies' investigation, then the surveillance must be disclosed so that Defendant has a meaningful opportunity to show that it was unlawful and that suppression is required. *See United States v. Moalin*, 973 F.3d 977, 1000 (9th Cir. 2020) ("[a]t a minimum, then, the Fourth Amendment requires notice to a criminal defendant when the prosecution intends to enter into evidence or otherwise use or disclose information obtained or derived from surveillance of that defendant conducted pursuant to the government's foreign intelligence authorities.")

Potential suppression issues may be obscured and litigated through the CIPA process in several ways. For instance, the prosecutors may label evidence derived from surveillance as a mere "tip" or "lead," and then may argue that the evidence is "too attenuated" from the trial evidence. That line of argument is not appropriate for CIPA proceedings. Rather than posing questions of relevancy under CIPA, such arguments present questions of whether the Fourth Amendment exclusionary rule applies, which is

a question that cannot and may not be resolved on the basis of the prosecutors' labels and unrebutted factual and legal claims. *See Kolod v. United States*, 390 U.S. 136, 137 (1968). The prosecutors may also argue that disclosure of surveillance of Defendant is not "relevant or helpful" because Defendant would not be entitled to suppression under the applicable Fourth (or Fifth) Amendment doctrines. However, these arguments raise merits-related questions that cannot be pre-judged in secret without defense participation. As discussed in more detail below, the Supreme Court has held in an analogous context that the prosecutors' unilateral representations concerning attenuation from taint cannot be relied upon, and that *ex parte* court review is insufficient to overcome the substantial risks of error and prejudice to defendants. *See Alderman*, 394 U.S. at 182–84.

Moreover, and specifically with respect to unlawful surveillance, the cases demonstrate that defendants are entitled to know about the *fact* of the surveillance in order to challenge it— even in cases implicating national security. *See Moalin*, 973 F.3d at 1000; *United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.* ("*Keith*"), 407 U.S. 297, 324 (1972); *Kolod*, 390 U.S. at 137; *United States v. Belfield*, 692 F.2d 141, 146 (D.C. Cir. 1982); *United States v. Bissell*, 634 F.2d 1228, 1233 (9th Cir. 1980); *see also* 50 U.S.C. §1806(c) (requiring notice of FISA surveillance). Simply put, even under CIPA, disclosure is necessary because of the relatively low "relevant or helpful" threshold; the need for courts to err on the side of disclosure; and because defendants must have a meaningful opportunity to seek suppression of unlawfully obtained evidence.

**III.    CIPA Section *Ex Parte* Proceedings Should Not Be Used to Undermine the Adversarial Process**.

Litigation of suppression issues, even in the national security setting, should not be done in an *ex parte* setting that undermines the adversarial process. In *Alderman*, a case predating CIPA but also involving national-security interests, the Supreme Court rejected the DOJ's effort to rely on an *ex parte* process to determine whether any of the government's evidence was based on evidence collected in violation of the Fourth Amendment, and specifically, "illegally overheard conversations or conversations occurring on [the petitioner's] premises." *Alderman*, 394 U.S. at 180. Determining whether such evidence was, in fact, based on illegally collected evidence was essential to the petitioner's ability to raise suppression arguments in order to assert that the evidence was the fruit of the poisonous tree. *See id.* (quoting *Wong Sun*, 371 U.S. a 488). The government in *Alderman*, recognized that it must disclose "records which are relevant to the decision of this ultimate issue" and further acknowledged that "disclosure must be made even though attended by potential danger to the reputation or safety of third parties or to the national security—unless the United States would prefer dismissal of the case to disclosure of the information." *Alderman*, 394 U.S. at 181. It also argued that, rather than disclosing the evidence to defense counsel, the court, sitting *ex parte*, should first review the records to first determine if they are arguably relevant and then turn them over to the petitioner who "would then have the opportunity to use the disclosed information in his attempt to show that the Government has used tainted evidence to convict him." *Id.* at 181. The Supreme Court rejected the government's proposal.

The Supreme Court's rationale for doing so is relevant for the anticipated CIPA issues because the importance of those issues may only be apparent only to defense counsel. On these points the Supreme Court stated as follows:

> Although this may appear a modest proposal, especially since the standard for disclosure would be "arguable" relevance, we conclude that surveillance records as to which any petitioner has standing to object should be turned over to him without being screened *in camera* by the trial judge. Admittedly, there may be much learned from an electronic surveillance which ultimately contributes nothing to probative evidence. But winnowing this material from those items which might have made a substantial contribution to the case against a petitioner is a task which should not be entrusted wholly to the court in the first instance. It might be otherwise if the trial judge had only to place the transcript or other record of the surveillance alongside the record evidence and compare the two for textual or substantive similarities. Even that assignment would be difficult enough for the trial judge to perform unaided. But a good deal more is involved. An apparently innocent phrase, a chance remark, a reference to what appears to be a neutral person or event, the identity of a caller or the individual on the other end of a telephone, or even the manner of speaking or using words may have special significance to one who knows the more intimate facts of an accused's life. And yet that information may be wholly colorless and devoid of meaning to one less well acquainted with all relevant circumstances. **Unavoidably, this is a matter of judgment, but in our view the task is too complex, and the margin for error too great, to rely wholly on the *in camera* judgment of the trial court to identify those records which might have contributed to the Government's case.**

*Alderman*, 394 U.S. at 182.

Further, the Supreme Court's refusal to accept the government's proposal to use *ex parte* proceedings, rather than disclose evidence to defense counsel, was based in large part on the centrality of conducting adversary proceedings in criminal cases. On this point, the Supreme Court stated as follows:

> Adversary proceedings are a major aspect of our system of criminal justice. Their superiority as a means for attaining justice in a given case is nowhere more evident than in those cases, such as the ones at bar, where an issue must be decided on the basis of a large volume of factual materials, and after consideration of the many and subtle interrelationships may exist among the facts reflected by these records. As the need for adversary inquiry is increased by the complexity of the issues presented for adjudication, and by the consequent inadequacy of *ex parte* procedures as a means for their accurate resolution, the displacement of well- informed advocacy necessarily becomes less justifiable.

*Alderman*, 394 U.S. at 183-84. These observations are particularly relevant to this case, which undoubtedly presents complex issues for adjudication, including a national security investigation involving confidential human sources. *Ex parte* litigation of suppression issues in this case would also violate Defendant's Due Process rights. Put simply, courts are not equipped to stand in for defense counsel when resolving novel, close, or complex questions of fact and law. *See United States v. Abuhamra*, 389 F.3d 309, 322–23 (2d Cir. 2004) ("Particularly where liberty is at stake, due process demands that the individual and the government each be afforded the opportunity not only to advance their respective positions but to correct or contradict arguments or evidence offered by the other."); *American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045, 1069 (9th Cir. 1995) ("[T]he very foundation of the adversary process assumes that use of undisclosed information will violate due process because of the risk of error.").

Suppression proceedings routinely involve extensive discovery, live testimony, and legal argument. The Court cannot reasonably replicate this inquiry on its own, taking on the role of surrogate defense counsel, especially in the face of extensive one-sided submissions by the government. The adversary process requires that the "determination of what may be useful to the defense can properly and effectively be made only by an advocate," not the judge. *Dennis v. United States*, 384 U.S. 855, 874-75 (1966); *see Libby*, 429 F. Supp. 2d at 23, *amended by* 429 F. Supp. 2d 46 (recognizing that "there are fewer threats to national security in disclosing classified documents to a defendant and his attorney who have obtained security clearances, than when disclosure is made to someone who has not received security clearances").

Ultimately, neither CIPA nor due process permit using an *ex parte* proceeding to preclude and defeat suppression motions on the merits before Defendant even knows

the grounds of the potential suppression motion. At a minimum, *Alderman* and its progeny instruct that defendants are entitled to notice and disclosure of surveillance, notwithstanding the DOJ's claim that its evidence is not "fruit of the poisonous tree." *See Belfield*, 692 F.2d at 146 ("[E]ven when the Government has purported not to be offering any evidence obtained or derived from the electronic surveillance, a criminal defendant may claim that he has been the victim of an illegal surveillance and seek discovery of the logs of the overhears to ensure that no fruits thereof are being used against him."); *see also Kolod*, 390 U.S. 136 (*per curiam*) (rejecting DOJ's unilateral determination that its evidence was not derived from challenged surveillance and requiring adversarial proceedings). This rule is consistent with the disclosure scheme Congress established in 18 U.S.C. §3504, which requires the prosecution to "affirm or deny the occurrence" of allegedly unlawful electronic surveillance, so that a defendant has the opportunity to seek suppression.

Accordingly, the prosecutors should not be permitted to use CIPA and secret, one-sided submissions to conceal even notice of the existence of surveillance from counsel. They cannot use these proceedings to argue that an exception to the "fruit of the poisonous tree" doctrine should apply; that its surveillance was lawful; or, that the good-faith exception should apply. These threshold questions cannot be decided at the outset without the defense having any opportunity to participate or even any knowledge of the surveillance. *See Belfield*, 692 F.2d at 146. Rather, cleared counsel are entitled to know, among other things, whether Defendant or any alleged co- conspirators were subject to surreptitious electronic surveillance in order to challenge the lawfulness of that surveillance, and then to test through fact-finding and adversarial litigation the extent to which the prosecutions' evidence is derived from any unlawful surveillance. *See Alderman*, 394 U.S. at 181; *Keith*, 407 U.S. 297; 18 U.S.C. § 3504. In this manner,

the notice and disclosure requirements ensure that counsel will have a meaningful opportunity to suppress unlawfully obtained evidence, as is their obligation to the Defendant. It should almost go without saying that a Defendant's right cannot be said to be meaningful if there are no means to enforce it.

### IV. CIPA Has Been Used to Conceal Complex Fourth Amendment Suppression Issues Without Defense Participation.

The concerns set forth in this objection are based in part on official public disclosures that have revealed that the prosecutors have in the past improperly relied on the CIPA process to conceal surveillance in federal criminal cases. For instance, a report that was issued by the Department of Justice Inspector General in July of 2009, but that was not made public until September of 2015, criticizes the DOJ's criminal discovery practices and shows that prosecutors have relied on CIPA's *ex parte* procedures to keep criminal defendants such as Osadzinski from learning about warrantless surveillance used to monitor their communications and activities. *See* DOJ Office of the Inspector General, *A Review of the Department of Justice's Involvement with the President's Surveillance Program* 347–59 (July 2009) ("OIG Report").

This OIG Report addresses the "Stellar Wind" surveillance programs, which intelligence agencies operated for years without congressional or judicial approval. **The report severely criticizes the DOJ's criminal discovery practices and shows that prosecutors have relied on CIPA's *ex parte* procedures to keep criminal defendants charged in material support cases from learning about warrantless surveillance that was used to monitor their communications and activities**. *See* DOJ Office of the Inspector General, *A Review of the Department of Justice's Involvement with the President's Surveillance Program* (July 2009) ("OIG Report"). This case is one in which Mr. Fong is charged with a material support offense.

Contrary to the DOJ's insistence that it is aware of and complies with its discovery obligations under the Federal Rules of Criminal Procedure and *Brady*, the Inspector General found that "the Department made little effort to understand and comply with its discovery obligations in connection with Stellar Wind-derived information for the first several years of the program"; and that after an the initial efforts of an OLC attorney produced "a legal analysis that was based on an incorrect understanding of the facts of the case to which it applied," the Department's subsequent remedial efforts "[were] not complete and do not fully ensure that the government has met its discovery obligations." OIG Report, p. 357.

One particular disclosure in the OIG Report is particularly relevant to the concerns raised in this objection. The report makes clear that the DOJ has routinely sought to litigate core Fourth Amendment questions—including whether its evidence is the "fruit of the poisonous tree"—in secret in order to insulate surveillance from adversarial challenge. According to the Inspector General, the DOJ's CIPA submissions in cases involving these surveillance programs:

> "uniformly stated that information in the NSA's intelligence reports had not been or would not be used as evidence, and that there was no causal connection between the information in the reports and any evidence used or to be used at trial, or was too attenuated from the evidence to be discoverable. The government argued that reporting would not aid the defense, the court need not explore the sources and methods used to acquire the information. The submissions also argued that the information collected by the NSA was not included in the government's FISA application, and therefore was too attenuated from the trial evidence to merit a review of the means by which the intelligence information was gathered. The government asserted that the "causal connection" between discovery of the derivative evidence and the alleged illegal search "may have become so attenuated as to dissipate the taint."

OIG Report, p. 351 (footnotes omitted). Thus, the prosecution would claim that its evidence was not "tainted" by the warrantless surveillance, despite the fact that other

portions of the OIG Report call those assertions into question. Based on its one-sided claims, the DOJ concealed its use of Stellar Wind surveillance from every criminal defendant who was subject to this warrantless wiretapping. This improper practice ensured that neither the surveillance nor the DOJ's "taint" claims were ever subject to an adversarial challenge.

In short, the 2009 OIG Report and other materials show that the DOJ has used the CIPA process to make one-sided claims in an *ex parte* setting about why its evidence was not tainted by secret surveillance. When making these arguments, prosecutors appear to rely on a variety of different theories in this context, including arguments that: (1) the surveillance was "too attenuated" from the trial evidence; (2) the surveillance was merely a "tip" or a "lead"; (3) any warrants broke the causal chain; (4) the trial evidence was obtained from an "independent" source; and (5) the "inevitable discovery" exception applies. Ultimately, these are complex legal and factual questions that cannot be accurately resolved in an entirely *ex parte* basis in a manner that is remotely consistent with due process.

## CONCLUSION

Based upon the foregoing, the court should not allow the Government to invoke secret litigation under the guise of the Classified Information Procedures Act. This would clearly violate Mr. Fong's Constitutional right to due process which would result in a fundamentally unfair trial. If this is allowed, Mr. Fong would be unable to present a complete defense and his counsel would be denied the opportunity to adequately cross examine the numerous government witnesses in this case.

Dated: August 15, 2021      Respectfully submitted,

*Karren Kenney*
Karren Kenney
Attorney for Jason Fong