E. MARTIN ESTRADA
United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
CHRISTINE M. RO (Cal. Bar No. 285401)
Assistant United States Attorney
Terrorism and Export Crimes Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-4496
    Facsimile: (213) 894-2927
    E-mail:   Christine.Ro@usdoj.gov

MATTHEW G. OLSEN
Assistant Attorney General
National Security Division
JOHN CELLA (D.C. Bar No. 1035356)
Trial Attorney
Counterterrorism Section
    950 Pennsylvania Ave, NW
    Washington, DC 20530
    Telephone: (202) 305-1601
    Email:    John.Cella@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

#### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>              v.<br><br>JASON FONG,<br>  aka "asian_ghazi,"<br>  aka "Jason Asian Ghazi,"<br>  aka "Mustafa Ahmed Al-Hakim,"<br><br>           Defendant. | No. SA CR 20-00146(A)-DOC<br><br>GOVERNMENT'S MOTION FOR PROTECTIVE ORDER PERTAINING TO THE TESTIMONY OF UNDERCOVER AGENTS AND A CONFIDENTIAL HUMAN SOURCE; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF KEVIN VORNDRAN<br><br>Hearing Date: TBA<br>Hearing Time: TBA<br>Location:    Courtroom of the<br>             Hon. David O.<br>             Carter |

1    Plaintiff United States of America, by and through its counsel

2 of record, the United States Attorney for the Central District of

3 California and Assistant United States Attorney Christine M. Ro and

4 National Security Division Counterterrorism Section Trial Attorney

5 John Cella, hereby moves the Court for a protective order in this

6 matter regarding the testimony of two undercover employees and a

7 confidential human source whom the United States anticipates calling

8 at trial.  The government seeks an order for reasonable precautions

9 to protect these witnesses' identities that is consistent with

10 defendant's Sixth Amendment rights.  These precautions are necessary

11 to protect the safety of these witnesses and to preserve their

12 ability to continue critical work on behalf of the United States.[1]

13 None of the requested procedures will prevent defendant from

14 effectively cross-examining the witnesses, nor will they otherwise

15 infringe on his rights under the Confrontation Clause.  As such, the

16 government respectfully requests the Court approve the proposed order

17 for the protective measures discussed below.

18    This motion is based upon the attached Memorandum of Points and

19 Authorities; the classified declaration from Kevin Vorndran, Acting

20 Assistant Director of the FBI's Counterterrorism Division; the files

21 ///

22

23

---

24    [1] The government incorporates by reference the government's
Classified, In Camera, Ex Parte, and Under Seal Motion for a
25 Protective Order Pursuant to CIPA Section 4 and Fed. R. Crim. P.
16(d)(1), and the accompanying classified declaration from Kevin
26 Vorndran, the Acting Assistant Director of the FBI's Counterterrorism
Division.  See Dkt. No. 130.  That motion and declaration set forth
27 additional factual information supporting the implementation of the
requested protective measures in relation to the testimony of the
28 anticipated witnesses referenced in this motion, OCE#1, OCE#2, and
the CHS.

ii

and records of this case; and such other evidence and argument as this Court may entertain on this motion.

Dated: September 20, 2022          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division


                                   _____/s/_____
                                   CHRISTINE M. RO
                                   Assistant United States Attorney

JOHN CELLA
Trial Attorney
Counterterrorism Section
National Security Division

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

**TABLE OF AUTHORITIES**.......................................................**v**

**MEMORANDUM OF POINTS AND AUTHORITIES**..................................1

    **I.**    **INTRODUCTION**.................................................1

    **II.**   **FACTUAL BACKGROUND**.........................................2

        **A.**   **Defendant's Dissemination of Combat and Weapons-Making Information to the Undercover Witnesses and Others (Counts 1-3)**.............................3

        **B.**   **Defendant's Solicitation of Cryptocurrency for HAMAS and Related Communications with OCE#1 (Count 4)** ..........................................5

        **C.**   **Defendant's Other Statements to the Undercover Witnesses and Others Regarding His Support for HTS and His Desire to Die as a Martyr**...............6

    **III.**  **PROTECTIVE MEASURES SOUGHT**................................7

    **IV.**   **ARGUMENT**...................................................9

        **A.**   **Use of Pseudonyms and Prohibition Against Eliciting Identifying Information (Measures ##1-3)**.................................................12

        **B.**   **Prohibition on Eliciting Information about the FBI's Undercover and Confidential Human Source Programs (Measure #4)**...............................16

        **C.**   **Partial Courtroom Closure and Use of a Separate Audio Feed (Measures #5)**...........................17

            1.   Substantial Reason............................19

            2.   Narrowly Tailored............................20

            3.   Reasonable Alternatives......................21

            4.   Courts Have Granted Partial Courtroom Closures in Similar Situations.................21

        **D.**   **Light Disguise (Measure #6)**.......................23

        **E.**   **Other Measures (Measures ##7-9)**...................24

    **V.**    **CONCLUSION**................................................25

## TABLE OF AUTHORITIES

DESCRIPTION                                                          PAGE

**CASES**

Ayala v. Speckard,
  131 F.3d 62 (2d Cir. 1997) ..............................19, 20

Brady v. Maryland,
  373 U.S. 83 (1963) .......................................15

Brown v. Kuhlman,
  142 F.3d 529 (2d Cir. 1998) ..............................13

Caldwell v. State of Minn.,
  536 F.2d 272 (8th Cir. 1976) .............................14

Carson v. Fischer,
  421 F.3d 83 (2d Cir. 2005) ............................20, 21

Chambers v. Mississippi,
  410 U.S. 284 (1973) ......................................11

Davis v. Alaska,
  415 U.S. 308 (1974) ......................................10

Delaware v. Van Arsdall,
  475 U.S. 673 (1986) ...................................10, 11

Giglio v. United States,
  405 U.S. 150 (1972) ......................................15

Maryland v. Craig,
  497 U.S. 836 (1990) ..............................10, 12, 23

Rodriguez v. Miller,
  537 F.3d 102 (2d Cir. 2008) ..............................19

Siegfriedt v. Fair,
  982 F.2d 14 (1st Cir. 1992) ..............................14

Smith v. Illinois,
  390 U.S. 129 (1968) ......................................13

United States v. Alimehmeti,
  284 F. Supp. 3d 477 (S.D.N.Y. 2018)................16, 24, 25

United States v. Alston,
  460 F.2d 48 (5th Cir. 1972) ..............................14

United States v. Baker,
   419 F.2d 83 (2d Cir. 1969) ..................................14

United States v. Bundy,
   2017 WL 888311 (D. Nev. Mar. 6, 2017) ......................24

United States v. Callahan,
   801 F.3d 606 (6th Cir. 2015) ...............................11

United States v. Cavallaro,
   553 F.2d 300 (2d Cir. 1977) ................................14

United States v. Celis,
   608 F.3d 818 (D.C. Cir. 2010) ..........................11, 13

United States v. Cosby,
   500 F.2d 405 (9th Cir. 1974) ...............................12

United States v. Crockett,
   506 F.2d 759 (5th Cir. 1975) ...............................14

United States v. de Jesus-Casteneda,
   705 F.3d 1117 (9th Cir. 2013) ..............................23

United States v. Domingo,
   No. 19-cr-313-SVW, Dkt. No. 522 (C.D. Cal., Jul. 29,
   2021) ......................................................21

United States v. El-Mezain,
   664 F.3d 467 (5th Cir. 2011) .......................11, 13, 14

United States v. Ellis,
   468 F.2d 638 (9th Cir. 1972) ...............................12

United States v. Falsia,
   724 F.2d 1339 (9th Cir. 1983) ..............................11

United States v. Givhan,
   740 F. App'x 458 (6th Cir. 2018) ...........................11

United States v. Hendricks,
   950 F.3d 348 (6th Cir. 2020) ...........................22, 24

United States v. Hernandez,
   2013 WL 3936185 (S.D.N.Y., Jul. 29, 2013) ..................20

United States v. Johnson,
   191 F. Supp. 3d 363 (M.D. Pa. 2016) ........................17

United States v. Lindh,
   198 F. Supp. 2d 739 (E.D.V.A. 2002) ........................16

United States v. Longueuil,
  567 F. App'x 13 (2d Cir. 2014) ..............................16

United States v. Mohamud,
  666 Fed. App'x 591 (9th Cir. 2016) .....................12, 22

United States v. Naseer,
  2015 WL 13843166 (E.D.N.Y. Jan. 26, 2015) ..................23

United States v. Palermo,
  410 F.2d 468 (7th Cir. 1969) ...............................13

United States v. Penick,
  496 F.2d 1105 (7th Cir. 1974) ..............................14

United States v. Ramos-Cruz,
  667 F.3d 487 (4th Cir. 2012) ...............................13

United States v. Rangel,
  534 F.2d 147 (9th Cir. 1976) ...............................12

United States v. Salemme,
  2018 WL 2465359 (D. Mass. June 1, 2018) ....................24

United States v. Schulte,
  436 F. Supp. 3d 698 (S.D.N.Y. 2020) ........................24

United States v. Sherlock,
  962 F.2d 1349 (9th Cir. 1989) ..........................18, 19

United States v. Simmons,
  797 F.3d 409 (6th Cir. 2015) ...............................19

United States v. Smaldone,
  484 F.2d 311 (10th Cir. 1973) ..............................14

United States v. Smith,
  780 F.2d 1102 (4th Cir. 1985) ..............................16

United States v. Van Horn,
  789 F.2d 1492 (11th Cir. 1986) .............................16

United States v. Yazzie,
  743 F.3d 1278 (9th Cir. 2014) ..............................18

Waller v. Georgia,
  467 U.S. 39 (1984) .........................................18

**STATUTES**

18 U.S.C. § 2339B(a)(1).....................................1, 2

vii

Jencks Act...............................................14, 15

**OTHER AUTHORITIES**

U.S. Const. amend. VI.....................................*passim*

Fed. R. Crim. P. 16(d)(1)..................................1, 17

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.     INTRODUCTION**

3          Defendant is charged with four counts of attempting to provide

4    material support and resources to a designated Foreign Terrorist

5    Organization ("FTO") in violation of 18 U.S.C. § 2339B(a)(1).  Trial

6    is currently set for October 25, 2022.[1]

7          At trial, the government intends to call one or more of the

8    following witnesses who participated in the investigation of

9    defendant in an undercover capacity: (1) a Federal Bureau of

10   Investigation ("FBI") undercover employee, identified as "OCE#1," who

11   interacted with defendant online and in-person; (2) an FBI undercover

12   online covert employee, identified as "OCE#2," who interacted with

13   defendant online; and (3) an FBI confidential human source (the

14   "CHS"), who interacted with defendant online (collectively, the

15   "Undercover Witnesses").  These witnesses recorded or otherwise

16   memorialized their communications and in the case of OCE#1, in-person

17   meetings with defendant,[2] and they are prepared to testify at trial,

18   including, if necessary, to authenticate those records and explain to

19   the jury their communications and interactions with defendant.

20         As further set forth in the government's Classified, In Camera,

21   Ex Parte, and Under Seal Motion for a Protective Order Pursuant to

22   CIPA Section 4 and Fed. R. Crim. P. 16(d)(1) (the "CIPA Section 4

23   Motion") and the Classified Declaration from Kevin Vorndran, the

24

25          [1] The parties have submitted a joint stipulation proposing a
26   continuance of the trial date and other pretrial deadlines.  Dkt. No.
     137.

27          [2] Defendant had three in-person meetings with OCE#1 on April 24
     and 25, 2020.  These meetings were audio-recorded and the government
28   has produced these recordings with alterations to the sound of
     OCE#1's voice so as to protect OCE#1's identity from disclosure.

Acting Assistant Director of the FBI's Counterterrorism Division (the "Vorndran Declaration"),[3] the Undercover Witnesses continue to operate in an undercover capacity in ongoing national security investigations.  The protective measures detailed below are necessary to prevent jeopardizing those ongoing national security investigations and to protect these individuals and their families.

Accordingly, the government seeks an order to implement narrowly tailored security measures at trial that will preserve defendant's Sixth Amendment confrontation rights while protecting the safety of these witnesses and maintaining their ability to continue their critical undercover work in ongoing national security investigations.

## II.  FACTUAL BACKGROUND

Defendant is charged with four counts alleging violations of section 2339B(a)(1) for his attempted provision of material support and resources to two designated FTOs, Hay'at Tahrir al-Sham ("HTS") and Harakat al-Muqawama al-Islamiya ("HAMAS").

Defendant's online statements and communications constitute some of the most powerful evidence in relation to the charges.  During the period of February 6, 2020, through May 18, 2020, defendant communicated with the Undercover Witnesses and others online regarding his support for certain terrorist groups as well as armed attacks in Syria and the United States.  Almost all of defendant's communications took place on online social media and encrypted communications platforms, either in direct messages or in group chats that defendant created.  The Undercover Witnesses saw and captured

---

[3] The Court granted the government's CIPA Section 4 Motion on September 7, 2022.  Dkt. No. 134.

these online communications, including those in which defendant
provided instructional information regarding chemical weapons, IEDs,
and tactical combat techniques to the Undercover Witnesses and others
he understood to be fighting on behalf of or planning to fight on
behalf of HTS.  In addition, defendant used an encrypted group chat
he created to send messages and a weblink soliciting the donation of
cryptocurrency for HAMAS to OCE#1 and others.[4]

**A.  Defendant's Dissemination of Combat and Weapons-Making Information to the Undercover Witnesses and Others (Counts 1-3)**

In February 2020, in an encrypted communications platform,
defendant created an online group chat titled "Mujahideen
Amerikeeon" (later renaming it "Mujahideen in America"), to
which he invited OCE#1, the CHS, and other individuals.  The
defendant used this group chat to provide, compile, and archive
weapons and combat training materials and information regarding
the making of chemical weapons and IEDs.  Defendant also
exchanged direct messages online with the Undercover Witnesses,
including audio and visual recordings.

During a March 17, 2020 discussion on the group chat,
defendant sent materials that appeared to be from the "Improvised
Munitions Black Book," which is based, in part, on the 1969 U.S.
Army "TM 31-210 Improvised Munitions Handbook."

_____

[4] At the time of his arrest, following advisement of his <u>Miranda</u>
rights, defendant admitted in a voluntary interview that he sent
explosive-making instructions and a fundraising link for HAMAS to
members of the online group chats in which he participated.
Defendant also admitted that he believed some of the information he
sent would likely be used by the CHS and others on behalf of HTS, and
that he knew HTS and HAMAS were FTOs.

1    Those materials contained information regarding the making of
2    IEDs and chemical weapons.

3        One week later, another individual in the Mujahideen
4    Amerikeeon group chat stated, "me and the boys are blowing up
5    Keesler afb [Air Force Base] near me."  After receiving this
6    message, defendant sent military tactical instructions for
7    entering a building while minimizing losses, telling the other
8    members of the group chat to "take it, save it, study it."  The
9    next day, in a private message to OCE#1, defendant said that the
10   CHS "wants to travel with" another individual who had indicated
11   his intent to join HTS in Syria.  OCE#1 asked defendant whether
12   defendant thought that this individual was planning an attack in
13   the United States and defendant responded, "if he does want to
14   plan something I will not stop him.  However, I think that
15   planning an attack is not needed/not thoughtful."

16       Defendant sent additional information that appeared to be
17   from the "Improvised Munitions Black Book" in the group chat on
18   April 1, 2020, specifically, information regarding the making of
19   IEDs and chemical weapons, including instructions on how to make
20   motor scrap mines, nail grenades, sodium chlorate and sugar or
21   aluminum explosives, fertilizer explosives, nitric acid,
22   improvised black powder, potassium nitrate, plastic explosive
23   filler, a chemical fire bottle, sodium chlorate, a recoilless
24   launcher, a grenade launcher, and a pipe hand grenade.  When
25   OCE#1 asked whether the other members of the group chat should
26   make these explosives, defendant responded, "it stays in this
27   chat of ours like a library so that if you ever need to, you
28   know where to look."

4

1       Then on May 3, 2020, via a direct message, the CHS
2  introduced defendant to OCE#2, who stated that he was an HTS
3  fighter overseas.  Defendant told OCE#2 that defendant was in
4  the U.S. military, that the U.S. government was "very corrupt,"
5  and that people in the United States are "morally bankrupt."
6  Defendant then sent OCE#2 photos of an assault rifle that
7  defendant had modified.  OCE#2 asked whether defendant could
8  perform similar modifications with "grenades" and defendant
9  responded that he wanted to "experiment with chemical recipes,"
10 and that he was "thinking of teaching our ikhwan[5] to make gun
11 cotton and thermite...And the more advanced stuff like potassium
12 nitrate."  Defendant also said that "pressure plate bombs and
13 remote detonated [bombs] are the most useful."  OCE#2 told
14 defendant that HTS's bomb-maker had been killed by Turkish
15 forces and that other HTS fighters did not know how to use
16 chemicals that remained.  OCE#2 asked whether defendant would be
17 willing to assist in making bombs and defendant replied, "Give
18 me a list of ingredients and I can ask one of the anti-
19 government sources here."

20     **B.   Defendant's Solicitation of Cryptocurrency for HAMAS and**
       **Related Communications with OCE#1 (Count 4)**

21
22     Defendant later used another online group chat that he had
23 created and that included OCE#1 to solicit cryptocurrency
24 donations for HAMAS.  Specifically, on May 18, 2020, defendant
25 posted a link to a fundraising website for the Al-Qassam Brigades,
26 HAMAS's military wing.  Defendant posted "Give them Sadaqah"[6]

27
28     [5] The Arabic word "ikhwan" translates to "brothers."

       [6] The Arabic word "sadaqah" translates to "voluntary charity."

under the link.  Referring to HAMAS, defendant also stated, "They take Bitcoin and they explain the whole process on how to help out the Palestinian Resistance...This is a cause I am sure we can all get behind" and "I know the majority of us are either individual workers, college students or the like.  But I want us to get involved with Blockchain or some other digital currency trading platform (make an account with a common password amongst us), so we can potentially give Sadaqah to groups we support anonymously."

That same day, after sending the HAMAS fundraising link in the group chat, defendant communicated with OCE#1 via a direct message exchange.  OCE#1 asked if sending money to HAMAS was possible, to which defendant responded, "of course we can" and that he was "trying to find out more about cryptocurrency" because it was the safest way to send money to help "our brothers overseas."

### C.   Defendant's Other Statements to the Undercover Witnesses and Others Regarding His Support for HTS and His Desire to Die as a Martyr

In addition to the communications described above, defendant made other online statements to the Undercover Witnesses and others indicating his support for HTS and its affiliates, while proclaiming his interest in fighting on their behalf in Syria.  Specifically, defendant stated several times in group chats that he wanted to join two groups that worked with HTS in Syria: Malhama Tactical and Ajnad Al Kavkaz.  Malhama Tactical, also known as "Khorasan," is a private military group that operated in Syria and was allied with HTS.  Ajnad Al Kavkaz, also known as "Soldiers of the Caucasus," is a Chechen-led jihadist group that historically has been active in northern

Syria.

Defendant also communicated online with the Undercover Witnesses and others regarding his animosity toward the United States and Israel and his desire to die as a martyr, fighting abroad.  For example, on March 30, 2020, in a voice message sent in Russian online, defendant told OCE#1 that he planned to leave the military because the "US Army are terrorists and so are the Marines."  On April 24, 2020, in a direct message sent to OCE#1, defendant stated that if al Qaeda "killed the innocent, they are not good," but that the 9/11 terrorist attacks were committed by "Israel Mossad agents or American agents," and that he is "not opposed to killing them, they are the dogs of the west."  On April 15, 2020, defendant posted in an online group chat that he had previously told a female with whom he interacted online that "dying as a martyr sounds way better than marrying in the West in general and that my afterlife is worth way more than any earthly marriage."  Defendant also stated that if "given the opportunity or possibility to leave this awful country," he would, and that "I pray to Allah every night that I can become a shaheed[7] instead of die [sic] peacefully."

**III. PROTECTIVE MEASURES SOUGHT**

Based on the need to protect the Undercover Witnesses' true identities and physical characteristics from disclosure, and the need to protect other investigations, the government respectfully requests that the Court adopt certain narrowly tailored measures to govern the testimony of these witnesses at trial and the presentation of images

---

[7] "Shaheed" or "shahid" is the Arabic word for "witness" and commonly refers to a Muslim who dies as a martyr to his faith.

and recordings depicting their physical characteristics.
Specifically, the government requests that the Court order and
implement the following measures for the Undercover Witnesses:[8]

1.   The Undercover Witnesses may testify under pseudonyms,
without disclosing their true identities to defendant, defense
counsel, or the jury.

2.   The defense shall be prohibited from asking the Undercover
Witnesses questions that would reveal personally identifiable
information or that could lead to the discovery of their true
identities.

3.   The defense shall be prohibited from asking the Undercover
Witnesses questions designed to identify their aliases, online
monikers, or personas.

4.   The defense shall be prohibited from asking the Undercover
Witnesses questions that would reveal the nature or extent of the
FBI's use of the Undercover Witnesses in other investigations, or
information regarding the FBI's selection and training programs for
undercover employees or confidential human sources.

5.   When the Undercover Witnesses testify, only the Court,
essential personnel, the jury, defendant and his counsel, and the
government's trial team shall be present in the courtroom.  The
government shall broadcast a contemporaneous audio feed of these
witnesses' testimony to a separate location in the courthouse that
will be open to the public.

---

[8] The government informed the defense of these proposed measures
on September 19, 2022, but did not receive a response with defense's
position prior to the deadline for filing this motion.

6.    The Undercover Witnesses may testify using a light disguise, such as changing their facial hair, hairstyle, or dress style.

7.    The Undercover Witnesses shall be permitted to use non-public entrances and exits to the courthouse and courtroom, to take their seat in the witness chair prior to the entry of the jury and the defendant into the courtroom, and to remain seated when sworn in and testifying.

8.    During the testimony of the Undercover Witnesses, all non-official recording and photographic devices shall be prohibited in the courtroom, as well as the courtroom in which the audio feed is broadcast during their testimony (as requested in measure #5, above).

9.    Public disclosure of any audio or video recording, sketch, or similar reproduction of the voices or visual images of the Undercover Witnesses while testifying shall be prohibited.

**IV.   ARGUMENT**

The Undercover Witnesses are highly valuable assets in the FBI's ongoing mission to detect, prevent, and prosecute national security cases, as set forth in the Vorndran Declaration.  The Undercover Witnesses have operated and will continue to operate in undercover capacities in other national security investigations.  In light of these interests, the true names of these witnesses along with their aliases, online monikers, and personas are classified, and the disclosure of this information would pose a risk to their safety and undermine the integrity of ongoing national security investigations.

Courts across jurisdictions have long held that narrowly tailored security measures are justified by compelling government interests, such as protecting witness safety and the integrity of

ongoing investigations, and do not interfere with defendants' rights under the Sixth Amendment.

The Confrontation Clause of the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to...be confronted with the witnesses against him." U.S. Const. amend. VI. The "elements of confrontation -- physical presence, oath, cross examination, and observation of demeanor by the trier or fact -- serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to rigorous adversarial testing that is the norm of Anglo American criminal proceedings." Maryland v. Craig, 497 U.S. 836, 846 (1990). "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." Davis v. Alaska, 415 U.S. 308, 315-16, (1974). Cross-examination allows a criminal defendant to test the believability of a witness and the truth of the witness's testimony, including by "revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." Id. at 316.

Thus, "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness." Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986) (cleaned up). The "prototypical forms of bias include the witness's own inconsistent statements, the witness's criminal history or status as a parolee or

probationer, any immunity or plea deals between the witness and the state, and other prejudices, or ulterior motives from which jurors could appropriately draw inferences relating to the reliability of the witness." United States v. Givhan, 740 F. App'x 458, 461 (6th Cir. 2018) (cleaned up).

However, the right of confrontation is not absolute and must "bow to accommodate other legitimate interests in the criminal trial process." Chambers v. Mississippi, 410 U.S. 284, 295 (1973).  Trial judges possess "wide latitude to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall, 475 U.S. at 679.  "So long as cross-examination elicits adequate information to allow a jury to assess a witness's credibility, motives, or possible bias, the Sixth Amendment is not compromised by a limitation on cross-examination." United States v. Callahan, 801 F.3d 606, 624 (6th Cir. 2015) (quoting United States v. Cueto, 151 F.3d 620, 638 (7th Cir. 1998)); see also United States v. Falsia, 724 F.2d 1339, 1343 (9th Cir. 1983) ("The rule is that once cross-examination reveals sufficient information to appraise the witnesses' veracity, confrontation demands are satisfied.") (citing United States v. DeLuca, 692 F.2d 1277, 1282 (9th Cir. 1982)). Instead of a fixed rule, when considering restrictions on cross-examination, courts have engaged in a case-specific analysis, "balancing interests in the relevant case-specific context." United States v. Celis, 608 F.3d 818, 833 (D.C. Cir. 2010); see also United States v. El-Mezain, 664 F.3d 467, 491 (5th Cir. 2011).

The measures requested in this case are necessary to ensure the safety of the Undercover Witnesses and will help to ensure the viability of ongoing and future investigations.  Moreover, because the witnesses will be physically present, testifying under oath, subject to cross-examination on the relevant issues, and observable by the jury, the purpose of the Confrontation Clause is satisfied even with the requested protections.  Craig, 497 U.S. at 846.

**A.  Use of Pseudonyms and Prohibition Against Eliciting Identifying Information (Measures ##1-3)**

The government's request to use witness pseudonyms complies with the Sixth Amendment's Confrontation Clause and is necessary to protect the witnesses' identities from disclosure.  The Confrontation Clause provides that defendant the right to confront and cross-examine the government's witnesses who testify against him, but it does not provide an absolute right for an accused to have a jury hear a witness's true name and address.  United States v. Rangel, 534 F.2d 147 (9th Cir. 1976); United States v. Cosby, 500 F.2d 405, 407 (9th Cir. 1974).

Accordingly, the Ninth Circuit has approved the use of pseudonyms in similar circumstances to those here, finding that the government's interest in protecting the identities of undercover agents and informants outweighs any interest the defendant may have in learning the true name of such witnesses.  See Rangel, 534 F.2d at 147 (no error in permitting informant to testify without divulging true name, address, and phone number); Cosby, 500 F.2d 405, 407 (9th Cir. 1974) (affirming the district court's decision to allow informant to withhold his name); see also United States v. Ellis, 468 F.2d 638, 639 (9th Cir. 1972) (affirming the decision of the district

court to allow the witness to refuse to give his name during cross-examination when the prosecution gave "substantial reasons for withholding information to protect the agent from harm."); United States v. Mohamud, 666 Fed. App'x 591, 594 (9th Cir. 2016) (allowing undercover FBI agents to testify using pseudonyms).

Other circuits have also approved the use of pseudonyms for testifying government undercover agents.  See United States v. Ramos-Cruz, 667 F.3d 487, 500 (4th Cir. 2012) (affirming decision "to allow two government witnesses to testify under pseudonyms and without revealing their names, home and work addresses, or dates and places of birth"); El-Mezain, 664 F.3d at 492 (affirming use of pseudonyms where the "defendants' interest in obtaining the names of the witnesses is outweighed by the Government's need to keep the information secret"); Celis, 608 F.3d at 834 (affirming protective order permitting government witnesses to use pseudonyms and holding that the order "involved a delicate balance of interests necessitated by extraordinary circumstances warranting special measures to protect key witnesses"); Brown v. Kuhlman, 142 F.3d 529, 532 n.3 (2d Cir. 1998) (noting that undercover detective who testified in closed courtroom due to safety concerns was permitted to testify using his badge number instead of his true name); United States v. Palermo, 410 F.2d 468, 472 (7th Cir. 1969) ("[W]here there is a threat to the life of the witness the right of the defendant to have the witness' true name, address and place of employment is not absolute.").

To be sure, in Smith v. Illinois, 390 U.S. 129, 131-32 (1968), the Supreme Court held that the true name of a particular witness was necessary to allow the defense to show that he had a possible criminal history, which went to the credibility and reliability of

13

the witness.  But that is not the case here.  Consistent with the
government's discovery obligations, defendant will be provided any
known impeachment information for all witnesses, including any
criminal histories, and statements falling within the Jencks Act.
Thus, defendant will have the same opportunity to impeach the
credibility of a witness testifying under a pseudonym as any other
witness at trial.  See Siegfriedt v. Fair, 982 F.2d 14, 18 (1st Cir.
1992) (distinguishing Smith, where the "witness adopted a pseudonym
for the sole purpose of testifying," from cases where the witness
interacted with the defendant using the pseudonym, such that "the use
of a fictitious name will be no more than a mere curiosity,
possessing no constitutional significance").

Moreover, the Court may require that the defense show a
"particularized need" or a showing of materiality to question the
witness about the identifying information at issue -- such as why the
defense would need the witness's current address or name.  United
States v. Cavallaro, 553 F.2d 300, 304-05 (2d Cir. 1977); see also
El-Mezain, 664 F.3d at 491-92; Caldwell v. State of Minn., 536 F.2d
272, 273-74 (8th Cir. 1976); United States v. Crockett, 506 F.2d 759,
762-63 (5th Cir. 1975); United States v. Penick, 496 F.2d 1105, 1108-
09 (7th Cir. 1974); United States v. Smaldone, 484 F.2d 311, 318-19
(10th Cir. 1973); United States v. Alston, 460 F.2d 48, 51-52 (5th
Cir. 1972); United States v. Baker, 419 F.2d 83, 87 (2d Cir. 1969).
The defense cannot make any such showing because the Undercover
Witnesses' true names and other identifying information are not
relevant to their testimony or credibility.

There are compelling reasons that justify the use of pseudonyms
here.  Disclosing the true names of the Undercover Witnesses to

14

defendant and the public risks their safety, the safety of their families, and the integrity of ongoing national security investigations.  At the same time, permitting the witnesses to testify under pseudonyms will not impede defendant's ability to cross-examine them.  The defendant in this case never knew the true names of any of the Undercover Witnesses and knowledge of their true names will have no bearing on defendant's ability to prepare his defense or to cross-examine them.  Further, inquiry into personally identifying information of the witnesses is not necessary to vindicate the defendant's right to confrontation.  Such information is not relevant to the testimony of the witnesses and will not affect their credibility.  It has particularly little, if any, value in circumstances such as these, where the defendant and the witnesses interacted primarily through online messages and when in person, in the case of OCE#1, the communications were recorded.  Finally, the government will continue to provide all material discoverable under Brady v. Maryland, 373 U.S. 83 (1963), impeachment material pursuant to Giglio v. United States, 405 U.S. 150 (1972), and Jencks Act statements.

Given the significant safety concerns attending disclosure of the Undercover Witnesses' true names; the irrelevancy of their true identities, aliases, online monikers, and personas to the testimony to be offered; and the ample opportunity for effective cross-examination if they testify pseudonymously, the Undercover Witnesses should be permitted to testify under pseudonyms and the defense should be precluded from asking them questions that reveal their identifiable information or could lead to the discovery of their true identities.

15

1        **B.**    **Prohibition on Eliciting Information about the FBI's**

2                 **Undercover and Confidential Human Source Programs (Measure #4)**

3      The government seeks to protect information related to the FBI's

4  undercover training programs, in particular, the techniques employed

5  by the FBI to develop and maintain undercover identities and bona

6  fides.  See CIPA Section 4 Motion (Dkt. 130).  Thus, the government

7  requests that the defense be prohibited from engaging in cross-

8  examination designed to elicit this information.  Public disclosure

9  of techniques employed by FBI undercover employees and confidential

10  human sources to develop and maintain undercover identities is

11  unrelated to the defendant's ability to mount a defense, including

12  with respect to entrapment.

13      Because "[t]he government has a substantial interest in

14  protecting sensitive sources and methods of gathering information,"

15  United States v. Smith, 780 F.2d 1102, 1108 (4th Cir. 1985), courts

16  routinely grant protective orders restricting defendants' access to

17  sensitive information and investigative techniques, even when they

18  are not classified.  See United States v. Alimehmeti, 284 F. Supp. 3d

19  477, 494-95 (S.D.N.Y. 2018) (permitting "general inquiry to the

20  nature of the work and objectives of a UC [undercover officer]," but

21  excluding "examination into the specifics of the [] UCs' training and

22  experience."); United States v. Lindh, 198 F. Supp. 2d 739, 742

23  (E.D.V.A. 2002) (granting protective order prohibiting the public

24  dissemination of unclassified but sensitive material to prevent

25  members of international terrorist organizations from learning

26  government investigative techniques from publicly available sources);

27  see also United States v. Longueuil, 567 F. App'x 13, 16 (2d Cir.

28  2014) (enforcing protective order sealing documents containing

sensitive information about the government's investigative methods and techniques); <u>United States v. Van Horn</u>, 789 F.2d 1492, 1507-08 (11th Cir. 1986) (applying law enforcement privilege to block access to information concerning the location and nature of secret surveillance equipment); <u>United States v. Johnson</u>, 191 F. Supp. 3d 363, 370 (M.D. Pa. 2016) (granting government request for protective order covering sensitive investigative techniques because "files are rightly shielded from public access where they reveal specific details of surveillance techniques, including equipment used and location and timing of use, the revelation of which could compromise the agency's ability to conduct future investigations").

Accordingly, the government respectfully requests the Court employ its wide discretion to safeguard these critical techniques for ongoing and future national security investigations. <u>See</u> Fed. R. Crim. P. 16(d)(1) ("At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief.").

### C. Partial Courtroom Closure and Use of a Separate Audio Feed (Measures #5)

A partial courtroom closure and use of a separate audio feed are warranted because the protective measures are narrowly tailored to protect the witnesses' identities, personal security, and the integrity of ongoing national security investigations, while preserving defendant's Sixth Amendment right to a public trial. These measures, which have been approved by courts around the country in similar circumstances, will allow the public to hear these witnesses' testimony through a live audio feed, without the need for

extensive physical barriers or other measures that would shield them from view in the courtroom.

The Sixth Amendment right to a public trial is not absolute and, under certain circumstances, trial courts may implement reasonable procedures to protect other compelling interests without violating the Sixth Amendment.  See e.g., Waller v. Georgia, 467 U.S. 39, 45-46 (1984) ("[T]he right to an open trial may give way in certain cases to other rights or interests, such as the. Defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information."); United States v. Sherlock, 962 F.2d 1349, 1356 (9th Cir. 1989) ("Federal courts have recognized limitations on [the right to a public trial] where a judge has excluded spectators during a witness's testimony for a justifiable purpose."); United States v. Yazzie, 743 F.3d 1278, 1288 n. 4 (9th Cir. 2014) ("Partial closure of a courtroom has a reduced impact on a defendant's rights.").

In Waller, the Supreme Court instructed courts to consider the following factors in determining whether to close a proceeding to the public:

> [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

Id. at 48.

When the government seeks a "partial" closure of a proceeding, as opposed to the complete closure addressed in Waller, the Ninth Circuit instructs courts to consider the following three factors: (1)

1 whether there is a substantial reason for the requested partial

2 closure; (2) whether the closure is narrowly tailored to exclude

3 spectators only to the extent necessary to satisfy the purpose for

4 which it is ordered; and (3) whether there are "reasonable

5 alternatives to closing the courtroom." Sherlock, 962 F.2d at 1357,

6 1359.

7         1.   Substantial Reason

8      Protecting ongoing undercover operations and witness security

9 are substantial government interests warranting a partial courtroom

10 closure.  The Second Circuit ruled that the government's interest in

11 "maintaining the continued effectiveness of an undercover officer" is

12 an "extremely substantial interest" that would be "seriously

13 prejudiced by requiring the officer to testify in an open courtroom."

14 Ayala v. Speckard, 131 F.3d 62, 72 (2d Cir. 1997); see also Rodriguez

15 v. Miller, 537 F.3d 102, 110 (2d Cir. 2008) ("It is clear that the

16 State has an 'overriding interest' in protecting the identity of its

17 undercover officers.").  Similarly, courts have found that the

18 government's "substantial" interest in protecting witness safety

19 warrants a partial courtroom closure.  See United States v. Simmons,

20 797 F.3d 409, 414 (6th Cir. 2015) ("In particular, courts have

21 consistently held that ensuring witness safety and preventing

22 intimidation constitutes a substantial reason to justify the partial

23 closure of the courtroom.").

24      Defendant's conduct in relation to the charges in this case

25 underscores the government's substantial interest in protecting the

26 safety of undercover witnesses and their families.  Defendant is

27 charged with providing material support and resources to two

28 designated FTOs, and has made statements indicating his willingness

to attack law enforcement officers and desire to die as a martyr fighting on behalf of terrorist groups.

Thus, the government has a substantial interest in seeking to protect unnecessary disclosure of the witnesses' identity to defendant or his associates, including fellow HTS or HAMAS supporters who may share defendant's desire to engage in violent attacks.

2.  Narrowly Tailored

The measures sought by the government are narrowly tailored to exclude spectators only to the extent necessary to protect the identities of the Undercover Witnesses.  Providing the public with a separate location to listen to these witnesses' live testimony is a minimally restrictive measure.  Indeed, courts have approved more restrictive measures under similar circumstances.  See Ayala, 131 F.3d at 72 (approving partial closure of court for testimony of undercover officer where only a transcript of testimony was made available to the public and press); United States v. Hernandez, No. 12-cr-809-PKC, 2013 WL 3936185 at *2 (S.D.N.Y., Jul. 29, 2013) (approving closure of court to public during testimony of undercover officer where government agreed to make the transcript of the testimony available at the end of the trial day).

Moreover, the government's proposed partial courtroom closure is limited in scope to the testimony of these witnesses.  Public access to the remainder of the case will not be restricted.  See Carson v. Fischer, 421 F.3d 83, 90 (2d Cir. 2005) (evaluating whether partial closure was broader than necessary, noting that "it is important that the closure occurred only during a single witness testimony").

1          ### 3.  Reasonable Alternatives

2          Less restrictive measures are impracticable and will not

3     adequately protect the government's substantial interests in this

4     case.  Alternative measures such as using screens or other physical

5     barriers to obstruct witnesses from public view are likely to impede

6     the Court, jury, and defendant's view of the testifying witness.  See

7     Fischer, 421 F.3d at 90 (noting that a curtain, like a disguise,

8     "would have impaired the jury's ability to see the witness and assess

9     his credibility").  The location of the jury box, witness chair,

10    counsel table, and bench makes the placement of a physical barrier

11    impractical without making major changes to the layout of the

12    courtroom.  Physical barriers can also impair the Court Security

13    Officers' ability to safety secure the courtroom and draw undue

14    public attention to the witnesses' testimony.  Similarly, allowing

15    witnesses to testify in extensive disguises in open court may hinder

16    the jury's ability to evaluate the witnesses' veracity, while

17    providing only minimal protection to the government's interests.

18         On balance, the protections a partial courtroom closure affords

19    outweigh the minimal restrictions the government's proposals will

20    place on the public's access.  For the reasons set forth above, the

21    partial closure requested is the most effective means of balancing

22    the government's substantial interest in protecting the integrity of

23    ongoing national security investigations and the safety of the

24    witnesses with defendant's Sixth Amendment right to a public trial.

25         ### 4.  Courts Have Granted Partial Courtroom Closures in Similar Situations

26

27         Courts have approved identical and nearly identical requests in

28    similar cases.  For example, in a 2021 terrorism case in the Central

District of California Western Division, the court approved the same partial closure with live audio provision that the government seeks here. United States v. Domingo, No. 19-cr-313-SVW, Dkt. No. 522 (C.D. Cal., Jul. 29, 2021) ("The Court will order partial court closure (i.e., the courtroom itself will be closed to the public but a live audio feed will be provided to the public in a separate location in the courthouse) during the testimony of the CHS and undercover agents."). Similarly, in a terrorism case in the District of Oregon, the district court granted the government's request for a partial courtroom closure (and to digitally alter publicly available images and recordings of an undercover agent). United States v. Mohamud, No. 10-cr-00475-KI, Dkt. No. 341, Protective Order (D. Or., Dec. 19, 2012) (attached as Exhibit 1). The court allowed the public to listen to undercover agents' testimony via closed-circuit broadcast from a separate room. And in a terrorism case in the Northern District of Ohio, the district court permitted the government to broadcast a live audio feed of an undercover officer's testimony to the public in another room within the courthouse. United States v. Hendricks, No. 16-cr-265-JRA, Dkt. No. 84, Protective Order (N.D. Ohio, Feb. 28, 2018) (attached as Exhibit 2). The Sixth Circuit upheld the district court's partial courtroom closure holding that the risk that the undercover officer's "safety, as well as the integrity of his active investigations, would be jeopardized if the general public could observe his physical appearance," and that alternatives such as screens or heavier disguises would be impractical or more invasive of the defendant's rights. United States v. Hendricks, 950 F.3d 348, 355-56 (6th Cir. 2020).

1    The same substantial government interests are at issue here.

2    The requested measures, which are nearly identical to those adopted

3    in other cases under similar circumstances, are narrowly tailored and

4    necessary to protect the safety of the witnesses and the integrity of

5    other national security investigations.

6    **D.   Light Disguise (Measure #6)**

7    The government also requests that the Undercover Witnesses be

8    permitted to testify in light disguise to further protect against the

9    revelation of their true identities.

10   Courts have held that a witness may testify in light disguise,

11   particularly when there are security concerns, when the reliability

12   of the evidence is otherwise assured, as it is here, because the

13   Undercover Witnesses will be physically present, their expression and

14   demeanor are visible, and they will be placed under oath.  See United

15   States v. de Jesus-Casteneda, 705 F.3d 1117, 1121 (9th Cir. 2013)

16   (despite an informant's disguise in the form of a wig and mustache,

17   his reliability was assured because "he was physically present,"

18   "testified under oath," "was subject to cross-examination," and "the

19   jury was able to hear his voice, see his face including his eyes and

20   facial reactions to questions, and observe his body language");

21   United States v. Naseer, No. 10-cr-19-RJD, 2015 WL 13843166, at *4

22   (E.D.N.Y. Jan. 26, 2015) (permitting members of MI-5 to testify in

23   light disguise).

24   Like in de Jesus-Casteneda, the important interests in the

25   instant case are readily apparent: the safety and continued

26   effectiveness of the undercover witnesses in their secretive

27   professional capacity, as well as the safety of their families and

28   associates.  Moreover, the witnesses' physical appearance has no

23

impact on the reliability of the evidence because each remains
subject to the four foundational purpose elements of confrontation
identified in Maryland v. Craig -- "physical presence, oath, cross-
examination, and observation of demeanor by the trier of fact."  497
U.S. at 836.  And the physical appearance of the witnesses is not at
issue and has no bearing on the substance of the witnesses'
interactions with the defendant.  There is also no issue of physical
identification of the witnesses for the jury to consider and the
light disguise will not be so extensive that the jury is unable to
evaluate the demeanor of the witnesses while testifying.  For these
reasons, the government requests that the Undercover Witnesses be
permitted to testify in light disguise in order to provide necessary
protection of their identities and undercover status.

   **E.    Other Measures (Measures ##7-9)**

   The remaining protective measures requested by the government –
(measure #7) that the Undercover Witnesses be permitted to use non-
public entrances and exits to the courthouse and courtroom, see
Alimehmeti, 284 F. Supp. 3d at 495 (allowing undercover agents to use
nonpublic entrances due to the "substantial risk that a testifying UC
would be observed by members of the public, risking compromising the
UC's ability to continue to serve in this role."); United States v.
Schulte, 436 F. Supp. 3d 698, 707 (S.D.N.Y. 2020) (allowing CIA
witnesses to use nonpublic entrances); United States v. Bundy, No.
16-cr-46-GMN-PAL, 2017 WL 888311, at *3, 8-9 (D. Nev. Mar. 6, 2017)
(keeping in place the part of a protective order allowing an
undercover employee to use nonpublic entrances); (measure #8) that
all non-official recording and photographic devices be prohibited
from the courtroom in which the Undercover Witnesses testify, as well

as the courtroom in which any video or audio feed is shown their testimony, see United States v. Salemme, No. 16-cr-10258-ADB, 2018 WL 2465359, at *3 (D. Mass. June 1, 2018) (prohibiting non-official recording devices to protect witnesses); Hendricks, No. 16-cr-265, Dkt. 84 (N.D. Ohio Feb. 28, 2018) (attached as Exhibit 2) (issuing an order prohibiting the use of non-official recording devices in the courtroom where the undercover employee was to testify and in the room where the testimony would be broadcast); and (measure #9) that public disclosure of any audio- or video- recording, or similar reproduction of the voice or visual image of the Undercover Witnesses be prohibited, see id. -- are all reasonable, necessary measures that help ensure the safety of the witnesses but do not conflict with defendant's right to confrontation.  Indeed, "[s]uch safety measures are commonplace in cases involving UCs." Alimehmeti, 284 F. Supp. 3d 477, 495 (S.D.N.Y. 2018) (permitting undercover employees to use nonpublic entrances and exits to the building and the courtroom). Absent such procedures, there would be a substantial risk that members of the public could observe the Undercover Witnesses or otherwise compromise their ability to continue their critical work on behalf of the United States.

**V.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court grant this motion and adopt the proposed protective measures.