E. MARTIN ESTRADA
United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
CHRISTINE M. RO (Cal. Bar No. 285401)
Assistant United States Attorneys
Terrorism and Export Crimes Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-4496
    Facsimile: (213) 894-2927
    E-mail:   christine.ro@usdoj.gov

MATTHEW G. OLSEN
Assistant Attorney General
National Security Division
JOHN CELLA (D.C. Bar No. 1035356)
Trial Attorney
Counterterrorism Section
    950 Pennsylvania Ave, NW
    Washington, DC 20530
    Telephone: (202) 305-1601
    Email:   John.Cella@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATE OF AMERICA,<br><br>       Plaintiff,<br><br>          v.<br><br>JASON FONG,<br>  aka "asian_ghazi,"<br>  aka "Jason Asian Ghazi,"<br>  aka "Mustafa Ahmed Al-<br>    Hakim,"<br><br>     Defendant. | No. SA CR 20-00146(A)-DOC<br><br>GOVERNMENT'S MOTION *IN LIMINE*<br>#2: MOTION TO PRECLUDE AN<br>ENTRAPMENT DEFENSE<br><br>Hearing Date: TBA<br>Hearing Time: TBA<br>Location: Courtroom of the Hon.<br>David O. Carter |

    Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of

California and Assistant United States Attorney Christine M. Ro and National Security Division Counterterrorism Section Trial Attorney John Cella, hereby files its Motion _in Limine_ to Preclude an Entrapment Defense (the "Motion").  This motion is based on the attached memorandum of points and authorities, the files and records in this case, and any further evidence or arguments the Court may allow.

Dated: September 20, 2022         Respectfully submitted,

                                  E. MARTIN ESTRADA
                                  United States Attorney

                                  CHRISTOPHER D. GRIGG
                                  Assistant United States Attorney
                                  Chief, National Security Division


                                  _____/s/_____
                                  CHRISTINE M. RO
                                  Assistant United States Attorney

                                  JOHN CELLA
                                  Trial Attorney
                                  Counterterrorism Section
                                  National Security Division

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................i

TABLE OF AUTHORITIES (continued)....................................ii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION...................................................1

II.   STATEMENT OF FACTS.............................................2

      A.   Defendant Befriended and Invited OCE#1 to Various
           Chatrooms.................................................3

      B.   Defendant's Dissemination of Combat and Weapons-
           Making Information to the Undercover Witnesses and
           Others (Counts 1-3).......................................3

      C.   Defendant's Solicitation of Cryptocurrency for
           HAMAS and Related Communications with OCE#1 (Count
           4) .......................................................6

      D.   Defendant's Other Statements to the Undercover
           Witnesses and Others Regarding His Support for HTS and
           His Desire to Die as a Martyr.............................7

III.  APPLICABLE LEGAL STANDARDS.....................................8

      A.   Defendant Must Proffer Facts Establishing a Prima
           Facie Showing of Entrapment in Order to Present an
           Entrapment Defense at Trial...............................8

      B.   Defendant Must Establish a Prima Facie Case That He
           Was Induced or Not Predisposed to Commit the Charged
           Crimes....................................................9

IV.   ARGUMENT......................................................10

      A.   Defendant Is Not Entitled to an Entrapment Defense at
           Trial....................................................10

      B.   The Government Did Not Induce Defendant to Attempt to
           Provide Material Support to HTS or HAMAS.................11

      C.   Defendant Was Predisposed to Support FTOs...............14

           1.   Defendant did not show any reluctance.............14

           2.   Defendant's character and reputation show that he
                was predisposed to commit this crime.............17

           3.   That the government made the initial suggestion
                of criminal activity does not change the
                analysis.........................................18

4.    Defendant did not engage in the activity for profit................................................19

5.    There was no inducement.............................19

V.    CONCLUSION....................................................20

**TABLE OF AUTHORITIES**

**Cases**                                                                 Pages

United States v. Arellano-Rivera,
    244 F.3d 1119, 1125 (9th Cir. 2001)..............................8

United States v. Avila,
    19 F. App'x 547, 548 (9th Cir. 2001).......................17, 18

United States v. Bailey,
    444 U.S. 394, 416 (1980)........................................9

United States v. Barry,
    814 F.2d 1400, 1401 (9th Cir. 1987).............................9

United States v. Boling,
    958 F.2d 378 (9th Cir. 1992) ..................................18

United States v. Busby,
    780 F.2d 804, 807 (9th Cir. 1986)...................10, 14, 16

United States v. Cortes,
    757 F.3d 850, 858 (9th Cir. 2014)...................10, 12, 19

United States v. Davis,
    36 F.3d 1424, 1430 (9th Cir. 1994)............................14

United States v. Dorrell,
    758 F.2d 427, 429 (9th Cir. 1985)..............................8

United States v. Fleishman,
    684 F.2d 1329, 1342 (9th Cir. 1982)............................1

United States v. Gurolla,
    333 F.3d 944, 951 n.8 (9th Cir. 2003)......................8, 10

United States v. Jabara,
    618 F.2d 1319, 1328–29 (9th Cir. 1980).......................17

United States v. Kabir,
    2015 WL 631961, at *2 (C.D. Cal. Feb. 13, 2015)................9

United States v. McConney,
    728 F.2d 1195 (9th Cir. 1984)..................................1

United States v. Moreno,
    102 F.3d 994, 997 (9th Cir. 1996)..............................9

United States v. O'Brien,
    27 F. App'x 882, 884 (9th Cir. 2001) .........................18

United States v. Poehlman,
    217 F.3d 692, 698 (9th Cir. 2000)...................10, 11, 12

**TABLE OF AUTHORITIES (continued)**

**Cases**                                                                     **Pages**

United States v. Reynoso-Ulloa,
        548 F.2d 1329, 1338 (9th Cir. 1977)........................11, 17

United States v. Rhodes,
        713 F.2d 463, 467 (9th Cir. 1983)...........................9, 11

United States v. Schafer,
        625 F.3d 629, 637 (9th Cir. 2010).  .........................11

United States v. Simas,
        937 F.2d 459, 462 (9th Cir. 1991)........................11, 12

United States v. Skarie,
        971 F.2d 317, 320 (9th Cir. 1992) ...........................12

United States v. Sotelo-Murillo,
        887 F.2d 176, 179 (9th Cir. 1989).............................1

United States v. Spentz,

        653 F.3d 815, 818 (9th Cir. 2011) ............................9

United States v. Thickstun,
        110 F.3d 1394, 1397 (9th Cir. 1997)..........................19

United States v. Vasquez-Landaver,
        527 F.3d 798, 802 (9th Cir. 2008) ...........................10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

A defendant seeking to put on an entrapment defense at trial bears the burden of proffering "some evidence that (1) a government agent induced him or her to commit an illegal act that (2) he or she was not predisposed to commit." United States v. Sotelo-Murillo, 887 F.2d 176, 179 (9th Cir. 1989).  Although "only slight evidence is needed," a defendant "must present evidence on both elements of the defense." Id.  Moreover, "this evidence must at least suggest that the defendant was initially unwilling to commit the crime, or that Government involvement planted the criminal design in the defendant's mind." United States v. Fleishman, 684 F.2d 1329, 1342 (9th Cir. 1982); overruled on other grounds by United States v. McConney, 728 F.2d 1195 (9th Cir. 1984) (en banc).

Here, defendant Jason Fong has not offered -- and cannot offer -- any evidence that he was induced to provide material support to Hay'at Tahrir al-Sham ("HTS") and/or Harakat al-Muqawamah al-Islamiya ("HAMAS").  On the contrary, the evidence shows that defendant was eager to commit the crime and had a history of showing support to foreign terrorists and organizations, including HTS and HAMAS.  And for his conduct, defendant is charged with four counts alleging violations of section 2339B(a)(1) for his attempted provision of material support and resources to the two designated Foreign Terrorist Organizations ("FTOs"), HTS and HAMAS.  As explained below, defendant fails to meet the elements to offer an entrapment defense and the Court should exclude an entrapment defense.

## II.   STATEMENT OF FACTS

Counts 1, 2, and 3 charge defendant with attempting to provide services by providing combat training information and information regarding the making of weapons, including improvised explosive devices ("IEDs"), HTS.  Counts 1 and 2 also charge defendant for attempting to provide the services of "compiling" and "archiving" such material.  Count 4 charges defendant with attempting to provide "services and currency, including fundraising and money," to HAMAS.

During the period of February 6, 2020, through May 18, 2020, defendant communicated with a Federal Bureau of Investigation ("FBI") undercover employee ("OCE#1"), an FBI confidential human source (the "CHS"), an FBI online covert employee ("OCE#2") (hereinafter, collectively referred to as the "Undercover Witnesses"), and others online regarding his support for certain terrorist groups as well as armed attacks to be carried out in Syria and the United States. Almost all of defendant's communications took place on online social media and encrypted communications platforms, either in direct messages or in group chats that defendant himself created.  The Undercover Witnesses saw and captured these online communications where defendant provided instructional information regarding chemical weapons, IEDs, and tactical combat techniques.  Defendant provided this information to the Undercover Witnesses and others he believed to be fighting on behalf of or planning to fight on behalf of HTS. In addition, defendant created another encrypted group chat, and used it to send messages and a weblink soliciting the donation of cryptocurrency for HAMAS.

**A.    Defendant Befriended and Invited OCE#1 to Various Chatrooms**

On February 6, 2020, OCE#1 was invited to a by-invitation-only Instagram group chatroom, "Baqiyah."[1]  Defendant was a member of the group chatroom when OCE#1 joined the group.  On February 6, 2020, after noticing that defendant's Instagram feed showed that he spoke Russian, OCE#1 sent defendant a private message asking whether he spoke Russian.  Defendant responded to that message and told OCE#1 that, among other things, he spoke Russian, was studying Arabic, was of Chinese descent, and lived in California.  In addition, defendant stated that he learned Russian watching YouTube videos and befriending Russian individuals.  On February 7, 2020, defendant invited OCE#1 to communicate using Signal, an encrypted communications application.  From February 7, 2020, to May 18, 2020, defendant and OCE#1 exchanged text messages, audio/video recordings, and pictures on Signal.  During that same timeframe, defendant created several Signal group chats and invited OCE#1, an FBI confidential human source (the "CHS"), and others to join the various group chats.  In addition, defendant and OCE#1 met three times over two days on April 24 and 25, 2020.

**B.    Defendant's Dissemination of Combat and Weapons-Making Information to the Undercover Witnesses and Others (Counts 1-3)**

On February 10, 2020, defendant created an online group chat titled "Mujahideen Amerikeeon" (later renaming it "Mujahideen in America"), to which he invited OCE#1, the CHS,

---

[1] Baqiyah is an Arabic word for "everlasting/enduring" or "it shall remain."  The term is also used by ISIS supporters and propagandists on social media platforms to solicit financial and emotional support, including prayers or donations.

and other individuals.  The defendant used this group chat to provide, compile, and archive weapons and combat training materials and information regarding the making of chemical weapons and IEDs.

During a March 17, 2020 discussion on the group chat, defendant sent materials that appeared to be from the "Improvised Munitions Black Book," which is based, in part, on the 1969 U.S. Army "TM 31-210 Improvised Munitions Handbook." Those materials contained information regarding the making of IEDs and chemical weapons.  No Undercover Witnesses asked for this information.

One week later, another individual in the Signal group chat defendant had created stated, "me and the boys are blowing up Keesler afb [Air Force Base] near me."  After receiving this message, defendant sent military tactical instructions for entering a building while minimizing losses, telling the other members of the group chat to "take it, save it, study it."  The next day, in a private Signal message to OCE#1, defendant said that the CHS "wants to travel with" another individual who had indicated his intent to join HTS in Syria.  OCE#1 asked defendant whether defendant thought that this individual was planning an attack in the United States and defendant responded, "if he does want to plan something I will not stop him. However, I think that planning an attack is not needed/not thoughtful."

Defendant sent additional information that appeared to be from the "Improvised Munitions Black Book" in the group chat on April 1, 2020, specifically, information regarding the making of

IEDs and chemical weapons, including instructions on how to make motor scrap mines, nail grenades, sodium chlorate and sugar or aluminum explosives, fertilizer explosives, nitric acid, improvised black powder, potassium nitrate, plastic explosive filler, a chemical fire bottle, sodium chlorate, a recoilless launcher, a grenade launcher, and a pipe hand grenade.  When OCE#1 asked whether the other members of the group chat should make these explosives, defendant responded, "it stays in this chat of ours like a library so that if you ever need to, you know where to look."  Again, defendant offered this information in the group chat and it was not prompted by an Undercover Witness.

Then on or about May 3, 2020, via a direct message, the CHS introduced defendant to an FBI undercover online covert employee, identified herein as "OCE#2," who stated that he was an HTS fighter overseas.  Defendant told OCE#2 that defendant was in the U.S. military, that the U.S. government was "very corrupt," and that people in the United States are "morally bankrupt."  Defendant then sent OCE#2 photos of an assault rifle that defendant had modified.  OCE#2 asked whether defendant could perform similar modifications with "grenades" and defendant responded that he wanted to "experiment with chemical recipes," and that he was "thinking of teaching our ikhwan[2] to make gun cotton and thermite...And the more advanced stuff like potassium nitrate."  Defendant also said that "pressure plate bombs and remote detonated [bombs] are the most useful."  OCE#2

---

[2] The Arabic word "ikhwan" translates to "brothers."

told defendant that HTS's bomb-maker had been killed by Turkish forces and that other HTS fighters did not know how to use chemicals that remained.  OCE#2 asked whether defendant would be willing to assist in making bombs and defendant replied, "Give me a list of ingredients and I can ask one of the anti-government sources here."   And on or about May 4, 2021, defendant sent OCE#2 an online link to the Army Field Manual on Boobytraps.

### C. Defendant's Solicitation of Cryptocurrency for HAMAS and Related Communications with OCE#1 (Count 4)

Defendant later used another online group chat that he had created and that included OCE#1 to solicit cryptocurrency donations for HAMAS.  Specifically, on May 18, 2020, defendant posted a link to a fundraising website for the Al-Qassam Brigades, HAMAS's military wing.  Defendant posted "Give them Sadaqah"[3] under the link.  Referring to HAMAS, defendant also stated, "They take Bitcoin and they explain the whole process on how to help out the Palestinian Resistance...This is a cause I am sure we can all get behind" and "I know the majority of us are either individual workers, college students or the like.  But I want us to get involved with Blockchain or some other digital currency trading platform (make an account with a common password amongst us), so we can potentially give Sadaqah to groups we support anonymously."

That same day, after sending the HAMAS fundraising link in the group chat, defendant communicated with OCE#1 via a direct message exchange.  OCE#1 asked if sending money to HAMAS was

_____

[3] The Arabic word "sadaqah" translates to "voluntary charity."

1  possible, to which defendant responded, "of course we can" and

2  that he was "trying to find out more about cryptocurrency" because

3  it was the safest way to send money to help "our brothers

4  overseas."

5        **D.   Defendant's Other Statements to the Undercover Witnesses**

6             **and Others Regarding His Support for HTS and His Desire to**
              **Die as a Martyr**

7      In addition to the communications described above,

8  defendant made a number of other online statements to the

9  Undercover Witnesses and others indicating his support for HTS

10  and its affiliates, while proclaiming his interest in fighting

11  on their behalf in Syria.  Specifically, defendant stated

12  several times in group chats that he wanted to join two groups

13  that worked with HTS in Syria: Malhama Tactical and Ajnad Al

14  Kavkaz.   Malhama Tactical, also known as "Khorasan," is a

15  private military group that operated in Syria and was allied

16  with HTS.  Ajnad Al Kavkaz, also known as "Soldiers of the

17  Caucasus," is a Chechen-led jihadist group that historically has

18  been active in northern Syria.

19      Defendant also communicated online with the Undercover

20  Witnesses and others regarding his animosity toward the United

21  States and Israel and his desire to die as a martyr, fighting

22  abroad.  For example, on March 30, 2020, in a voice message sent in

23  Russian via Signal, defendant told OCE#1 that he planned to leave

24  the military because the "US Army are terrorists and so are the

25  Marines."  On April 24, 2020, in a direct message sent to OCE#1

26  on Signal, defendant stated that if al Qaeda "killed the

27  innocent, they are not good," but that the 9/11 terrorist

28  attacks were committed by "Israel Mossad agents or American

agents," and that he is "not opposed to killing them, they are the dogs of the west."  On April 15, 2020, defendant posted in a group chat that he had previously told a female with whom he interacted online that "dying as a martyr sounds way better than marrying in the West in general and that my afterlife is worth way more than any earthly marriage."  Defendant also stated that if "given the opportunity or possibility to leave this awful country," he would, and that "I pray to Allah every night that I can become a shaheed[4] instead of die [sic] peacefully."

## III. APPLICABLE LEGAL STANDARDS

### A. Defendant Must Proffer Facts Establishing a Prima Facie Showing of Entrapment in Order to Present an Entrapment Defense at Trial

"A district court may require a defendant to submit a pretrial offer of proof on an entrapment defense; if the defendant fails to make a prima facie showing, the district court may preclude him from presenting the defense at trial."  United States v. Gurolla, 333 F.3d 944, 951 n.8 (9th Cir. 2003); see also United States v. Arellano-Rivera, 244 F.3d 1119, 1125 (9th Cir. 2001) ("[I]f the defendant's offer of proof is insufficient as a matter of law to support the proffered defense, then the trial court should exclude the defense and the evidence offered in support."); United States v. Dorrell, 758 F.2d 427, 429 (9th Cir. 1985) (explaining that where "the evidence, as described in the defendant's offer of proof, is insufficient as a matter of law to support the proffered defense," the "trial court should exclude the defense and the evidence offered in support").

---

[4] "Shaheed" or "shahid" is the Arabic word for "witness" and commonly refers to a Muslim who dies as a martyr to his faith.

This is because, absent an adequate offer of proof, evidence in support of an affirmative defense is not relevant.  See United States v. Moreno, 102 F.3d 994, 997 (9th Cir. 1996) ("Evidence of duress is not relevant if the defendant fails to present evidence of a prima facie case of the affirmative defense.").  Thus, "[t]he requirement of a threshold showing on the part of those who assert an affirmative defense to a crime is by no means a derogation of the importance of the jury as a judge of credibility.  Nor is it based on any distrust of the jury's ability to separate fact from fiction.  On the contrary, it is a testament to the importance of trial by jury and the need to husband the resources necessary for that process by limiting evidence in a trial to that directed by the elements of the crime or at affirmative defenses."  United States v. Bailey, 444 U.S. 394, 416 (1980).

### B. Defendant Must Establish a Prima Facie Case That He Was Induced or Not Predisposed to Commit the Charged Crimes

"The entrapment defense has two elements: (1) the defendant was induced to commit the crime by a government agent, and (2) he was not otherwise predisposed to commit the crime."  United States v. Spentz, 653 F.3d 815, 818 (9th Cir. 2011) (citing United States v. Barry, 814 F.2d 1400, 1401 (9th Cir. 1987)).  "A defendant is not entitled to have the issue of entrapment submitted to the jury in the absence of evidence showing some inducement by a government agent and a lack of predisposition by the defendant."  United States v. Rhodes, 713 F.2d 463, 467 (9th Cir. 1983); see also United States v. Kabir, 2015 WL 631961, at *2 (C.D. Cal. Feb. 13, 2015).

"Inducement can be any government conduct creating a substantial risk that an otherwise law-abiding citizen would commit an offense,

1    including persuasion, fraudulent representations, threats, coercive

2    tactics, harassment, promises of reward, or pleas based on need,

3    sympathy or friendship." Gurolla, 333 F.3d at 954 (quoting United

4    States v. Poehlman, 217 F.3d 692, 698 (9th Cir. 2000)). "[E]ven very

5    subtle governmental pressure, if skillfully applied, can amount to

6    inducement." Poehlman, 217 F.3d at 701-02.

7        The Ninth Circuit has identified five factors to consider in

8    determining whether a defendant was predisposed to commit the charged

9    crimes: (1) the character or reputation of the defendant, including

10   any prior criminal record; (2) whether the suggestion of the criminal

11   activity was initially made by the Government; (3) whether the

12   defendant was engaged in the criminal activity for profit; (4)

13   whether the defendant evidenced reluctance to commit the offense,

14   overcome only by repeated Government inducement or persuasion; and

15   (5) the nature of the inducement or persuasion supplied by the

16   Government. United States v. Cortes, 757 F.3d 850, 858 (9th Cir.

17   2014) (quoting United States v. Busby, 780 F.2d 804, 807 (9th Cir.

18   1986)). "Although none of these factors is controlling, the

19   defendant's reluctance to engage in criminal activity is the most

20   important." Id. (quoting Busby, 780 F.2d at 807).

21   **IV.  ARGUMENT**

22       **A.   Defendant Is Not Entitled to an Entrapment Defense at Trial**

23       For defendant to present an entrapment defense to the jury, it

24   is defendant's burden prior to trial to make an offer of proof that

25   is sufficient as a matter of law to support the defense. See, e.g.,

26   United States v. Vasquez-Landaver, 527 F.3d 798, 802 (9th Cir. 2008)

27   (finding that a "district court may exclude evidence on [an

28   affirmative defense] and may refrain from providing a jury

                                    10

instruction on [the affirmative defense] where the defendant's proffer failed to make a prima facie showing of the required elements") (citations omitted).  Further, "[a] district court may preclude a defense if the defendant fails to make a prima facie showing that he is eligible for the defense."  United States v. Schafer, 625 F.3d 629, 637 (9th Cir. 2010).

Here, defendant has failed to provide an offer of proof of admissible evidence to support an entrapment defense.  And the evidence "presents no genuine dispute as to whether the defendant was entrapped," so "there is no factual issue for the jury, and the judge has a duty to rule on the defense as a matter of law."  Rhodes, 713 F.2d at 467.

**B.   The Government Did Not Induce Defendant to Attempt to Provide Material Support to HTS or HAMAS**

The Undercover Witnesses in this case did not induce defendant to attempt to provide material support to HTS or HAMAS.  Inducement occurs when government agents engage in "repeated and persistent solicitation or persuasion which overcomes the defendant's reluctance" to commit a crime.  United States v. Simas, 937 F.2d 459, 462 (9th Cir. 1991) (quotation marks omitted).  Inducement does not occur when government agents merely "provide an opportunity" or "make themselves available to participate in a criminal transaction."  Poehlman, 217 F.3d at 701.  Thus, "the defense of entrapment, while protecting the innocent from the government creation of a crime, is unavailable to a defendant who, motivated by greed and unconcerned about breaking the law, readily accepts a propitious opportunity to commit an offense."  United States v. Reynoso-Ulloa, 548 F.2d 1329, 1338 (9th Cir. 1977).

1    In this case, the communications between defendant and the

2 Undercover Witnesses, as well as defendant's statements to other

3 associates, demonstrate that the Undercover Witnesses did not subject

4 defendant to "repeated and persistent solicitation or persuasion

5 which over[came his] reluctance" to commit the planned attack.

6 Simas, 937 F.2d at 462 (quotation marks omitted).

7    Here, OCE#1 merely reached out to defendant in the Baqiyah

8 chatgroup to discuss whether he spoke Russian, and through that

9 discourse, defendant befriended and invited OCE#1 to join another

10 group chat that defendant created.  In fact, it was defendant who

11 created these specific group chats to discuss his support for certain

12 terrorist groups, their ideological aims, and training for and

13 carrying out future attacks on their behalf.  Further, for the counts

14 alleged in Counts 1 and 2, the Undercover Witnesses were merely

15 present in the group chats where defendant disseminated combat and

16 weapon-making information to support HTS.

17    For Count 3, the CHS introduced defendant to OCE#2, who

18 defendant believed to be a HTS fighter, but opportunity alone is not

19 inducement; rather, "inducement consists of an 'opportunity' plus

20 something else -- typically, excessive pressure by the government

21 upon the defendant or the government's taking advantage of an

22 alternative, non-criminal type of motive."  Poehlman, 217 F.3d at

23 701.  Such excessive pressure might include "persuasion, fraudulent

24 representations, threats, coercive tactics, harassment, promises of

25 reward, or pleas based on need, sympathy or friendship."  Cortes, 757

26 F.3d at 858; Poehlman, 217 F.3d at 702 (finding inducement where

27 undercover agent hinted at a potential romantic relationship); United

28 States v. Skarie, 971 F.2d 317, 320 (9th Cir. 1992) (finding

inducement where a government informant "initiated the idea of the methamphetamine sale, pressured [defendant] repeatedly to agree to the plan, and threatened her in order to convince her").

There is no evidence of inducement in this case. The Undercover Witnesses did not apply excessive pressure or attempt to take advantage of a non-criminal motive. Quite the opposite, the only offer an Undercover Witness made to defendant was the chance to meet a purported HTS fighter, OCE#2. When OCE#2 spoke via text messages with defendant, defendant volunteered information that he was in the military, shared his disdain for the United States and U.S. government, and seemingly bragged about his weapon-making skills by showing OCE#2 firearms that he had built and modified and provided a YouTube link to a video showing how defendant completed the firearm modification. At that point, OCE#2 asked if defendant could do the same with "grenades," and defendant responded that he wanted to experiment with chemical recipes, that he was considering teaching others how to make gun cotton, thermite, and "the more advanced stuff like potassium nitrate." Defendant further stated that "pressure plate and remote detonated [bombs] are the most useful." OCE#2 stated that their bomb maker had been killed by Turkish forces and that none of the remaining HTS fighters knew how to use the remaining chemicals. Defendant then asked how he could help support OCE#2's operations and suggested Bitcoin. OCE#2 provided a site where defendant could donate, but stated that defendant should feel no pressure to donate. OCE#2 asked if defendant could be willing to assist in making bombs. Defendant replied, "Give me a list of ingredients and I can ask one of the anti-government sources here." Defendant stated his source gave him the basic recipes and that

defendant had studied them.  And on or about May 4, 2021, defendant sent OCE#2 an online link to the Army Field Manual on Boobytraps. OCE#2 did not persuade, threaten, use coercive tactics, harass, promise any reward, or make any pleas based on need, sympathy of friendship.

Because defendant cannot make a prima facie showing that he was induced to commit the crimes at issue, he should be precluded from offering an entrapment defense at trial.

### C.   Defendant Was Predisposed to Support FTOs

Defendant likewise has not presented any evidence that he was not predisposed to provide material support or resources to FTOs, including HTS and HAMAS.  Courts evaluating a defendant's predisposition to commit an offense review five factors: (1) whether the defendant showed any reluctance, (2) the character and reputation of the defendant; (3) whether the government made the initial suggestion of criminal activity; (4) whether the defendant engaged in the activity for profit; and (5) the nature of the government's inducement.  United States v. Davis, 36 F.3d 1424, 1430 (9th Cir. 1994) (internal citation omitted).

#### 1.   Defendant did not show any reluctance.

"Although none of [the five] factors is controlling, the defendant's reluctance to engage in criminal activity is the most important."  Busby, 780 F.2d at 807.  From the outset, defendant did not show any reluctance.  On the contrary, defendant created these group chats, inviting other like-minded individuals who hated the U.S. government, and it was defendant who volunteered his skills and knowledge as someone "in the military."  Furthermore, after his

14

conduct to support each count, defendant vocalized his continued

support to help HTS and/or HAMAS.

### a.   Count 1

In fact, after defendant provided the unsolicited information

regarding the making of chemical weapons and improvised explosives on

March 17, 2020 (Count 1), defendant told the group chat: "please

don't send yourself to Allah so soon from a dumb mistake."  Defendant

knew he was providing dangerous information and resources to the

group and warned them to be careful when attempting to follow his

instructions.

### b.   Count 2

Further, when a member of the group chat stated he wanted to

bomb a United States Air Force base, defendant sent additional

information and resources on how to build chemical weapons and IEDs.

Defendant stated that he thought the member was joking about blowing

up the base, but when OCE#1 later asked if defendant believed that

member was planning an attack in the United States, defendant

responded: "if he does want to plan something I will not stop him.

However, I think that planning an attack is not needed/not

thoughtful."  Defendant not only verbalized that he would not stop

someone from planning an attack, but also provided additional

information and resources on the making of chemical weapon and IEDs

to the same group chat, after defendant learned a member in the chat

wanted to attack an Air Force base.  Defendant stated to OCE#1, "I

have rules, when we use bombs that we cannot use against innocent

people like elderly, women, and children."  However, defendant did

not otherwise show any reluctance on making or using the bombs.

1

      *c. Count 3*

2   Only after defendant sent the Army Field Manual on Boobytraps to

3 OCE#2 (Count 3), defendant seemed to change his mind on his previous

4 support for HTS and was unhappy with OCE#2's willingness to kill

5 innocent people.  On May 9, 2020, defendant created a new Signal

6 group chat called Brotherhood and stated that OCE#2 asked defendant

7 to "Teach them to make bombs because the Turks had already killed

8 their bombmaker."  Defendant said he "tested" OCE#2 by stating

9 defendant would be willing to kill innocent teachers, judges, and

10 families in order to determine whether OCE#2 would be willing to do

11 the same; and, was ultimately unhappy with OCE#2's willingness to do

12 the same.  Yet, defendant still sent OCE#2 the Army Field Manual on

13 Boobytraps, showed him how to modify firearms, and asked how he could

14 help OCE#2 with his efforts.

15       *d. Count 4*

16   And, after defendant sent an unsolicited fundraising link for

17 HAMAS (Count 4), defendant stated, "this is a cause I am sure we can

18 all get behind."  And when OCE#1 asked defendant if sending money to

19 HAMAS was doable, defendant responded: "of course we can" and stated

20 he was "trying to find more about cryptocurrency" because it was the

21 safest way to send money to help "our brothers overseas."

22   These are not the words of a defendant who reluctantly stumbled

23 into a crime at the government's behest; rather, defendant's own

24 words show that he was an eager participant who enthusiastically

25 shared his specialized knowledge in attempt to support HTS and HAMAS.

26 On this first factor, which the Ninth Circuit considers to be the

27 "most important," defendant cannot prevail.  <u>Busby</u>, 780 F.2d at 807.

28

1            2.   **Defendant's character and reputation show that he was**
2               **predisposed to commit this crime.**

3      To determine whether defendant's character and reputation

4  support predisposition, in the context of narcotics trafficking,

5  courts consider things like criminal history, knowledge of narcotics

6  trafficking, "familiar[ity] with the code words used in the narcotics

7  transactions," and ability to "negotiate[] the best price for the

8  sale of narcotics." United States v. Jabara, 618 F.2d 1319, 1328–29

9  (9th Cir. 1980).

10     In Reynoso-Ullua, the court held that the defendant's statements

11  "manifested his knowledge of smuggling heroin across the border," and

12  "lead to [the] inference" that defendant had been involved in

13  previous heroin sales. 548 F.2d at 1336. Importantly, the Reynoso-

14  Ullua court emphasized that even though the defendant's statements

15  did not "establish his involvement in previous heroin transactions,"

16  the inference was sufficient to show predisposition. Id.

17     So, too, here defendant's statements create an inference that he

18  previously attempted to support other terrorist organizations.

19  Defendant stated several times in group chats that he wanted to join

20  two groups that worked with HTS in Syria: Malhama Tactical and Ajnad

21  Al Kavkaz. Defendant's own words show that he was familiar with

22  specific military and jihadist groups on the ground fighting in

23  support of HTS. And, defendant specifically shared that he would

24  "pray to Allah every night that I can become a shaheed instead of die

25  [sic] peacefully."

26     Defendant's lack of criminal history does not compel a different

27  outcome on this factor. In United States v. Avila, the defendant had

28  prior crimes concerning smaller amounts of drugs; the court held that

despite this minimal criminal history, defendant was predisposed because he "show[ed] no reluctance" and was "willing to enter into the transaction."  19 F. App'x 547, 548 (9th Cir. 2001); United States v. O'Brien, 27 F. App'x 882, 884 (9th Cir. 2001) (no entrapment found even though defendant "did not have a criminal record prior to" the crime at issue).

On this second factor, defendant cannot prevail, as his character and reputation show predisposition toward providing material support to the FTOs named in the indictment.

### 3.   That the government made the initial suggestion of criminal activity does not change the analysis.

The third factor is the only factor that arguably weighs in defendant's favor because for Count 3, it was the government, through the CHS, that initially introduced defendant to OCE#2.  This single factor, however, does not change the analysis when the remaining four factors weigh against the defendant.  United States v. Boling, 958 F.2d 378 (9th Cir. 1992) ("The only [factor] supporting the entrapment claim is that it was the government agent who made the initial suggestion of criminal activity.  However, looking to the other factors, there is ample evidence to dispute the entrapment claim.").  And notably, the suggestion of criminal activity here was simply the provision of an opportunity -- which the Ninth Circuit has held does not amount to inducement.  See infra.  Even before this "opportunity" with respect to OCE#2 in May 2020, defendant had already sent similar weapons-making information to the group chat he had created in March and April 2020, as charged in Counts 1 and 2.

      4.   Defendant did not engage in the activity for profit.

Here, defendant did not engage in this criminal activity for profit.  However, he repeatedly explained his disdain for the west, his hatred for the U.S. government and Israel, and expressed his support for HTS and HAMAS.

      5.   There was no inducement.

The final factor, as detailed in Section IV.B, weighs in the government's favor because the nature of the government inducement here was minimal to none.  Inducement requires excessive pressure, such as "persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship."  Cortes, 757 F.3d at 858.  In United States v. Thickstun, the court found that "the government inducement was minimal" where the government "encouraged the [crime] only by giving [defendant] the opportunity to [commit] it."  110 F.3d 1394, 1397 (9th Cir. 1997).

The government did not use any coercive tactics here, and defendant certainly did not need any persuading to attempt to support HTS or HAMAS.  Instead, in just one instance outlined in Count 3, the government merely presented the opportunity for defendant to talk to someone he believed was an HTS fighter in Syria.  Defendant cannot prevail on this factor.

Taken together, the factors weigh towards finding that defendant was predisposed to support HTS and HAMAS, with his lack of reluctance being most important.  Because defendant cannot make a prima facie showing that he was not predisposed to commit the crimes at issue, he should be precluded from offering an entrapment defense at trial.

**V.    CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court preclude defendant from introducing an entrapment defense at trial.