KARREN KENNEY, CA. SBN 174872
KENNEY LEGAL DEFENSE
2900 Bristol Street, Suite C204
Costa Mesa, CA 92626
TELEPHONE:(855) 505-5588
E-MAIL: KARREN.KENNEY@GMAIL.COM

CHARLES D. SWIFT, WA Bar No. 41671
CONSTITUTIONAL LAW CENTER FOR
MUSLIMS IN AMERICA
100 N. Central Expy. SUITE 1010
Richardson, TX  75080
TELEPHONE: (972) 914-2507
FAX: (972) 692-7454
EMAIL: CSWIFT@CLCMA.ORG

ATTORNEYS FOR THE DEFENDANT

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| UNITED STATE OF AMERICA | ) | Case No.    SACR  20-00146 -DOC |
| | ) | **RESPONSE TO GOVERNMENT'S** |
| v. | ) | **MOTION IN LIMINE PERTAINING TO** |
| | ) | **THE TESTIMONY OF UNDERCOVER** |
| JASON FONG | ) | **AGENTS AND A CONFIDENTIAL** |
| | ) | **HUMAN SOURCE** |

**DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTION IN LIMINE**

**REGARDING COURTROOM PROTECTIVE MEASURES**

i

# **TABLE OF CONTENTS**

I.   BACKGROUND ....................................................................................................1

II.   ARGUMENT ......................................................................................................5

  A.   **Identities of Testifying Witness (Proposed Protective Measure 1, and 2)**...................5

    1.   The Government fails to establish more than a hypothetical threat to the witness's safety .....................................................................................................7

    2.   The government's decision to Classify the identity of witnesses does not justify withholding their identity. ..........................................................................9

    3.   The government's proposed anonymous testimony denies the defense the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test ……………………………………………………………13

  B.   **The government's requested restrictions on questioning violate the Sixth Amendment (Proposed Protective Measure 4)** ....................................................................15

  C.   **Prohibiting the defense from utilizing the online aliases of the undercovers during cross-examination and permitting undercovers to testify in a manner that prevents their facial appearance from being revealed to the public (Protective Measures 3, 6, and 9), prejudice Mr. Fong's right to due process, and violate the Federal Rules of Evidence** ....................................................................................................17

III.   **CONCLUSION** ..............................................................................................23

1

## **TABLE OF AUTHORITIES**

2

 **Supreme Court Cases**

3

*Brady v. Maryland*
373 U.S. 83 (1963) …………………………………………………..……10

*Crawford v. Washington*
541 U.S. 36 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)…………………………………11,13

*Giglio v. United States*
405 U.S. 150 (1972)…………………………………………………………..10

*Holbrook v. Flynn*
475 U.S. 560 S. Ct. 1340, 89 L. Ed. 2d 525 (1986) ………………………………21

*Roviaro v. United States*
353 U.S. 53 (1957) ……………………………………………………………5

*Smith v. Illinois*
390 U.S. 129 (1968) …………………………………………………………5,6

**Circuit Court Cases**

*United States v. Abu Ali*
528 F.3d 210 (4th Cir. 2008) ……………………………………………19

*United States v. Alaniz*
726 F.3d 586 (5th Cir. 2013)……………………………………………10,13

*United States v. Celis*
608 F.3d 818, 832  (D.C. Cir. 2010) …………………………………………7

*United States v. Claudio*
44 F.3d 10 (1st Cir. 1995) ……………………………………………………19

*United States v. Cosby*
500 F.2d 405 (9th Cir. 1974)…………………………………………………6

*United States v. Ellis*
468 F.2d 638 (9th Cir. 1972)…………………………………………………6

*United States v. El-Mezain*
664 F.3d 467 (5th Cir. 2011) ………………………………………………14

*United States v. Gutierrez de Lopez*
761 F.3d 1123 (10th Cir. 2014)………………………………………………7,14

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*United States v. Lawler*
  413 F.2d 622  (7th Cir. 1969)..........................................................................7

*United States v. Mohamed Osman Mohamud*
  666 F. App'x 591 (9th Cir. 2016) ...................................................................11

*United States v. Moussaoui*
  333 F.3d 509 (4th Cir. 2003)...........................................................................19

*United States v. Muse*
  633 F.2d 1041 (2d Cir. 1980) ..........................................................................15

*United States v. Navarro*
  737 F.2d 625  (7th Cir. 1984)..........................................................................14

*United States v. Olson*
  978 F.2d 1472 (7th Cir. 1992)..........................................................................14

*United States v. Palermo*
  410 F.2d 468 (7th Cir. 1969)............................................................................6

*United States v. Passaro*
  577 F.3d 207 (4th Cir. 2009)...........................................................................20

*United States v. Ramos-Cruz*
  667 F.3d 487 (4th Cir. 2012)............................................................................7

*United States v. Varca*
  896 F.2d 900 (5th Cir. 1990)…………………………………………….............10

**District Court Cases**

*United States v. Alimehmeti*
  284 F. Supp. 3d 477 (S.D.N.Y. 2018) .............................................................20

*United States v. Chaoqun*
  No. 18 CR 611, 2022 U.S. Dist. LEXIS 119704 (N.D. Ill. July 7, 2022)……………….....11,22

*United States v. Seifert*
  351 F. Supp. 2d 926 (D. Minn. 2005)…………………………………………....22

**Statutes**

18 U.S.C.S. app. § 8(a)....................................................................................19

18 U.S.C.S. app. § 8(b)....................................................................................20

18 U.S.C.S. app. §§ 1-16.................................................................................9

Other Authorities

*1965 Army field manual on making booby traps* (HTTPS://WWW.BITS.DE/NRANEU/OTHERS/AMD-US-ARCHIVE/FM5-31%2865%29.PDF ...................................................................................3

*HTS Condemns U.S. Terror Designation, Demands Evidence of AQ Link,"* Site Intelligence Group, June 1, 2018, (AVAILABLE AT: HTTPS://ENT.SITEINTELGROUP.COM/STATEMENTS/HTS-CONDEMNS-U-S-TERROR-DESIGNATION-DEMANDS-EVIDENCE-OF-AQ-LINK.HTML) ..................................................8

*"The Blackwater of Jihad", Foreign Policy,* Feb. 10, 2017. (AVAILABLE AT: HTTPS://FOREIGNPOLICY.COM/2017/02/10/THE-WORLD-FIRST-JIHADI-PRIVATE-MILITARY-CONTRACTOR-SYRIA-RUSSIAMALHAMATACTICAL/).……………………………………………………………………3

*Signal is a cross-platform centralized encrypted instant messaging service developed by the non-profit Signal Foundation and Signal Messenger LLC.* HTTPS://WWW.BUSINESSOFAPPS.COM/DATA/SIGNAL-STATISTICS…………………………….......……………………………………………………………..2

Smith, Anastasia and Zelin, Aaron. *Washington Institute for Near East Policy, "Al-Qaeda, Hayat Tahrir al-Sham, and the Future of Jihadism",* June 15, 2022. (AVAILABLE AT: HTTPS://WWW.WASHINGTONINSTITUTE.ORG/POLICY-ANALYSIS/AL-QAEDA-HAYAT-TAHRIR-AL-SHAM-AND-FUTURE-JIHADISM (REFERRING TO AMBASSADOR JAMES JEFFREY, WASHINGTON'S FORMER SPECIAL ENVOY FOR BOTH SYRIA ENGAGEMENT AND THE GLOBAL COALITION TO DEFEAT ISIS.)) ...............................................................................................................9

Rules

FED. R. EVID. 1001(4)......................................................................................................22

FED. R. EVID. 403 ...........................................................................................................20

FED. R. OF CRIM. P. 16(a)(1)(B)........................................................................................2

The Defendant Jason Fong, by and through his attorneys, responds to the government's Motion in Limine (Doc. 143) seeking protective measures with respect to the testimony of two Undercover Employees and a Confidential Human Source whom the United States anticipates calling at trial.  Defendant opposes protective measures 1[1], 3, 4, and 5 on the grounds that the measures violate Mr. Fong's Sixth Amendment right to confront the witness against him. Defendant opposes protective measures 3 and 6 on the grounds that they violate Mr. Fong's Fifth Amendment right to due process by unfairly and unnecessarily prejudicing his right to an impartial jury. Counsel opposes protective measure 3 on the grounds that it is contrary to the Federal Rules of Evidence and is not authorized by CIPA. Counsel holds in abeyance their position on protective measure 2 pending investigation of the witnesses. Finally, counsel does not oppose protective measures 7 – 9.

## I.     BACKGROUND

Between February 2020, and June 2020, the New York Police Department ("NYPD") and Federal Bureau of Investigation ("FBI") investigated Mr. Fong based his social media use. In February of 2020, the NYPD identified Mr. Fong as the Marine who was being discussed by persons they suspected of supporting Islamic State of Iraq and al Sham ("ISIS"), a designated Foreign Terrorist Organization ("FTO"). Similarly, the Alabama Field Office of the FBI identified Mr. Fong as a potential suspect based on his social media posts on Instagram. Both the NYPD and the Alabama Field Office made contact with Mr. Fong utilizing Undercover Online Operatives. The NYPD operative posed as a Russian-speaking immigrant living in New York. The Alabama undercover online operative posed as a 21-year-old, recent convert to Islam living with his parents in Alabama. These undercover operatives made contact with Mr. Fong through social media on an Instagram

---

[1] Mr. Fong does not oppose the undercover witnesses testifying utilizing a pseudonym but does oppose failing to provide the true identities of the Undercover Witnesses to defense counsel.

group chat Baqiyah.[2] In the Baqiyah chat group, the FBI online undercover agent and the NYPD undercover online operative developed a rapport with Fong.

Mr. Fong created Mujahideen in America in February 2020 as an alternative to the Instagram group chat Baqiyah that he has been participating in, and a critic of the persons who supposed ISIS in that group chat.[3] Mr. Fong's expressed purpose for creating Mujahideen in America was to train young American Muslims in weapons safety, marksmanship, and military tactics so they would be able to defend themselves. Mr. Fong invited the NYPD undercover operative, and the Alabama undercover online operative, into the group chat Mujahideen in America created on Signal.

On March 17, 2020, and April 1, 2020, Mr. Fong shared the material that is the subject of Count 1 and Count 2 to the members of the Mujahideen in America group chat. As members of the Mujahideen in America group chat the undercover online operatives received these materials on their mobile phones and created screenshots on their devices of the materials. The government has furnished these screenshots to the defenses part of the discovery, the screenshots are, however, redacted to remove the undercovers' online aliases, online monikers, or personas. Exhibit A[4].

Defendant Mr. Fong met with NYPD undercover operative agent on April 24-25, 2020. These meetings were video and audio taped, during the meetings the NYPD undercover operative and Mr. Fong spoke in English and in Russian.  The copies of the video tapes and audio tapes provided to the defense are edited to obscure the NYPD undercover operative's face, and the NYPD undercover

---

[2] The government would be required to provide all relevant written or recorded statements of the accused under Fed. Rules of Criminal Procedures 16(a)(1)(B). The initial conversations between the undercover online operatives and Mr. Fong are relevant to the underlying charges as they form the basis for their relationship.  The government however has not provided any discovery related to the Instagram chat group Baqiyah, presumably because these statements are not in their possession.
[3] Signal is a cross-platform centralized encrypted instant messaging service developed by the non-profit Signal Foundation and Signal Messenger LLC. Users can send one-to-one and group messages, which can include files, voice notes, images and videos. It can also be used to make one-to-one and group voice and video calls. As of January 2021, the platform had approximately 40 million monthly active users. As of May 2021, it was downloaded more than 105 million times. https://www.businessofapps.com/data/signal-statistics
[4]  Included are 10 pages of 1474 page of the conversation from Signal Group Chat Mujahideen in America, which is representative of the entire document.

operative's voice has been disguised to prevent recognition. As a result of the editing of the audio, the defense is unable to understand either the English or the Russian statements of the NYPD undercover operative in the recording. Exhibit B.

Apart from the video/audio recording, the government provided the defense with a summary translation of the April 24-25, 2020 meetings. Because the defense is unable to understand the NYPD undercover operative in the underlying recordings the defense is unable to agree to the accuracy of the translations and summaries.

During the April 24-25, 2020 meetings, Mr. Fong is alleged to have discussed his intention to potentially leave the United States to join Malhama Tactical[5] as an instructor. The government does not allege that the defendant Mr. Fong's stated intention to join Malhama Tactical constitutes attempted training of HTS charged in Counts 1 through 3. Instead, the government per its request to pre-admit evidence contends that the conversation is either inextricably intertwined with the charges or admissible under Federal Rules of Evidence 404(b). ECF No. 144.

On May 7, 2020, the FBI Alabama operative invited Mr. Fong to a private chat on Signal wherein he introduced Mr. Fong to a second FBI undercover online operative who posed as an Hay'at Tahrir al Sham ("HTS") commander seeking Mr. Fong's assistance for his fictional unit "which had recently lost its bomb maker". During their online conversation, Mr. Fong provided a link to a 1965 Army field manual on making booby traps (https://www.bits.de/NRANEU/others/amd-us-archive/FM5-31%2865%29.pdf). On May 8th, 2020, Mr. Fong told the NYPD undercover online operative that he did not think that HTS and the Alabama undercover online operatives were on the right path and were terrorists. Exhibit C. He further told the NYPD undercover online operative that

---

[5] Malhama Tactical is a training group in Syria that trained Hayat Tahrir Al-Sham's elite forces known as "The Red Bands" in military tactics. It consists of 10 well-trained fighters from Uzbekistan and the Russian Caucasus. Komar, Rao. "The Blackwater of Jihad", Foreign Policy, Feb. 10, 2017. Available at: https://foreignpolicy.com/2017/02/10/the-world-first-jihadi-private-military-contractor-syria-russia-malhama-tactical/

he (Mr. Fong) was thinking of creating a "new group for us and not for them (undercover operatives)." Exhibit D.

Thereafter, Mr. Fong created the new group, Al Ikhwan. The NYPD undercover operative was invited to join this group, but the Alabama FBI undercover online operatives who had introduced Mr. Fong to the second FBI undercover online operative posing as an HTS commander were not invited. Mr. Fong initially continued to discuss the need for training for American Muslims. However, on May 18, 2020, NYPD undercover operative asked Mr. Fong if the group should donate to Al Qassam Brigades ("Hamas"), Mr. Fong expressed his opinion in Russian with the NYPD undercover operative that Hamas "of course we can (send $ to Hamas). There is a possibility which is why I am trying to find out more about cryptocurrency. They would accept bitcoin. Check out on private browser." Exhibit E.  On May 19, 2020, Mr. Fong posted links in English, that perhaps they could fund Hamas or other similar groups using bitcoin.

Although, the NYPD undercover operative is represented in discovery as intelligence from the NYPD anti-terrorism division, the FBI has classified him as a Confidential Human Source (CHS), rather than an NYPD undercover operative. This was presumably done to bring the NYPD undercover operative under the umbrella of the FBI anti-terrorism program, thereby treating his identity, training, recruitment, etc. as classified, despite the fact that during the pendency of the investigation of Mr. Fong, the NYPD undercover operative was not under the supervision or control of the FBI.

The government requests the following protective measures in relation to testimony and evidence presented during trial relating to all undercover operative testimonies:

1. The Undercover Witnesses may testify under pseudonyms, without disclosing their identities to the defendant, defense counsel, or the jury;

2. The defense shall be prohibited from asking the Undercover Witnesses questions that would reveal personally identifiable information or that could lead to the discovery of their true identities;

3. The defense shall be prohibited from asking the Undercover Witnesses questions designed to identify their aliases, online monikers, or personas;

4. The defense shall be prohibited from asking the Undercover Witnesses questions that would reveal the nature or extent of the FBI's use of the Undercover Witnesses in other investigations, or information regarding the FBI's selection and training programs for undercover employees or confidential human sources;

5. When the Undercover Witnesses testify, only the Court, essential personnel, the jury, defendant and his counsel, and the government's trial team shall be present in the courtroom. The government shall broadcast a contemporaneous audio feed of these witnesses' testimony to a separate location in the courthouse that will be open to the public;

6. The Undercover Witnesses may testify using a light disguise, such as changing their facial hair, hairstyle, or dress style;

7. The Undercover Witnesses shall be permitted to use non-public entrances and exits to the courthouse and courtroom, to take their seat in the witness chair prior to the entry of the jury and the defendant into the courtroom, and to remain seated when sworn in and testifying;

8. During the testimony of the Undercover Witnesses, all non-official recording and photographic devices shall be prohibited in the courtroom, as well as the courtroom in which the audio feed is broadcast during their testimony; and

9. Public disclosure of any audio or video recording, sketch, or similar reproduction of the voices or visual images of the Undercover Witnesses while testifying shall be prohibited.

## II.     ARGUMENT

### A. Identities of Testifying Witness (Proposed Protective Measure 1, and 2)

The Supreme Court first addressed the question of anonymous government informants in *Roviaro v. United States*, 353 U.S. 53 (1957). The question in *Roviaro* was whether the government was obligated to disclose the identity of anonymous government agents, stating "[t]he problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 629.  Eleven years later the Supreme Court dealt with the issue presented to this Court, an anonymous government informant testifying at trial, in *Smith v. Illinois*, 390 U.S. 129, 131-32 (1968). In *Smith*, the Supreme Court analyzed the question regarding the trial testimony of the informant in the context of the Sixth Amendment right to confrontation. In reversing

the decision of the Illinois Supreme Court to uphold the trial court's decision to maintain the witness's anonymity, the Supreme Court explained that a government witness's name and address open countless avenues of in-court examination and out-of-court investigation. To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself." *Id.* at 131.

The Ninth Circuit, like every other circuit to consider *Smith v. Illinois*, has held that *Smith* "does not establish a rigid rule of disclosure, but rather discusses disclosure against a background of factors weighing conversely, such as personal safety of the witness." *United States v. Cosby*, 500 F.2d 405, 407 (9th Cir. 1974); *United States v. Ellis*, 468 F.2d 638 (9th Cir. 1972). In determining whether the government was obligated to provide the witnesses' name, address, and place of employment, the Ninth Circuit has held that this Court should apply the test set out by the Seventh Circuit in *Palermo*. *See United States v. Ellis*, 468 F.2d ("the procedures suggested in *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969), should ordinarily be followed". *Id* at 639)

The Seventh Circuit held in *Palmero;*

"that where there is a threat to the life of the witness, the right of the defendant to have the witness' true name, address and place of employment is not absolute. However, the threat to the witness must be actual and not a result of conjecture. The government bears the burden of proving to the district judge the existence of such a threat. An actual threat being shown, the government must also disclose to the district judge *in camera* the relevant information.  Knowing of the existence of an actual threat and the witness' location, the district judge must determine whether the information must be disclosed in order not to deny effective cross-examination. "The trial judge can then ascertain the interest of the defendant in the answer and exercise an informed discretion in making his ruling." (White, J. concurring) Such a decision is reviewable on appeal. Under almost all circumstances, the true name of the witness must be disclosed. *Palermo*, 410 F.2d, 472[6]

---

[6] *See also United States v. Rangel*, 534 F.2d 147 (9th Cir. 1976) (stating "*Smith v. Illinois* . . . 'does not establish a rigid rule of disclosure, but rather discusses disclosure against a background of factors weighing conversely, such as personal safety of the witness.'") (quoting *United States v. Cosby*, 500 F.2d 405, 407 (9th Cir. 1974)); *Caldwell v. Minnesota*, 536 F.2d 272, 273-74 (8th Cir. 1976); *McGrath v. Vinzant*, 528 F.2d 681, 683-84 (1st Cir.), *cert. denied*, 426 U.S. 902 (1976); ; *United States v. Baker*, 419 F.2d 83, 87 (2d Cir. 1969), *cert. denied*, 397 U.S. 971 (1970); *United States v. Palermo*, 410 F.2d 468, 472-73 (7th Cir. 1969).

In applying the Palermo analysis, the predicate questions for permitting anonymous testimony are (1) whether an actual threat exists to the witness; and (2) if so, whether anonymous testimony will deprive the defendant of an opportunity for effective cross-examination. *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1140 (10th Cir. 2014).

### 1. The Government fails to establish more than a hypothetical threat to the witness's safety

The government bears the burden of showing an actual threat. *See United States v. Ramos-Cruz*, 667 F.3d 487, 500 (4th Cir. 2012), ("When the government seeks to withhold a witness's true name, address, or place of employment, it bears the burden of demonstrating that 'the threat to the witness [is] actual and not a result of conjecture;' quoting, *Palermo*, 410 F.2d 468.  The threat need not arise solely from the defendant but can also arise from third parties. *See United States v. Celis*, 608 F.3d 818, 832, 391 U.S. App. D.C. 112 (D.C. Cir. 2010) ("The appropriateness of using pseudonyms to protect witnesses does not depend on whether the threat to the witness comes directly from a defendant or from another source."); *accord Ramos-Cruz*, 667 F.3d at 501 (citing *Celis* with approval). But "a generalized statement" about danger—such as "*anyone* who testifies against one of [a gang] members faces danger from [that gang]"—"would be insufficient to show that a threat against a witness was 'actual and not a result of conjecture.'" *Ramos-Cruz*, 667 F.3d at 501 (quoting *Palermo*, 410 F.2d at 472); *see also United States v. Lawler*, 413 F.2d 622, 627 n.4 (7th Cir. 1969) (disapproving of the prosecution's "unsubstantiated reference to the possible danger to the witness's safety"); *see also United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1141 (10th Cir. 2014).

The government argues that the classified declaration from Kevin Vorndran, the Acting Assistant Director of the FBI's Counterterrorism Division provided the factual basis for this Court to find that a threat exists to the safety of the Online Covert Employee ("OCE"), OCE#1, OCE#2, and the CHS if their names were to become public or disclosed. The defense objects to reliance on in-camera and *ex-parte* filings to determine whether a witness's safety is at risk as erroneous. *Palmero* only permits

in camera consideration of government filings after a determination that the witness's safety is at risk. *Palmero* 410 F.2d, 472.

Should this Court, nevertheless, consider the affidavit, fairness dictates strict scrutinization of the government's representations, in absence of the defense's ability to challenge the sufficiency of the government's representations. The defense respectfully submits that the Court should pay particular attention to three areas. First, is the government's tendency to rely on generalized rather than specific threats to the testifying witness's safety. Counsel's experience from reviewing past affidavits concerning undercover witnesses filed in open court is that it is likely that the affidavit makes no claim the defendant would present a risk to the undercovers' safety if the defendant were to learn the undercovers' identity. That is particularly true in this case. There is no evidence that Mr. Fong has attempted to learn the true identities of the undercover operatives or plotted any actions against the undercover operatives.

Second, unlike other terrorism and drug cartel cases, there is no appreciable risk to the undercover from third parties. The charges do implicate the attempted provision of material support to Foreign Terrorist Organizations ("FTO"). The witness, however, resides in the United States and faces no threat from HTS or Hamas. HTS was added to the State Department's existing designation of its predecessor, the al-Qaeda affiliate Jabhat al-Nusra, as a Foreign Terrorist Organization in May of 2018. HTS is believed to be a largely localized Syrian terrorist organization, with its primary objective being the establishment of Islamic rule in Syria via "toppling the criminal [Assad] regime and expelling the Iranian militias".[7] Since its break with Jabhat al-Nusra, HTS has no history of operations in the United States, nor has HTS called for attacks against the United States. Instead, HTS

---

[7] "HTS Condemns U.S. Terror Designation, Demands Evidence of AQ Link," Site Intelligence Group, June 1, 2018, Available at: https://ent.siteintelgroup.com/Statements/hts-condemns-u-s-terror-designation-demands-evidence-of-aq-link.html.

8

allegedly used backchannels to send U.S. officials the following message: "We want to be your friend. We're not terrorists. We're just fighting Assad...We're not a threat to you."[8]

Likewise, there is no threat to the undercover operatives from Hamas. The anonymous witnesses in *El-Mezain*, who were Israeli security agents, for which "[t]he Government showed that Hamas and other terrorist organizations seek out the true identities… so that they can be targeted." 664 F.3d at 492. Here the undercover operatives however are not located in Israel, and consequently face no threat from Hamas which does not operate in the United States.  Also, unlike *El-Mezain* there was no actual connection or contact between Mr. Fong and either HTS or Hamas. It is, therefore, highly unlikely that these organizations would seek to retaliate or intimidate witnesses in Mr. Fong's case even if they had the means to do so.  Unless the witnesses plan to go to Syria and fight on behalf of the Assad regime or an Iranian militia or go to Israel and work as security agents there, the witnesses do not face a threat from interested third parties.

Third, and finally, to the extent, the affidavit asserts that the undercovers' safety is at risk by virtue of their participation in the program, the defense urges the Court to reject the argument.   The government's undercover program targeting suspected supporters of terrorism has existed for more than 20 years, and at this point has resulted in hundreds of prosecutions. That one or more of the undercover operatives have received a threat, is similar to the rejected claim that "anyone who cooperates in a case with cartel connections faces danger." *Gutierrez de Lopez*, 761 F.3d at 1145.

## 2. The government's decision to Classify the identity of witnesses does not justify withholding their identity.

The government's submission of a factual basis for a protective order within a Classified Information Protective Act (CIPA) 18 U.S.C.S. app. §§ 1-16, filing strongly suggests that the

---

[8] Smith, Anastasia and Zelin, Aaron. Washington Institute for Near East Policy, "Al-Qaeda, Hayat Tahrir al-Sham, and the Future of Jihadism", June 15, 2022. Available at: https://www.washingtoninstitute.org/policy-analysis/al-qaeda-hayat-tahrir-al-sham-and-future-jihadism (referring to Ambassador James Jeffrey, Washington's former special envoy for both Syria engagement and the Global Coalition to Defeat ISIS.)

government's primary argument for withholding the identity of the testifying undercover employees and CHS is not witness's safety, but instead because the witnesses' identities have been classified.

One of the aspects of cases alleging material support of terrorism is that the FBI considers "terrorism sting operations" to be a matter of national security.  This is true regardless of whether or not agents of a foreign terrorist organization, or government, are actually involved. The result is the government classifies the investigative materials including the identities of undercover operatives based on the persona as an agent of a foreign terrorist organization.  The fact that the identity is classified, however, does not exempt the identity from disclosure if the evidence is relevant and helpful to the defense. *See United States v. Yunis*, 276 U.S. App. D.C. 1, 867 F.2d 617, 622 (1989). CIPA hearings are routinely used during the prosecution of a material support case to determine whetheror not the classified items must be provided as part of discovery. An in-camera balancing test of the needs of the defendant and the government has been held to satisfy the discovery requirements of the federal rules of discovery, and the Fifth Amendment due process requirements of *Brady, Gigilio,* and their progeny. *See United States v. Varca*, 896 F.2d 900, 905 (5th Cir. 1990).

The question presented here, however, is different from whether the government must disclose the identity of an undercover operative as part of discovery. The question here is whether the government may withhold the name of a testifying witness. See *United States v. Alaniz*, 609 cite ("The Supreme Court expressly distinguished *Roviaro,* and its attendant balancing, as applicable only where the informant did not testify under alias at trial (or did not testify at all)." Unlike Roviaro where the question was whether the government had to disclose the witness's name and address as part of discovery, here because the government is calling the witness the defense's need for the name to investigate is presumed.

Nevertheless, courts have applied the *Roviaro* balancing test to sanction the government's withholding of a testifying witness's identity on the basis that the witness's identity was classified.

*See e.g United States v. Mohamed Osman Mohamud*, 666 F. App'x 591, 594 (9th Cir. 2016) (holding that the district court acted within its discretion in excluding information about the true identities of FBI undercovers under the *Roviaro* balancing test); *see also United States v. Chaoqun*, No. 18 CR 611, 2022 U.S. Dist. LEXIS 119704, at *5 (N.D. Ill. July 7, 2022) (applying the *Roviaro* balancing test to the question of whether a testifying undercover witnesses whose identity was classified should be provided to defense counsel and whether counsel should be precluded from questioning the witness regarding the undercover agents training.)

The above decisions, however, are not binding on this Court and the defense urges this Court to not follow their example. Judge Henry F. Floyd concurring in *Ramos-Cruz*, explained more eloquently than counsel ever could how the in-camera balancing test fails to satisfy the Confrontation Clause. As Judge Floyd explained:

> Our method of criminal adjudication relies upon the "common-law tradition . . . of live testimony in court subject to adversarial testing," not the civil law inquisitorial method of "examination in private by judicial officers." *Crawford v. Washington*, 541 U.S. 36, 43, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); *see also id.* at 50 (recognizing that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure"). We thus define a fair trial as one in which the evidence is subject to adversarial testing. *Strickland*, 466 U.S. at 685. But here, the district court and the government investigated Diaz's and Perez's backgrounds in private. They then announced to the defense that the witnesses had nothing to disclose and, by refusing to provide the witnesses' true names, effectively prevented defense counsel from verifying this information. In this respect, what took place below resembles more the inquisitorial method of examination than our adversarial method. Because we rely upon the adversarial method as the hallmark of a fair trial, I am unable to accept the government's and district court's investigations into the witnesses' backgrounds as adequate substitutes for defense counsel's ability to do the same. *Ramos-Cruz*, 667 F.3d 508-09 (4th Cir. 2012).

With regard to the requirement that the defense proffer evidence that the name of the witness would be helpful in establishing the witness's bias, Judge Floyd further observed:

> Nor do I find persuasive the government's argument that "[a]ny suggestion that the defense would have unearthed impeachment material if [it] had learned the witnesses' identities is mere speculation." Because the defense does not have the true names of the witnesses, it is unable, and cannot be expected, to know whether any specific impeachment material exists. All it can do is speculate. But the government

seeks to justify not turning over the true names because defense counsel can only speculate that impeachment material exists. This circular reasoning is unappealing to me. Credibility is a potential issue for every witness, and often the only way to know whether a witness has credibility issues is to investigate the witness's background. We rely on the adversarial method to reveal credibility issues, which means criminal defendants must be given the tools essential to doing so". *Id* at 509.

Applying the *Roviaro* balancing test to a testifying witness eliminates the distinction made in *Smith* between a testifying witness and a non-testifying witness, allowing the Court and the government to foreclose "the countless avenues of in-court examination and out-of-court investigation, thereby emasculating the right of cross-examination itself." *Smith*, 390 U.S. at 131. In the best-case scenario, defendants accused of unlawful dealings with foreign organizations, who are typically Muslim, or more recently Chinese, receive a lesser version of the protections of the Sixth Amendment because the government has chosen to classify the identities of the government officers investigating them. In the worst case, the government is free to abrogate *Smith* by simply classifying the identities of those who work undercover.

The present case is more likely the latter than the former.  The CHS is a party of the New York Terrorism Task Force.  As a state law enforcement officer, his identity is only protected if it would jeopardize his safety, but is not protected as classified information.  The government gets around this distinction by designating him as a CHS thereby shielding his identity from discovery. The protection, however, is illusionary because the individual is only part of the FBI's program because he is a testifying witness, and as soon as his testimony is complete, he will go back to being a state law enforcement officer.

Likewise, the FBI employees conduct their operations online where their features and identities are hidden. Disclosure of their true names and locations does not compromise their abilities to continue to assist the government in the future. Like undercover officers who play child victims in online sting operations, they remain free to play any role they want in the future without concern that revealing their true identities at trial will compromise their ability.

1
2
3
4
5
6
7
8
9

In either case, using the *Roviaro* balancing test to the detriment of Mr. Fong's confrontation rights is contrary to Supreme Court's interpretation of the Framer's intent with respect to the confrontation clause.  In *Smith,* the Supreme Court held that the name of witness was fundamental to the defendant's right to cross. *Crawford v. Washington* held that "[b]y replacing categorical constitutional guarantees *with open-ended balancing tests*, we do violence to their design. Vague standards are manipulable... the Framers had an eye toward politically charged cases like Raleigh's--great state trials where the impartiality of even those at the highest levels of the judiciary might not be so clear." 541 U.S. 36, 67-68, (2004) (emphasis added).

10
11
12
13
14
15

Applying the Framers' intent to prevent such abuses, it is hard to fathom how the rights of a defendant, in a national security trial, to confront the witnesses the government has called against him, can be determined in an *ex parte* setting wherein he is unable to view evidence used to decide his rights, and the government's determination of withholding is not subject to adversarial scrutiny and is instead determined by a vague balancing test that weighs his interest in absentia.

16
17

### 3. The government's proposed anonymous testimony denies the defense the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test.

18
19
20
21
22
23
24
25
26
27
28

The second prong for determining any limits on anonymous testimony is that they must not compromise the defenses "…opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test." *Smith*, 390 U.S. at 132.  Where the witness testifies using a pseudonym, the defendant's confrontation rights are ordinarily protected by providing the defense with the witness's name, background information, criminal record, the amount of compensation received, and trial testimony given in previous cases.  *See Palermo*, 410 F.2d, 472 (holding that "Under almost all circumstances, the true name of the witness must be disclosed."); *See also United States v. Alaniz*, 726 F.3d 586, 609-10 (5th Cir. 2013) (holding the defendant's confrontation rights were satisfied when the witness's name, background information, criminal

record, the amount of compensation received, and trial testimony given in previous cases. *Id* at 609-10. The government's proposed protective order eschews this approach.

Where the witness's name is not provided to the defense then the burden falls to the government to provide sufficient information and latitude in cross to moot the need for defense investigation. *See eg United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011), (holding that anonymous testimony of an expert witness did not violate the Confrontation Clause where the defense was provided with over twenty volumes of material the expert used formulate his expert opinions, and the defense was permitted to question the witness regarding his training and experience, legal education, and potential bias towards Israelis living in the West Bank. *Id* at 492); *See United States v. Olson,* 978 F.2d 1472, 1477 (7th Cir. 1992) ("Notable, in this case, is the ample opportunity defendants had to impeach Fessler's testimony. They were able to bring out a prior felony conviction, a misdemeanor conviction for fraud, perjury, and receipt of payment for testimony." (footnote omitted))., *see also United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1146 (10th Cir. 2014) (finding that permitting anonymous testimony of the government informants violated the Confrontation Clause where the government failed to produce specific evidence of a threat.  But that the error was harmless because the defense counsel was able to cross-examine the anonymous witnesses concerning their prior arrests, compensation schedule for cooperating with the DEA, and immigration status, and there was substantial evidence cooperating the witnesses' testimony. Id at 1144-49.) *See also United States v. Watson*, 599 F.2d 1149, 1157 (2d Cir. 1979) (upholding limitations on cross-examination "to maintain [Witness Protection Program participant's] concealed identity" because defense counsel had been able to "explore [] in extensive detail his criminal background"), *amended on reh'g on other grounds*, 690 F.2d 15, *modified en banc sub nom. United States v. Muse*, 633 F.2d 1041 (2d Cir. 1980); *United States v. Navarro*, 737 F.2d 625, 634 (7th Cir. 1984).

What the government proposes to provide in this case is that the Undercover Employees were paid for their participation in the program. Reading the above cases to stand for the proposition that this is sufficient to warrant satisfying the defendant's confrontation rights is an error. What the above cases stand for is when there is substantial other evidence that the defense may utilize in impeaching, such evidence weighs against the need for further investigation by the defense in the court balancing of the parties' interests. It follows, therefore, that if the government provides little evidence to the defense, then the need for defense investigation is higher.

If it were true that providing financial compensation to a witness would be sufficient to impeach, then experts would never be relevant. Certainly, compensation is part of the impeachment, but it is the beginning, and not the end. Cross-examining on compensation alone does not provide "the opportunity to place the witness in his proper setting and put the weight of testimony and credibility to a test." *Smith*, 390 U.S. at 132. Accordingly, the balance weighs in favor of providing the defense with the names, and addresses of the witnesses so that they can conduct an independent investigation of the witness's credibility.

**B. The government's requested restrictions on questioning violate the Sixth Amendment (Proposed Protective Measure 4)**

Apart from proposing that the witnesses testify anonymously, the government proposes that the defense be precluded from questioning the witness concerning the nature and extent of the FBI's use of the Undercover Witnesses in other investigations, or information regarding the FBI's selection and training programs for undercover employees or confidential human sources. The government contends that the restrictions are necessary to protect the tradecraft used by the FBI undercover operatives. But these are the very areas that allow the defense the opportunity to place the witness in his proper setting and put the weight of testimony and credibility to a test.

The witnesses are going to testify concerning their interactions with Mr. Fong, what their impressions were of what he intended when he provided training materials, how Mr. Fong would

have known that the training was being directed or coordinated by HTS, and why they did not understand Mr. Fong's endorsement of Hamas was not independent advocacy. Their training, just like any law enforcement officer, is directly relevant to their understanding, and performance of their law enforcement duties. Had a similar restriction been applied in *El-Mezain,* the defense would have been precluded from asking witnesses about their "training and experience", factors that were critical in the Fifth Circuit finding that the defendant's Sixth Amendment rights were not violated.

Likewise, training is also relevant to whether the witnesses' actions were in conformance with the training they had received specifically. The witnesses first met the defendant on an Instagram channel where they provided their fictitious backgrounds to the defendant in order to befriend the defendant and be invited to the Mujahideen in America group that Mr. Fong later created. However, the government has not provided those Instagram conversations to the defense, presumably because they have not preserved them. Their training regarding the preservation of those conversations is directly relevant to their credibility.

The witnesses' participation in other investigations is also relevant to both the facts of this case and their credibility. From the discovery, the defense has deduced that the undercover witnesses initially learned about Mr. Fong in the context of a separate investigation. It follows that the investigation has some relevance to their decision and modus operandi in investigating Mr. Fong. Additionally, the success or failure of these investigations has relevance to the witnesses' bias, particularly where their compensation is based on their performance. If the witnesses testified in the past concerning their other investigations, then that testimony may also be relevant.

Finally, the government proposes that this Court prohibit the defense from questioning the witnesses regarding their selection, and recruitment. This prohibition flies in the face of the government's claim that providing financial compensation to the witness is sufficient to protect the defendant's right to confrontation. Specifically, if the defendant cannot place the compensation

16

received by the undercover witnesses in context, then the information is of marginal value because the defense is unable to establish the significant role that money might have in their selection, recruitment, and ultimate bias.

In summary, the proposed restrictions in protective order number 4 independent of the proposed restriction on the investigation of the witnesses by the defense violate the defendant's Sixth Amendment confrontation rights because they prohibit the defense from "opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test." *Smith*, 390 U.S. at 132

The defense would be prohibited from questioning the witness about other investigations in which they have been or may be involved; questioning which would reveal the nature or extent of the FBI's undercover techniques; training which they have received, or even asking the undercover about their place of birth.

The undercover's training is directly relevant to the offense, and the undercover's adherence to, or deviation from, their training is directly relevant to how the operation was conducted in Mr. Fong's case.

**C.   Prohibiting the defense from utilizing the online aliases of the undercovers during cross-examination and permitting undercovers to testify in a manner that prevents their facial appearance from being revealed to the public (Protective Measures 3, 6, and 9), prejudice Mr. Fong's right to due process, and violate the Federal Rules of Evidence**



Picture 1 a screen capture from a video recording of Mr. Fong meeting with the CHS that was conducted on April 24, 2020. The language used on April 24, 2020 was primarily Russian. In addition to obscuring the CHS's, facial appearance the video recording depicted in picture 1 also distorts the CHS's voice to the point that Mr. Fong and counsel are unable to verify the government's translations.

Picture 2 is a screenshot of a conversation from Mr. Fong's Mujahideen in America group chat on March 17, 2020. The government has separately furnished an unredacted copy of the chat to the defense. Prohibiting questions regarding online monikers, however is nonsensical if those same identities are to be provided to the jury as documentary evidence.

Proposed protective measures 3, 6, and 9 are a precursor to the government's introduction of video recordings, social media conversations, and audio recordings of the undercover agent's conversations with defendant Fong. From discovery and the requested protective measures, it is clear

that the government intends to attempt to introduce a redacted version of these conversations which obscures the facial features of the CHS, disguises the CHS's voice in audio recordings, and redacts the names and/or online monikers from the evidence.  Introduction of evidence in this form is not authorized under the procedures contained within CIPA or by the rules of evidence.

"CIPA generally comes into play when the defendant seeks to obtain, or plans to disclose, national security information, and the government opposes disclosure." *United States v. Sterling,* 724 F.3d 482, 515 (4th Cir. 2013), citing *United States v. Moussaoui*, 333 F.3d 509, 514 (4th Cir. 2003). "There is a stark difference between *ex parte* submissions from prosecutors which protect the disclosure of irrelevant, nonexculpatory, or privileged information, and situations in which the government seeks to use *ex parte* information in court as evidence to obtain a conviction. *United States v. Abu Ali*, 528 F.3d 210, 255 (4th Cir. 2008), s*ee also United States v. Claudio,* 44 F.3d 10, 14 (1st Cir. 1995).

The latter is present here as the government seeks to introduce evidence redacted pursuant to CIPA in an effort to prevent the disclosure of classified information as evidence of the defendant's guilt.  The introduction of classified evidence at trial is dealt with in 18 U.S.C.S. app. § 8(a) allows for "writings, recordings, and photographs containing classified information may be admitted into evidence without change in their classification status." 18 U.S.C.S. app. § 8(b) permits "[t]he court, in order to prevent unnecessary disclosure of classified information involved in any criminal proceeding, may order admission into evidence of only part of a writing, recording, or photograph, or may order admission into evidence of the whole writing, recording, or photograph with excision of some or all of the classified information contained therein, unless the whole ought in fairness be considered." "CIPA does not, however, alter the substantive rules of evidence, including the test for relevance: thus, it also permits the district court to exclude irrelevant, cumulative, or corroborative

classified evidence. Id. at 1106, 1110; see also Fed. R. Evid. 403. *United States v. Passaro*, 577 F.3d 207, 219-20 (4th Cir. 2009).

In this case, the redactions proposed by the government are not authorized by § 8(b) because they would unfairly prejudice Mr. Fong. The prejudicial effects of the suggested redactions and accompanying protective order were explained by the court in *United States v. Alimehmeti*, 284 F. Supp. 3d 477 (S.D.N.Y. 2018). In *Alimehmeti*, the government sought to obscure the images in publicly available materials, stating "[a]ny videos, photographs, or other images of the UCs that are shown in open court, or otherwise made available to the public, [will] . . . be altered to pixelate or otherwise obscure the UCs' faces". There was, however, a critical caveat because the measure did not apply "to materials viewed *only by the Court, essential courtroom personnel, the jury, the defendant and his counsel, and the Government's trial team.*" 284 F. Supp. 3d at 482 (emphasis added). The Court's understanding of the caveat was that the government proposed showing the unpixelated videos to the jury, defendant, and counsel on their screens, while simultaneously broadcasting a pixelated video to the courtroom. The government further proposed that the undercovers testify in light disguise or behind a partition to prevent their recognition. The Court ultimately found that this measure was not going to work, as explained above, and held that the differences in light disguise and what the jury saw on the video would necessarily create prejudice. The government now seeks to eliminate this issue by pixelating the image that everyone sees. This is not a solution, as the Court noted in *Alimehmeti* "the jury would likely discern the fact of a UC's disguise—including to the extent the UC presented differently in the court than in a video recording—the jury might infer a potential for danger or retaliation against the UC and draw negative inferences adverse [to the defendant]". *United States v. Alimehmeti,* 284 F. Supp. 3d at 489. If the slight difference between light disguise and a video is sufficient to cause a potential for prejudice, which may or may not be noticed, the

pixilation is a flashing red light improperly suggesting that the defendant poses a potential for danger or retaliation against the undercovers.

If a security measure is inherently prejudicial, it may be employed "only where justified by an essential state interest specific to each trial." *Holbrook v. Flynn*, 475 U.S. 560, 568-69, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986). In the present case, the security measures are not justified. First, the disclosure of the on-line monikers of the undercover witnesses does not prejudice their abilities to participate in other investigations. The investigation in question was conducted more than two years ago, and it is highly unlikely that the undercovers are still utilizing he same monikers, particularly because Mr. Fong, as a U.S. Marine was uniquely identifiable online, and this trial has received some publicity following his arrest. As a result, it would be fool hearted for the undercover witnesses to use the same monikers in subsequent sting operations. In the unlikely event that the undercovers are still involved in the operation that would be jeopardized by the disclosure of their monikers in open court, the non-prejudicial remedy would be to continue Mr. Fong's trial to such a time when the operation is complete, rather than prejudice him, and potentially confuse the jury through the extensive use of redactions.

Likewise, with regards to obscuring the CHS's facial features and voice in the audio and video recording proposed to be played in the court, the specific circumstances of this case do not justify this extreme measure. The CHS is part of the NYPD, and his work presumably focuses within the jurisdiction of the New York City authorities. New York is more than 3,000 miles from Orange County, and it strains all credulity that exposure of his features and voice to an Orange County jury would jeopardize his ability to work in New York. The better alternative is partial closure of the courtroom combined with redactions of the public record of the evidence presented to the jury.

Moreover, the government's proposed protective order backdoors admission of altered recording evidence under Fed. R. Evid. 1002 as a duplicate. Courts have allowed enhancements to

videos where the enhancement makes it easier to identify the persons in the video, finding that the enhancement changes the image only in a metaphysical sense and has no effect on the accuracy of the image. *See United States v. Seifert*, 351 F. Supp. 2d 926, 928 (D. Minn. 2005). But no court has ever permitted a video to be redacted to *prohibit* the finder of fact from identifying the persons in the image. The plain language of Fed. R. Evid. 1001(4) defines a duplicate as an accurate reproduction of the original. The government's proposal fails to meet this requirement because it would not be an accurate reproduction. Further, Fed. R. Evid. 1003 prohibits the introduction of a duplicate under circumstances where it would be unfair. As the *Alimehmeti* Court explained, the duplicate here would clearly be unfair to the defendant because it would suggest that he is dangerous.

Denying the government's request to obscure the face of the undercover or undercovers in the videos but granting the request of presenting themselves in light disguise presents exactly the same prejudice as the court described in *Alimehmeti*—it also red flags that there is a security concern regarding the undercover, thereby prejudicing the jury.

The solution here, as it was in *Alimehmeti*, is to partially close the courtroom during the undercovers' testimony. This solution presents minimal prejudice to the defendant. And was recently again employed in *United States v. Chaoqun*, No. 18 CR 611, 2022. The government's proposed protective measure 8, wherein the government indicates they will apply for a partial closure of the courtroom, during the undercover operative testimony, tacitly admits that the government knows that partial closure is the standard practice to protect against visual recognition. Nevertheless, they continue to submit this request in the hopes that some court will be willing to grant the protective measuring allowing them to *sub rosa* suggest to the jury that the defendant is dangerous and likely to retaliate against the undercover operative.  For the reasons stated above, the Court should deny the government's request for partial court closure.

### III.     CONCLUSION

For the reasons set forth above the defense respectfully requests the following:

This Court should permit the undercover operatives to testify using pseudonyms with the condition that defense counsel is furnished with the true names of any undercover operative testifying under a pseudonym. This Court should permit the undercover operatives to testify using pseudonyms with the condition that defense counsel is furnished with an address in the form of the city, and state of where they reside, with the restriction that the counsel cannot share with the defendant the undercover operative's true name. (Alternative to Proposed Protective Measure 1).

This Court should grant the government's request for limiting questioning on personal identifying information, only in so much that the defense is restricted from asking the undercover operatives their true name, address, and other immediate identifiable information.  The defense respectfully submits that they should be permitted to ask all other questions e.g. education, country of birth, whether the undercover operative had any prior dealing with law enforcement that did not result in arrest, undercover operative immigration status, or any other personal information that is relevant to the undercovers bias or credibility, recruitment, and training. (Alternative to Proposed Protective Measures 2, and 4).

The defense respectfully submits that this Court should prohibit the government from entering any evidence that has been redacted removing the alias, online moniker, or personas of an undercover witness, and deny the government's request to prohibit questioning regarding the same. (Alternative to Proposed Protective Measure 3).

The defense does not oppose partial closure during the Undercover Witness's testimony.  The defense does oppose, however, full closure, in favor of partial closure wherein the defendant and his non-testifying family members may be present. (Alternative to Proposed Protective Measure 5).

1

2

3

The defense respectfully submits that the Court should deny the government's request that the Undercover Witnesses testify using a light disguise in favor of partial closure. (Alternative to Proposed Protective Measure 6).

4

5

6

7

The defense does not oppose the government's request to permit the undercover operative to use a nonpublic entrance/exit to the courthouse and the courtroom, nor does the defense oppose the prohibition of all non-official recording and photographic devices during the testimony of the undercover witnesses. (Alternative to Proposed Protective Measures 7 and 8).

8

9

10

11

12

The defense respectfully submits that this Court should deny the government's request to prohibit public disclosure of the witnesses' audio, or video recording, with respect to evidence offered in court for the jury's benefit, and instead permit redaction of the publicly available evidence. (Alternative to Proposed Protective Measure 9).

13

14

Respectfully submitted this 4th Day of November 2022.

15

16

/s/ CHARLES SWIFT
Charles D. Swift
Constitutional Law Center for
Muslims in America (CLCMA)
100 N. Central Expy, Suite 1010
Richardson, TX 75080
(972) 914-2507
*Pro Hac Attorney for Defendant*

17

18

19

20

/s/ KARREN KENNEY
Karren Kenney
Kenney Legal Defense
2900 Bristol Street, Suite C204
Costa Mesa, CA 92626
(855) 505-5588
*Attorney for Defendant*

21

22

23

24

25

26

27

28