E. MARTIN ESTRADA
United States Attorney
CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, National Security Division
CHRISTINE M. RO (Cal. Bar No. 285401)
SOLOMON KIM (Cal. Bar No. 311466)
Assistant United States Attorneys
Terrorism and Export Crimes Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-4496
     Facsimile: (213) 894-2927
     E-mail:    Christine.Ro@usdoj.gov
                Solomon.Kim@usdoj.gov

MATTHEW G. OLSEN
Assistant Attorney General
National Security Division
JOHN CELLA (D.C. Bar No. 1035356)
Trial Attorney
Counterterrorism Section
     950 Pennsylvania Ave, NW
     Washington, DC 20530
     Telephone: (202) 305-1601
     Email:     John.Cella@usdoj.gov


Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-146-DOC |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT JASON FONG; DECLARATION OF CHRISTINE M. RO |
| v. | |
| | |
| JASON FONG, | |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorneys Christine M. Ro and

Solomon Kim, and National Security Division Counterterrorism Section

Trial Attorney John Cella, hereby files its Sentencing Position for

Defendant Jason Fong in the above-captioned case.

This filing is based upon the attached memorandum of points and

authorities, declaration of Christine M. Ro, Exhibits A and B filed

under seal, the files and records in this case, the Presentence

Investigation Report, the Recommendation Letter, and such further

evidence and argument as the Court may permit.

Dated: November 20, 2023          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, National Security Division


_____/s/_____
CHRISTINE M. RO
SOLOMON KIM
Assistant United States Attorneys

JOHN CELLA
Trial Attorney
Counterterrorism Section
National Security Division

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**Table of Contents**

I.   INTRODUCTION....................................................1

II.  STATEMENT OF FACTS.............................................2

     A.   Relevant Conduct and Background..........................2

          1.   Defendant Created an Online Chat Group Named
               "Mujahideen in America" that Included Person 1
               and the OCE.........................................2

          2.   Defendant Created Another Online Chat Group
               Called "Brotherhood" that Included the OCE..........4

          3.   Defendant Possessed Loaded Firearms in His
               Bedroom at the Time of His False Statements to
               the FBI.............................................6

     B.   Defendant Made False Statements to the FBI...............8

III. THE PRESENTENCE INVESTIGATION REPORT..........................9

IV.  DEFENDANT'S RELEVANT CONDUCT DOES NOT DISQUALIFY HIM FOR
     THE NEWLY-EFFECTIVE ZERO-POINT OFFENDER ADJUSTMENT, BUT IT
     MERITS A HIGH-END SENTENCE...................................10

V.   GOVERNMENT'S SENTENCING RECOMMENDATION........................12

     A.   Nature and Circumstances of the Offense.................12

     B.   Defendant's Personal History and Characteristics........13

     C.   The Need to Protect the Public, Reflect the
          Seriousness of the Crime, Deter Defendant and Others,
          and Provide Just Punishment.............................15

VI.  CONCLUSION....................................................17

# Table of Authorities

Page(s)

## Cases

Pepper v. United States,
  562 U.S. 476 (2011) .............................................. 13

United States v. Christensen,
  732 F.3d 1094 (9th Cir. 2013) ................................... 13

United States v. Contreras,
  No. CR 16-00740 HG-01, 2017 WL 2563222 (D. Haw. June 13, 2017) ... 13

United States v. Lawton,
  193 F.3d 1087 (9th Cir. 1999) ................................... 11

United States v. Navarro,
  756 F. App'x 702 (9th Cir. 2018) ................................ 11

## Statutes

18 U.S.C. § 3553(a) ...................................... 2, 12, 15

18 U.S.C. § 3661 ................................................. 13

## Other Authorities

U.S.S.G. § 2J1.2 ................................................. 9

U.S.S.G. § 3E1.1 ................................................. 9

U.S.S.G. § 4C1.1 ............................................. 10-11

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3

From February 2020 through May 2020, defendant Jason Fong ("defendant") created and controlled encrypted online chat groups where he disseminated information regarding chemical weapons, improvised explosive devices ("IEDs"), and tactical combat techniques to individuals he invited based on their professed support for extremist Islamist ideology and terrorist organizations.  One of those individuals defendant invited into the chat group was a minor ("Person 1") who told defendant he wanted to fight for the designated foreign terrorist organization Hay'at Tahrir Al-Sham ("HTS") in Syria, and that he was interested in "blowing up" a military base in the United States.  Another of the individuals defendant invited into the chat group was an online covert employee operating as part of an FBI investigation (the "OCE").  Believing that the OCE was a likeminded extremist intending to travel to Syria to engage in violent jihad, defendant met with the OCE in person over the course of two days to discuss their plans.

When confronted by the FBI in connection with the FBI's investigation of defendant and his chat groups--an investigation involving international terrorism--defendant lied to minimize his own conduct as well as the conduct of others in the chat group, and for his lies, defendant pled guilty to the single-count Second Superseding Information, pursuant to a plea agreement, charging defendant with Making a False Statement Involving International Terrorism, in violation of Title 18, United States Code, Section 1001(a)(2).

Based on the sentencing factors in 18 U.S.C. § 3553(a) and for the reasons set forth below, the United States recommends that defendant be sentenced to 46 months of imprisonment, followed by three years of supervised release, and a $100 special assessment.

## II.   STATEMENT OF FACTS

### A.   Relevant Conduct and Background

#### 1.   Defendant Created an Online Chat Group Named "Mujahideen in America" that Included Person 1 and the OCE

From February 2020 through early May 2020, at the same time as he was serving as a Sergeant in the U.S. Marine Corps Reserve, defendant communicated with Person 1, the OCE, and others in an encrypted online chat group titled "Mujahideen in America," which defendant had created, administered, and personally invited individuals to join. (PSR ¶¶ 10-11, 126.)  Defendant also communicated online in direct messages with both Person 1 and the OCE during this time. (Id.)  In those communications, Person 1, the OCE, and defendant discussed certain terrorist groups as well as Person 1's and the OCE's desire to fight on behalf of those groups, including HTS, in Syria or elsewhere. (Id. ¶¶ 11, 13.)  In addition to communicating with the OCE online, defendant met in person with the OCE on April 24 and 25, 2020 in Orange County and they discussed shared plans to travel to Syria to fight and train other fighters on behalf of Malhama Tactical, a paramilitary group aligned with HTS and other jihadist organizations in Syria that defendant had discussed in the "Mujahideen in America" chat group. (Id. ¶¶ 38-42.)

In some of defendant's communications in the "Mujahideen in America" chat group, he also provided instructional information regarding chemical weapons, IEDs, and tactical combat techniques,

2

1  knowing that Person 1 and others desired to fight with terrorist

2  groups.  (Id. ¶¶ 27-31.)  Specifically, during a March 17, 2020

3  discussion in the chat group, defendant sent Person 1 and others

4  materials from the "Improvised Munitions Black Book," which is

5  based, in part, on the 1969 U.S. Army "TM 31-210 Improvised

6  Munitions Handbook."  (PSR ¶ 27.)  Those materials contained

7  information regarding the making of IEDs and chemical weapons.

8  (Id.)  The materials sent by defendant stated that when various

9  chemicals were combined, they could cause breathing issues and

10 chest pain.  (Id.)  The materials also contained recipes for

11 making IEDs.  (Id.)  Defendant cautioned Person 1 and the other

12 participants in the chat group about handling explosives

13 materials, warning, "please don't send yourself to Allah so soon

14 from a dumb mistake."  (Id.)

15      Shortly thereafter, on March 24, 2020, Person 1 stated to

16 defendant and others in the chat group that "me and the boys blowing

17 up keesler afb [Air Force Base] near me."  (Id. ¶ 28.)

18

19

20

21                       

22

23

24

25

26

27

28 Shortly after receiving this message, defendant sent military

1  tactical instructions for entering a building while minimizing
2  losses, telling Person 1 and others to "take it, save it, study it."
3  (Id.)  Approximately a week later, on April 1, 2020, defendant sent
4  Person 1 and others in the chat group additional information from the
5  "Improvised Munitions Black Book."  (Id. ¶ 30.)  The screenshots sent
6  by defendant to the chat group contained more information regarding
7  the making of IEDs and chemical weapons, including instructions on
8  how to make motor scrap mines, nail grenades, sodium chlorate and
9  sugar or aluminum explosives, fertilizer explosives, nitric acid,
10 improvised black powder, potassium nitrate, plastic explosive filler,
11 a chemical fire bottle, sodium chlorate, a recoilless launcher, a
12 grenade launcher, and a pipe hand grenade.  When the OCE asked
13 whether the other members of the chat group should make these
14 explosives, defendant responded, "it stays in this chat of ours like
15 a library so that if you ever need to, you know where to look."  (Id.
16 ¶ 30.)

17      Defendant also made other statements during the relevant
18 timeframe regarding his animosity toward the United States and
19 Israel, hatred of the LGBTQ community ("they must be eradicated"),
20 willingness to kill U.S. military service members and law enforcement
21 agents, and desire to die as a martyr.  (Id. ¶¶ 16, 32-37.)
22 Although he was a Marine during the time of his relevant conduct,
23 defendant stated that the U.S. Army were "just terrorists.  Marines
24 are as-as well."  (Id. ¶ 16.)

25           2.   Defendant Created Another Online Chat Group Called
                  "Brotherhood" that Included the OCE
26

27      Defendant also used another online chat group that he had
28 created—-and to which he had invited the OCE--to solicit

4

cryptocurrency donations for the designated foreign terrorist organization Hamas shortly before he made his false statements to the FBI. (Id. ¶¶ 24-26.) Specifically, on May 18, 2020, defendant posted a link to a fundraising website for the Al-Qassam Brigades, Hamas' military wing, in a separate encrypted online group chat he had created, titled "Brotherhood." (Id.) The link allowed for the transmittal of Bitcoin cryptocurrency to online wallets associated with the Al-Qassam Brigades. (PSR ¶ 25.) Defendant also posted a link to a video that provided a "how-to" guide for users to complete the Bitcoin transmittal anonymously. (Id.) Defendant posted "Give them Sadaqah," referencing the concept of charity or donation, under the links. (Id.) Referring to Hamas, defendant also stated, that Hamas takes "Bitcoin and they explain the whole process on how to help out the Palestinian Resistance... This is a cause I am sure we can all get behind" and "I know the majority of us are either individual workers, college students or the like. But I want us to get involved with Blockchain or some other digital currency trading platform (make an account with a common password amongst us), so we can potentially give Sadaqah to groups we support anonymously." (Id.)

     That same day, after sending the Hamas fundraising link in the chat group, defendant communicated with the OCE via a direct message exchange. The OCE asked if sending money to Hamas was possible, to which defendant responded, "of course we can" and that he was "trying to find out more about cryptocurrency" because it was the safest way to send money to help "our brothers abroad." Defendant also stated that "it is very difficult to fight there because Israeli scumbags are in power" and that Israel's "weapons and structure are very

complex." (<u>Id.</u> ¶ 26.)

3. <u>Defendant Possessed Loaded Firearms in His Bedroom at the Time of His False Statements to the FBI</u>

During a search of defendant's bedroom at the time of his arrest on May 20, 2020, at the same time as defendant made his false statements outlined below, law enforcement found an unserialized AR-15 type assault rifle, a bolt-action rifle with a scope, two handguns, nine high-capacity handgun and rifle magazines, and several thousand rounds of ammunition. (<u>Id.</u> ¶¶ 43-48.) The assault rifle was loaded with a round of 5.56mm ammunition in the chamber and had a high-capacity magazine with a second, high-capacity magazine taped to it. (<u>Id.</u> ¶ 44.) The assault rifle was found on an improvised rifle rack on the side of his bed. (<u>Id.</u>) This is a picture of how the assault rifle looked after being rendered safe by law enforcement:



(<u>See</u> Declaration of Christine Ro ("Ro Decl."), ¶ 3.) Defendant discussed this same assault rifle and the improvised rifle rack he had constructed on the side of his bed with Person 1 in the

"Mujahideen in America" chat group on April 22, 2020.  (Id. ¶ 2, Exhibit A (filed under seal).)

One handgun was found under defendant's pillow on his bed, loaded with a magazine and a round in the chamber.  (Id. ¶ 45.) Defendant had also stored two high-capacity handgun magazines in his bedroom, both of which were loaded.  (Id. ¶ 46.)  One of the magazines was loaded with four hollow point rounds.  (Id.)  This is a picture of the loaded handgun found under defendant's pillow:



(See Ro Decl. ¶ 3.)

Law enforcement also found an armor plate carrier containing body armor next to his bed and a gas mask in his bedroom.  (PSR ¶ 45.)  Although at the time, defendant was a Marine reservist, the gas mask and armor plate carrier found in his bedroom were not issued by the military.  (Id.)  In addition to the firearms and armor, law enforcement also found Nazi paraphernalia in defendant's bedroom during the search, including a certificate that appeared to be an affirmation of allegiance to the Nazi Waffen SS, written in German with defendant's name at the top.  (Id. ¶ 48.)  This is a picture showing the gas mask, ammunition, and Nazi paraphernalia in

defendant's bedroom closet on the day he lied to the FBI:



(See Ro Decl. ¶ 3.)

**B.    Defendant Made False Statements to the FBI**

When the FBI confronted defendant about the "Mujahideen in America" chat group during a May 20, 2020 recorded interview, defendant lied about his online communications and his in-person meeting with the OCE, the conduct which forms the basis for the Second Superseding Information to which defendant has pled guilty. (Plea Agreement ¶ 10.)

8

During the interview, after being advised of his <u>Miranda</u> rights and being advised it was a crime to lie to the federal government, defendant knowingly and willfully made the following materially false statements, among others, to the FBI:

Defendant falsely stated that he had not had contact with anyone who expressed interest in joining a foreign terrorist organization. In fact, defendant knew that Person 1 had told defendant that he wanted to join HTS, which defendant knew to be a foreign terrorist organization.  Defendant also falsely stated that he had never met in person with any of the individuals that he communicated with in the "Mujahideen in America" chat group.  In fact, defendant knew that he had met in person with the OCE on April 24 and 25, 2020, less than a month earlier.  (<u>Id.</u>)

## III. THE PRESENTENCE INVESTIGATION REPORT

On July 24, 2023, the USPO disclosed the PSR and its recommendation letter.  (Dkt. 250 "PSR Ltr."; Dkt. 251 "PSR.")  The USPO found that defendant's total offense level was 23, based on the following calculations:

| | | |
|---|---|---|
| Base Offense Level: | 14 | U.S.S.G. § 2J1.2 |
| Offense Involves International Terrorism: | +12 | U.S.S.G. § 2J1.2(b)(1)(C) |
| Acceptance of Responsibility: | -3 | U.S.S.G. § 3E1.1 |
| Total Offense Level: | 23 | |

(PSR ¶¶ 75-86.)  With a total offense level of 23 and a criminal history category of I (for zero criminal history points), the USPO calculated defendant's guidelines range to be 46 to 57 months imprisonment.  (<u>Id.</u> ¶ 146.)  The USPO recommended a sentence of 46 months imprisonment, followed by three years of supervised release,

1  and a $100 special assessment.  (PSR Ltr.)  As explained below, after

2  the PSR was filed, an amendment to the Sentencing Guidelines went

3  into effect that calls for certain defendants with a zero-point

4  criminal history to receive a two offense-level decrease in their

5  guidelines calculation.  See § 4C1.1.  The government agrees with

6  USPO's guidelines calculations in the PSR, but also accepts that

7  defendant qualifies for the two offense-level reduction under the

8  newly-effective § 4C1.1.

9     **IV.  DEFENDANT'S RELEVANT CONDUCT DOES NOT DISQUALIFY HIM FOR THE**
       **NEWLY-EFFECTIVE ZERO-POINT OFFENDER ADJUSTMENT, BUT IT MERITS**
10      **A HIGH-END SENTENCE**

11        Under the Amendments to the Sentencing Guidelines, which became

12  effective on November 1, 2023, defendants with a criminal history

13  score of zero should receive a two offense-level decrease in their

14  guidelines calculation, provided they meet a set of enumerated

15  criteria, including that they "did not use violence or credible

16  threats of violence in connection with the offense" (§ 4C1.1(a)(3));

17  and "did not possess, receive, purchase, transport, transfer, or

18  otherwise dispose of a firearm or other dangerous weapon (or induce

19  another participant to do so) in connection with the offense"

20  (§ 4C1.1(a)(7)).  Defendant filed an objection to the PSR on November

21  11, 2023, arguing that he satisfies the criteria in the newly-

22  effective § 4C1.1 and that his guidelines range should be adjusted to

23  reflect the two offense-level reduction provided in that amendment.

24  (Dkt. 254).  The government accepts that the defendant qualifies for

25  the § 4C1.1 reduction in this case, but his conduct merits a sentence

26  at the top of the as-adjusted guidelines range.

27        As an initial matter, defendant's "relevant conduct" for

28  purposes of determining his guidelines range includes his threats of

10

violence and his possession of firearms as described above.  See § 1B1.3 ("Relevant Conduct"); see also § 6B1.2(a) (policy statement) (". . . a plea agreement that includes the dismissal of a charge or a plea agreement not to pursue a potential charge shall not preclude the conduct underlying such charge from being considered under the provisions of § 1B1.3 . . . in connection with the count(s) of which the defendant is convicted."); United States v. Lawton, 193 F.3d 1087, 1091 (9th Cir. 1999) ("§ 6B1.2(a) explicitly provides" that "conduct dismissed or uncharged as part of a plea bargain" may "be considered 'Relevant Conduct' under § 1B1.3."). That same conduct should also be considered by the Court when determining an appropriate sentence.  See § 1B1.4 ("Information to Be Used in Imposing Sentence").  However, the government does not contend that defendant used credible threats or possessed firearms "in connection with" his offense of conviction under section 1001(a)(2) for purposes of § 4C1.1.[1]

After adjusting defendant's guidelines range by applying the two offense-level decrease in § 4C1.1, defendant's offense level is 21 and his resulting guidelines range is 37 to 46 months imprisonment. For the reasons discussed below, the government recommends a sentence

---

[1] While § 4C1.1 went into effect only earlier this month, when determining whether a defendant possessed a firearm "in connection with another felony" for purposes of the firearms enhancement under § 2K2.1(b)(6)(B), an analogous context, courts have considered whether "the firearm or ammunition facilitated (or had potential to facilitate) another felony offense," and whether the physical possession of a firearm was possessed in a manner (e.g., in proximity to contraband) that had some potential emboldening role in a defendant's felonious conduct.  See United States v. Navarro, 756 F. App'x 702, 705 (9th Cir. 2018).  Here, the government does not contend that the defendant made threats or possessed firearms in a manner to facilitate or embolden the false statements he made to the FBI on May 20, 2020, the basis for his offense of conviction.

11

of 46 months imprisonment, the top of the adjusted guidelines range.

**V.   GOVERNMENT'S SENTENCING RECOMMENDATION**

As in every case, the Court must fashion a sentence that justly balances the seriousness of the offense against the history and characteristics of the defendant, considering both the mitigating and aggravating factors.  See 18 U.S.C. § 3553(a).  Here, based on defendant's conviction and the evidence described above, the government recommends a high-end sentence of 46 months imprisonment, followed by three-years of supervised release, and a $100 special assessment.

**A.   Nature and Circumstances of the Offense**

With regard to the nature and circumstances of the offense, defendant made false statements to federal agents investigating international terrorism, including individuals discussing carrying out an attack on an U.S. Air Force base and seeking to join terrorist groups abroad.  Prior to the FBI interview, agents were aware of defendant's (1) status as a military member; (2) possession of multiple firearms, including an assault rifle; and (3) defendant's online threats of violence, to include animosity toward the United States and Israel, hatred of the LGBTQ community ("they must be eradicated"), willingness to kill U.S. military service members and law enforcement agents, and desire to die as a martyr.  When questioned, defendant lied to law enforcement.  Defendant's lies not only minimized his own conduct in the "Mujahideen in America" chat group that he created and controlled, but they were also aimed to divert attention away from other potential FBI subjects who were engaged in online hate speech.  The conduct that defendant sought to minimize included his creation and use of encrypted online chat

12

groups to provide weapon-making instructions to those who expressed
an interest and desire to fight on behalf of terrorist organizations.
Further, defendant minimized the conduct of others.  And defendant
used one of his chat groups to fundraise for the military wing of
Hamas, a group defendant admitted to knowing was a designated foreign
terrorist organization, in an effort to aid Hamas' fight against what
he termed as "Israeli scumbags."  (PSR ¶¶ 26, 54.)

The Court can and should consider all this relevant conduct that
forms the backdrop for defendant's lies when imposing a sentence.
See 18 U.S.C. § 3661; § 1B1.4 ("[n]o limitation shall be placed on
the information concerning the background, character, and conduct of
a person convicted of an offense which a court of the United States
may receive and consider for the purpose of imposing an appropriate
sentence"); see also United States v. Christensen, 732 F.3d 1094,
1102 (9th Cir. 2013); United States v. Contreras, No. CR 16-00740 HG-
01, 2017 WL 2563222, at *3 (D. Haw. June 13, 2017) (where corrections
officer convicted under section 1001 for lying about relationships
with inmates, court allowed victim inmate's allocution at sentencing
and found "[t]he relationship with A.G. is part of the conduct
Defendant lied about to Department of Justice investigators. A.G.'s
allocution provides greater insight into Defendant's 'background,
character, and conduct'. . .[and] allows the Court to appropriately
consider the Defendant's sentence and evaluate the seriousness of the
conduct, the need for deterrence, and threat to the public," citing
Pepper v. United States, 562 U.S. 476, 488 (2011)).

**B.   Defendant's Personal History and Characteristics**

The Court must also consider defendant's personal history and
characteristics.  In mitigation, defendant has no criminal history

13

1   and has accepted responsibility for the offense and provided a

2   written statement to the USPO further accepting "full responsibility

3   for my conduct on May 20th, 2020." (PSR ¶ 71.) These factors are

4   already incorporated in the guidelines calculation, including in the

5   adjustment provided in § 4C1.1. And although defendant has accepted

6   responsibility for his lies that day, the evidence of his conduct and

7   personal history goes well beyond. At the same time as he was

8   providing bomb-making instructions to Person 1, the OCE, and others

9   in his chat groups, providing training and guidance that could have

10  lethal consequences, defendant was a Marine reservist with weapons

11  training and who periodically reported for duty at Camp Pendleton.

12  (Id. ¶¶ 126-27.) And despite claiming in certain instances that he

13  was not a terrorist, he also ensured that the bomb-making

14  instructional materials he disseminated would "stay[] in this chat of

15  ours like a library so that if you ever need to, you know where to

16  look," knowing that Person 1 had referenced "blowing up" a U.S. Air

17  Force base only a week earlier. (Id. ¶¶ 28-30.) Defendant's

18  sustained willingness to secretly train and counsel individuals he

19  knew to be hostile to the United States and the military in which he

20  then served, and then lie to the FBI about it, should be weighed

21  heavily by the Court.

22      In mitigation, the USPO considered defendant's diagnoses of

23  autism spectrum disorder ("ASD"). The government refutes the

24  diagnosis.[2] After the government's expert spent hours evaluating

25  defendant, the forensic psychiatrist submitted a thorough report and

26  concluded that defendant does not meet the criteria for ASD. (See Ro

27  _____

28      [2] The government provided its own evaluation and report to the
    USPO on July 24, 2023.

Decl. ¶ 4, Exhibit B (filed under seal).) "[Defendant]'s presentation is not consistent with even the mildest level of [ASD] severity." (Id. at 69.) As the expert notes, defendant does not speak in simple sentences, he showed no evidence of "markedly odd, nonverbal communication," defendant appears to have coped adequately with multiple life changes, and defendant's alleged deficits appears to have gone mostly unnoticed in his educational and military experiences. (Id.) Even if defendant had a mild form of ASD at the time of the offense, it is not a mitigating factor. Contrary to the defense's suggestion that he was "vulnerable to exploitation," (PSR ¶ 114), the government's expert notes that defendant "took an active role throughout these events, from the formation of group chats, the selection of educational materials, and recommendations to donate money to Hamas." (Ex. B at 76.)

Surprisingly, defendant argues that his condition makes him susceptible to exploitation despite his successful career in the Marine Corps where defendant achieved the rank of Sergeant. But there is no question that defendant knew he was committing a crime when he lied to the FBI and that he understood the seriousness of lying to the FBI in a terrorism investigation.

> **C.  The Need to Protect the Public, Reflect the Seriousness of the Crime, Deter Defendant and Others, and Provide Just Punishment**

A significant term of imprisonment and supervised release is also required here to promote the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). Defendant's demonstrated desire and ability to support terrorist organizations and train others who would fight for those organizations, not to mention his references to "dying here violently," (Id. ¶ 33), indicate that he has the potential to present

a continuing danger to the public and must be deterred.  As his

months of communications with Person 1, the OCE, and others reflect,

he desired to "actually wage Jihad against the US Gov" and insisted

"we need a civil war" before he lied to the FBI.  (Id. ¶¶ 32, 37).[3]

With these goals in mind, he armed himself and others seeking to

engage in violence, including by accumulating multiple firearms,

ammunition, and high-capacity magazines.  (Id. ¶¶ 43-47).  He even

built an AR-15 style assault rifle with parts he purchased on the

internet, then shared photographs and information about it with the

OCE.  (Id. ¶¶ 32, 57).  The combination of defendant's extremism and

his demonstrated expertise, training, and ability to acquire the

means to engage in violence weigh in favor of a high-end sentence of

imprisonment and term of supervised release.  Such a sentence is

necessary not only to adequately protect the public, but also to

deter similar conduct by defendant or others in the future.

The sentence must satisfy society's need to reflect the

seriousness of the offense, promote respect for the law, provide just

punishment for the offense, afford adequate deterrence, and protect

the public.  After communicating with Person 1, the OCE, and others

regarding terrorist groups and lethal weaponry for months, defendant

lied to the FBI to hide and minimize his and others' conduct.  A

high-end sentence of 46 months imprisonment, followed by three years

_____

[3] Should defendant claim that this or similar statements were
insincere, or that he actually rejected violent jihad when he told
the members of the "Brotherhood" chat group that he disagreed with
the killing of innocents during an online conversation with a
purported HTS fighter on May 9, 2020, (PSR ¶ 22-23), note that
defendant made his statement regarding waging jihad against the U.S.
government subsequently on May 10, 2020.  (Id. ¶ 37).

of supervised release, and a special assessment of $100 is appropriate.

**VI.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose the following sentence: 46 months of imprisonment, followed by three years of supervised release, and a special assessment of $100.